THIRTEENTH JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF VALENCIA


GILBERT TORRES, JR.,

       Petitioner,

v.

                        No. D-1314-CR-2001-483

JOE ROMERO, Warden,
Central New Mexico Correctional Facility,

       Respondent.


## PETITION FOR WRIT OF HABEAS CORPUS

The Petitioner, GILBERT TORRES, JR., by and through his attorney, Todd Hotchkiss of Frechette & Associates, P.C., hereby files this petition for a writ of habeas corpus pursuant to Rule 5-802(D)(1), N.M.R.A. 2006.

This petition seeks to vacate, set aside, or correct an illegal sentence and order of confinement for second-degree murder and tampering with evidence on the grounds that MR. TORRES was denied his state and federal constitutional rights to adequate and effective assistance of counsel, due process of law, protections against unlawful searches and seizures, and a fair trial. MR. TORRES seeks to set aside his convictions and sentence and to obtain a new trial on all of the charges contained in the original indictment which resulted in a conviction.

In support of this petition, counsel states:

1

1.   **Respondent's Name and Title, and Petitioner's Place of Confinement:**   GILBERT TORRES, JR. (#58623) is imprisoned or otherwise restrained at Central New Mexico Correctional Facility, P.O. Drawer 1328, Los Lunas, New Mexico  87031 by Joe Romero, Warden of said facility, who is also Respondent in this action pursuant to Rule 5-802(B)(1) & (2).

2.   **Nature of Proceedings:**   In this matter, <u>State of New Mexico v. Gilbert Torres, Jr.</u>, Thirteenth Judicial District Court No. D-1314-CR-2001-483, MR. TORRES was convicted in February of 2003 by a jury of the second-degree murder of Ms. Pamela Pace and tampering with evidence on December 3, 2001.  The State's theory was that MR. TORRES murdered Ms. Pace in MR. TORRES' home and covered up the murder by claiming that the deceased committed suicide.  Judge John W. Pope presided over the trial, the jury found MR. TORRES not guilty of first-degree murder, guilty of second-degree murder and tampering with evidence, and Judge Pope sentenced MR. TORRES to 16½ years in prison.  The Thirteenth Judicial District Court in Valencia County is located at the Valencia County Courthouse, P.O. Box 1089, Los Lunas, New Mexico 87031.

3.   **Judgment and Sentence:**   The Judgment, Sentence and Commitment ordered MR. TORRES into the custody of the New Mexico Department of Corrections for service of MR. TORRES' sentence of 15 years for the second-degree murder conviction and 18 months

consecutive for the tampering with evidence conviction.

4. **Prior Appeal or Prior Habeas Corpus Petitions, and Exhaustion of Available Remedies:** Pursuant to Rule 5-802(B)(4), no other prior applications, petitions, or motions for post-conviction relief have been filed as pertains to this imprisonment. Regarding MR. TORRES' direct appeal of his conviction and sentence, MR. TORRES exhausted all other available remedies as required by Rule 5-802(B)(3) & (4):

A. MR. TORRES appealed to the Court of Appeals for the State of New Mexico in <u>State of New Mexico v. Gilbert Torres, Jr.</u>, No. 24,103, which resulted in a published opinion reported at 2005-NMCA-070, 137 N.M. 607, 113 P.3d 877.

B. The grounds upon which MR. TORRES appealed were:

> On appeal, Defendant argues that plain error occurred due to his trial counsel's failure to file a motion to suppress evidence because the police did not obtain a search warrant prior to collecting evidence from Defendant's home. In the alternative, Defendant argues that his counsel was ineffective in failing to file the motion. Additionally, Defendant argues that the trial court erred in allowing a witness to testify to a statement made by the victim over Defendant's hearsay objection, that it erroneously admitted testimony of two police officers, and that statements made by the prosecutor during opening statements and closing arguments constituted fundamental error.
>
> <u>State v. Torres</u>, 2005-NMCA-070, ¶1, 137 N.M. 607, 113 P.3d 877.

C. The result of the appeal was that the Court of Appeals, in a April 7, 2005 decision, affirmed MR. TORRES'

convictions and sentence.

D.   On April 27, 2005, MR. TORRES filed in the Supreme Court of the State of New Mexico a petition for writ of certiorari to the Court of Appeals in No. 29,194.  The State filed a response on May 13, 2005.

E.   On May 20, 2005, the Supreme Court denied MR. TORRES' petition for writ of certiorari.  That denial is reported at 2005-NMCERT-5, 137 N.M. 522, 113 P.3d 345.

F.   The claim that trial counsel provided ineffective assistance of counsel when not objecting to a prior statement by the decedent based on the confrontation clause of the Sixth Amendment to the United States Constitution is distinctly different from challenging the admission of the statement as not being a statement of the victim's state of mind under Rule 11-803(C), N.M.R.A.

5.   **Previously Raised Claim:**  Pursuant to Rule 5-802(B)(5), one claim herein was raised on direct appeal.  Regarding the claim of ineffective assistance of counsel because trial counsel did not file a motion to suppress evidence, the Court of Appeals ruled that the record "is devoid of facts from which we could determine the effectiveness of Defendant's counsel" and "he has also not shown that his counsel's failure to file the motion prejudiced his defense". State v. Torres, 2005-NMCA-070, ¶¶ 14 & 18.  The ends of justice require consideration of this claim

4

because the Court of Appeals refused to address the issue on direct appeal because the record was insufficient. A sufficient record must be made on the issue and MR. TORRES should be allowed to attempt to establish prejudice at an evidentiary hearing. Kimmelman v. Morrison, 477 U.S. 365, 390-91, 106 S.Ct. 2574, 2591 (1986).

6. **Prior Counsel:** The name and address of the attorney who represented MR. TORRES at trial is Mr. Joseph M. Campbell, Esq., 4 Opal Court East, Edgewood, New Mexico 87015-9094. A defense attorney who represented MR. TORRES before trial was Ms. Trienah Meyers Gorman, present address unknown. The prosecutors at trial were Mr. John J. Bogren, Esq., 8400 Menaul Boulevard N.E., #A, Albuquerque, New Mexico 87112-2200 and Elizabeth A. Garcia, P.O. Box 27248, Albuquerque, New Mexico 87125-7248. The name and address of the attorney who represented MR. TORRES on the appeal is Todd Hotchkiss, Frechette & Associates, P.C., P.O. Box 26807, Albuquerque, New Mexico 87125. Ms. M. Anne Kelly, Assistant Attorney General, 111 Lomas Boulevard N.W., Suite 300, Albuquerque, New Mexico 87102, represented the State of New Mexico on appeal.

7. **Statement of Facts,** pursuant to Rule 5-802(B)(7):

**Los Lunas Police Officer Dino Wroten,** an accident reconstructionist, on December 3 was dispatched to TORRES' residence regarding a woman who committed suicide. (T.03-77,25-

75)   MR. TORRES had called the police informing the police of a suicide which occurred at his residence.   Wroten arrived at approximately 7:00 p.m. (T.03-77,84)

Wroten entered the residence and saw debris, broken pottery and blood stains on the floor. (T.03-77,115-22)   TORRES was inside and said, "Well, she finally did it." (T.03-77,132)

In the back bedroom laid Pamela Pace dead on a bed with a shotgun wound to her chest. (T.03-77,148)   A 12-gauge shotgun leaned against the bed with the barrel of the shotgun "peeled back like a banana". (T.03-77,156,247)   Pace had a gash to her left upper thigh from which blood flowed toward her hip rather than down. (T.03-77,259)

Los Lunas Police Department (LLPD) Sergeant Perea arrived and spoke with Wroten. (T.03-77,280)   TORRES told them Pace was his ex-wife. (T.03-77,285)   Pace and he argued leading to Pace breaking a vase, slipping on the vase cutting her thigh, and went into the bedroom and committed suicide. (T.03-77,293)

Sgt. Perea and Wroten called LLPD Detective James Harris due to their suspicions of whether Ms. Pace had committed suicide. (T.03-77,314, 549)

**LLPD Sergeant Josh Perea** was dispatched on October 14, 2001 to TORRES' residence on a domestic violence call from TORRES reporting Pace. (T.03-77,426-41; T.03-78,252)   Over defense counsel's objection based on hearsay, the trial court allowed

6

Perea to testify, as a statement of Pace's state of mind under Rule 11-803(C), N.M.R.A. 2003, that Pace said, "The next time you guys see me you're going to find me dead." (T.03-77,467-72)

On December 3, Perea arrived at TORRES' residence at 6:54 p.m. Inside was in disarray as if a "pretty good fight had taken place." (T.03-77,490)

Perea went to the bedroom where Pace was dead on the bed. (T.03-77,510) Perea noticed the shotgun beside the bed with the barrel peeled back. (T.03-77510-40) Pace had a large laceration to her left upper thigh, her right thumb was found under a bed stand, and in the corner were apparent pieces of potato. (T.03-77,510-40) On the bottom part of the shotgun he saw some grey duct tape with some blue cloth fibers hanging on it. (T.03-77,542) Perea did not initially consider the potato because he thought Ms. Pace and MR. TORRES may have been throwing food at each other. (T.03-78,45)

Police removed everyone from the house and put up crime scene tape. (T.03-78,83)

A neighbor later told Perea he saw a man exit the residence and put an item over a fence. (T.03-78,96) Perea looked and found a blue rag or towel wrapped in duct tape. (T.03-78,101) Perea did not initially think much of those items at the time but he did tell other officers about it. (T.03-78,127)

**LLPD Officer Vince Torres** arrived at TORRES' residence on

7

December 3 at 6:57 p.m. and went inside. (T.03-78,294-316)
Torres took photographs of the scene. (T.03-78,350)

**LLPD Detective James Harris** on December 3 spoke with Sgt.
Perea prior to arrival at the scene and told him to secure the
scene. He arrived at 7:15 p.m. with the scene secured. (T.03-
81,57-85) Harris spoke with officers at the scene and then to
TORRES, who was outside. (T.03-81,96)

TORRES said Pace committed suicide. (T.03-81,99-102) Harris
went inside the residence, saw several pieces of pottery and
blood stains, and believed a fight had occurred. (T.03-81,107-19)

Harris went to the back bedroom, saw Pace dead on the bed,
observed the scene, and then approached TORRES. Harris told
TORRES he was not under arrest but that Harris wanted TORRES to
go to LLPD to speak with him later. (T.03-81,148) Torres took
TORRES to LLPD. (T.03-78,419) TORRES, at LLPD, said, "I can't
believe she did that." (T.03-78,485) TORRES was not arrested,
had not been read any Miranda warnings, waited in the "pink
room", and was free to leave LLPD at that time. (T.03-78,529-32)

This was Harris' first murder scene investigation as a
detective. (T.03-89,458) After the initial walk through, Harris
decided he needed a closer look at the scene. (T.03-89,476)
Harris went back into TORRES' home and carefully evaluated the
details of the scene. (T.03-89,483-572; T.03-90,1-200)

After initial photos were taken of the scene by Harris and

8

other members of LLPD, Harris and Sgt. Perea decided, within 30 minutes of Harris' arrival, to call the New Mexico State Police (NMSP) crime scene team. (T.03-81,175; T.03-90,201-05)

Thereafter, the only people that were in the residence were the crime scene unit and Harris. (T.03-90,410-12)

**Neighbor Edgar Neil** saw TORRES exit his residence with a brown bag in his hand, approach the fence line, and throw a bag over the fence into someone else's yard. (T.03-79,48-55)

**Neighbor Tomasina Baca** heard screaming and yelling by both a woman and a man from TORRES' residence for approximately 30 minutes on December 3. (T.03-79,176)  10-15 minutes after the arguing ended, Ms. Baca also saw a man, not identified as TORRES, exit the residence and throw a brown bag over a fence. (T.03-79,245,364)  The police arrived approximately 10 minutes later. (T.03-79,287)

**Neighbor Juan Lopez** on December 3 heard a loud noise with his wife. (T.03-79,392-419)  **Lori Lopez** thought someone had busted a beer bottle in their back yard. (T.03-79,513-17)  Three to four minutes later, Mr. Lopez saw TORRES outside, throw something in Lopez's yard, and re-enter his residence. (T.03-79,420-26)  Ten minutes later the police arrived. (T.03-79,436)

LLPD searched the area and found the blue cloth with duct tape on it. (T.03-81,193)  The significance of the cloth with tape escaped Harris until later when he saw those items on the

9

butt of the shotgun. (T.03-81,201)

LLPD collected the shotgun from the residence. (T.03-81,208; T.03-90,314)   The weapon was processed. (T.03-81,245)   It was concluded that the barrel of the 12-gauge shotgun exploded and sent shrapnel through the wall between the bedroom and the laundry room. (T.03-81,350)   A piece of potato was found on the right side of the barrel and duct tape was on the barrel. (T.03-82,389) The ceiling tile from above Pace's body had gun powder residue, blood, and apparent potato pulp on its surface. (T.03-81,465-90)   An arm of a chair had hair consistent with Pace's hair. (T.03-81,538)   Harris observed bruises or marks around Pace's neck. (T.03-82,195)   The cut on Pace's upper left thigh was approximately 4"-5" long. (T.03-82,201)

Mike Applegate of the NMSP crime scene team arrived at 9:22 p.m., Shane Arthur at 9:59 p.m., Ramon Casaus at 11:02 p.m., and Art Ortiz at 11:24 p.m. on December 3. (T.03-90,230)

**NMSP Investigator Mike Applegate**, the crime scene manager in this case, assigned Arthur to photograph, Casaus to videotape, and Ortiz to process the blood splatter in TORRES' home. (T.03-92,549-54;T.03-95,52)

Applegate arrived at TORRES' residence at 9:22 p.m. on December 3. (T.03-96,160)   After Harris' briefing, Applegate went into the house to look around "to see what you have." (T.03-96,168-74)   That first time in the house, with Detective Harris,

10

was "Just to get a general feel for what was happening and what type of evidence we needed to look for." (T.03-96,266)

The door to the front bedroom was busted off its hinge. (T.03-95,142)  A broken vase was found in the hallway. (T.03-95,200)  Blood stains were found in the living room. (T.03-95,240)  Duct tape was on the gun with blue fibers. (T.03-95,425) 22 blood stains were on the ceiling and west wall of the master bedroom. (T.03-95,519-42)

The initial assessment was domestic violence occurred, Pace was shot with a shotgun, and suicide was staged. (T.03-95,553-56)

The crime scene team went to LLPD to question TORRES at approximately 3:30 a.m. about the blue rag, duct tape and potato and the use of the potato as a suppressor. (T.03-96,78-92 & 444)

"We went back to the residence and began processing the scene." (T.03-96,128)  None of the evidence was collected until after a search warrant was obtained. (T.03-96,131)

Later on that evening, when processing the scene, the crack in the chair's arm was brought to his attention. (T.03-96,268)

**NMSP Sergeant Ramon Casaus** arrived at the scene to assist at approximately 11:00 p.m. on December 3. (T.03-96,531; T.03-97,419)  Casaus videotaped the scene. (T.03-96,550-53;T.03-97.457)  That videotape, Exhibit 37, went into evidence and played for the jury. (T.03-97,1)

According to Casaus, after initially investigating as a

11

suicide, "then when we found the rag, and stuff like that, we stepped out and decided to get the warrant." (T.3-97,291) The scene was not processed until after a search warrant was acquired at approximately 10:00 a.m. on December 4. (T.03-97,408)

NMSP Agent Shane Arthur, after Wroten's briefing, photographed the scene in TORRES' residence from 9:30 p.m. on December 3 until the morning of December 4. (T.03-97,549-53;T.03-98,10) Evidence markers were in place. (T.03-98,66)

According to Arthur, police searched the residence from his arrival into the early morning hours of December 4, and then "we started up again a few hours later on December 4". (T.03-98,10-18) Arthur assisted with the search of the residence and with the questioning of TORRES. (T.03-98,264) Arthur took 433 photos during the pre-warrant searches, execution of the search warrant, and afterwards. (T.03-98,318)

NMSP Agent Art Ortiz, arrived at 11:24 p.m. and was an expert at trial in blood stain pattern analysis and accident reconstruction. (T.03-98,375-482)

Ortiz was briefed on what agents had seen at the scene. (T.03-98,483) Casaus was videotaping inside the residence. (T.03-98,485) Ortiz put on shoe covers and Applegate and Harris took him into the residence. (T.03-98,490)

No blood was found on the pottery, which contradicted TORRES' statements Pace cut herself with a ceramic pot. (T.03-

99,204,224) Evidence markers were used "to identify pieces of evidence from the crime scene." (T.03-99,270 & 370)

Ortiz saw blood stains on the couch, living room kitchen, and hallway. (T.03-99,250-300)  The blood stains in the living room and hallway were "somewhat consistent with length and width of the wound" on Pace's left upper thigh. (T.03-99,309)  No transfer patterns were found at a walking distance. (T.03-99,426)

An L-shaped blood swipe was found  (T.03-99,445)  No evidence existed that Pace walked to the back. (T.03-99,452)

In the hallway, 10 blood stains were between the kitchen and the master bedroom. (T.03-99,493)  25 blood stains were in the kitchen. (T.03-99,492)

6 or 7 drops of blood existed on the shotgun. (T.03-100,24) Something was at the top of the shotgun to keep in the gases and caused the explosion. (T.03-100,44)  Blankets were "somewhat piled up" under Pace. (T.03-100,54)  The blood stains and flow patterns evidenced that Pace had been moved. (T.03-100,64)

Pace's right upper arm, bra and abdomen had dark staining consistent with gun shot powder residue. (T.03-100,76)  No gun shot residue was found in the wound track like Ortiz normally sees as close distance. (T.03-100,160-64)

The shotgun was fired and exploded, shrapnel lacerated the back of Pace's hands and abdomen, and gun powder residue was blocked from the wound track. (T.03-100,173)  A piece of

13

suspected potato was on the barrel of the shotgun. (T.03-100,210)

No transfer stains existed from the stains on the bottom of Pace's feet. (T.03-100,274,288)  A person with bloody feet did not walk on the floor. (T.03-100,313)  A substance appearing to be potato was found in TORRES' home. (T.03-100,360)

The prosecutor asked Ortiz, "Do you know approximately what time these items were found?" (T.03-100,370)  Ortiz responded, "I would say in the early morning hours of December the 4th." (T.03-100,371)

On Pace's neck was found suspected potato. (T.03-100,418) On the ceiling above the bed was shredded duct tape, potato, gun shot residue and a piece of shrapnel. (T.03-100,459)

Due to blood stains on TORRES' clothing, Ortiz believed that TORRES had contact with Pace. (T.03-100,528)

Ortiz rendered the opinion that Pace did not commit suicide. Pace laid back on the bed when she was shot. (T.03-101,117-20)

Pace was not accidentally shot. (T.03-101,140)

Ortiz testified that it was obvious that the towel was used to shield the shooter.  The potato was used at the end of the barrel with layers of duct tape, done "ahead of time".  Pace, due to her state of dress, possibly was in the bedroom when TORRES went into the room with the shotgun, "maybe with the intent to kill her at that point in time." (T.03-101,183-92)  Pace possibly ran from the room and TORRES pursued her, forced open the other

14

bedroom door.  A struggle ensued, in which Pace began to bleed, property was broken, and  Pace was strangled.  TORRES then carried Pace to the master bedroom. (T.03-101,193-220)

Ortiz continued that TORRES then shot Pace.  The "physical evidence does not lie," and "all the physical evidence points to this was a deliberate killing." (T.03-101,248-53)

Ortiz agreed "physical evidence doesn't lie, but there are different interpretations of physical evidence". (T.03-101,258)

During the evening of December 3, Ortiz testified, "we took a look at the evidence [inside TORRES' residence] and it was very suspicious and it was obvious it was staged." (T.03-101,284-86)

Regarding the fact that State agents searched TORRES' residence without a warrant prior to the December 4 search warrant later issued, TORRES' trial counsel asked, "Gilbert had given consent to search his house, correct?" (T.03-102,392) Ortiz responded, "That's correct." (T.03-102,393)  TORRES' trial counsel responded, "I didn't think there's anything really of interest there." (T.03-102,399)

After photographing the scene, Harris went to LLPD. (T.03-82,55)  At approximately 12:35 a.m. on December 4 at LLPD, Harris began the questioning of TORRES who had no objection to being videotaped. (T.03-82,237-377)

In his first statement on December 4, TORRES told police Pace was mad at him, and threw some pottery and a beer bottle.

15

TORRES denied there was a big fight. Pace cut her leg on the broken pottery or beer bottle, TORRES offered to assist Pace, and Pace profanely rejected TORRES. Pace went to the master bedroom. Minutes later TORRES heard the shotgun blast. TORRES went to the bedroom and shook Pace to attempt to revive her. (T.03-85,250)

TORRES kept the shotgun in the closet. (T.03-83,122) After TORRES heard the shot and went into the bedroom, he called his son and then called LLPD. (T.03-83,170-84)

An officer present at the time of the videotaping can be heard to have said that he has already processed the scene. (T.03-82,259) An officer also asserted that Ms. Pace did not cut her leg on the pot as determined by the investigation at the scene. (T.03-82,336)

TORRES denied throwing the blue rag and duct tape and potato over the fence. (T.03-83,395,425,441) TORRES asserted that Pace shot herself. (T.03-83,413,495,557; T.03-84,250)

An officer can be heard telling TORRES the investigation showed TORRES was involved in Pace's death. (T.03-83,403,415)

Harris told TORRES police investigation showed TORRES put the blue rag on the shotgun butt and threw the rag over the fence. (T.03-83,424) This was one of many references in the videotape by officers of the continuing investigation in TORRES' home and the officers' consequent belief TORRES was involved in Pace's death. (T.03-83,436,452,501,568; T.03-84,147,252,447)

16

TORRES denied shooting Pace. (T.03-83,449; T.03-84,238,424,486,522)

TORRES proffered the possibility that, when he shook Pace after discovering her body, he said, "Pam, Pam, Pam!", his hands may have caused bruises to Pace's neck. (T.03-83,497)

Harris wanted to give TORRES a break while Harris called the other agents to ask them what they have learned at the scene. (T.03-83,498)  "Our investigation is showing you are involved in this." (T.03-83,501; T.03-84,147)

Harris spoke with NMSP Agent Ortiz at the scene, and told TORRES, "its not adding up to the way your story is saying, Gilbert." (T.03-83,518)  Harris said, "They're examining her wounds." (T.03-83,528)

Harris told TORRES, "It's clearing up that that rag was taped on that shotgun." (T.03-83,568)  TORRES denied knowing anything about the blue rag and duct tape. (T.03-84,1-30)

Harris told TORRES that their investigation was showing that Ms. Pace was not cut from the pottery. (T.03-84,115)

Harris told TORRES that his statements were inconsistent with the officers' investigation at the scene. (T.03-84,324)

TORRES denied moving Pace and instead asserted that Pace walked into the bedroom. (T.03-84,406-45,545)

A police officer asserted that Pace's wounds were not consistent with TORRES' statement. (T.03-84,447)

17

Agent Ortiz then arrived after investigating in TORRES's home and told TORRES that, based on the "evidence at the scene", Pace did not commit suicide. (T.03-84,483)  Ortiz asserted that TORRES tried to make it look like Pace committed suicide. (T.03-84,487; T.03-102,256)  The police theory of Pace's murder was based on their investigation at the scene. (T.03-84,491)

Ortiz questioned TORRES about hair found in a broken chair which appeared consistent with Pace's hair. (T.03-84,516) Ortiz questioned TORRES about marks on Pace's neck and alleged TORRES strangled Pace. (T.03-84,530)  Ortiz questioned TORRES about blood stains on the bottom of Pace's feet. (T.03-84,546)

Ortiz claimed TORRES propped up Pace and there was no blood on the rifle where her blood-soaked left hand would have been. (T.03-85,55)  An police officer asked TORRES about the blood on the bed sheets. (T.03-85,160)  Ortiz said too much of the evidence pointed to TORRES. (T.03-85,180)  "This scene over there does not add up to what you are saying." (T.03-85,221) TORRES was asked how the blood got on Pace's hands and feet. (T.03-85,237)

TORRES was informed that he was being arrested and booked on the charge of tampering with evidence and suspicion of murder. (T.03-85,242,250)  30-45 minutes later, TORRES apparently approached Harris and asked if he could talk to Harris again because he wanted to tell the truth. (T.03-85,279)

NMSP agents took the video camera back to the scene. (T.03-

18

85,287-95)   Later, NMSP agents returned to LLPD with the video camera. (T.03-85,290)

Harris stated the NMSP agents "out at the scene" advised of "additional evidence that they had located and that they wanted to come back and interview him further." (T.03-85,291-94)

TORRES began the second statement by changing his version of events. (T.03-85,279)   Pace and he had a big fight, Pace had cut herself, Pace had run into the master bedroom, TORRES entered the bedroom, Pace pointed the shotgun at him, they struggled over the shotgun, the shotgun got turned around, the shotgun somehow went off, and Pace was shot. (T.03-85,344- T.03-88,100)

TORRES denied any knowledge of the blue rag. (T.03-85,350)

Pace was " accident[ally]" shot. (T.03-85,362,369,466,558)

The police officer asserted Pace did not walk into the bedroom. (T.03-85,411)

TORRES then started posing the question, "Either way, I'm going to prison, right?" (T.03-85,439)

An officer asserted that they have physical evidence of strangulation, including bruises and marks. (T.03-85,451)   An officer asserted that the blue rag and tape found beyond the fence match the rag and tape on the gun. (T.03-85,528) An officer asserted that the blood drops are not foot prints but they indicate Pace was dragged. (T.03-86,94)   An officer asserted that Pace was bruised under her arms and on her neck. (T.03-86,103)

19

An officer asserted that Pace's blood vessels were blown in her eyes, consistent with strangulation. (T.03-86,108)

At one point an officer asserted, "There's some more stuff we found over there, its getting deeper...." (T.03-86,173)

Then, questions about the potato started after the investigation inside TORRES' residence by the NMSP crime scene team showed that a potato was likely put at the end of the shotgun. (T.03-86,227,307,540)  Police learned of potato in Pace's hair, on the ceiling and on duct tape. (T.03-86,320,463)

TORRES eventually agreed that he did put the blue towel on the shotgun to try to prevent Pace from using the gun. (T.03-86,397)

TORRES denied any knowledge of the potato. (T.03-86,432)

An officer told TORRES that it looked like premeditated murder. (T.03-87,524)

After TORRES was booked on the tampering with evidence charge, Harris collected TORRES' blood stained clothes and boots. (T.03-82,93-127,136-40;T.03-88,336)

**Forensic pathologist Jeffrey Nine** performed the autopsy on Pace on December 5. (T.03-91,362)  The cause of death was the gun shot wound to the chest. (T.03-91,411)  The manner of death was homicide. (T.03-91,415)

Some duct tape was found in the shotgun wound indicating that duct tape had to be in front, not necessarily at the tip, of

20

the barrel. (T.03-91,491; T.03-92,215,383,408)

White material consistent with potato was found on some duct tape and on Pace's hair, bra, chest or skin. (T.03-92,246)  Pace was alive when shot. (T.03-92,266)

Nine rejected suicide due to injuries to the backs of hands and the rest of her body. (T.03-92,308)  "I don't believe there is any way that she could have done this herself." (T.03-92,323)

The twisting metal from barrel of the gun possibly cut her thumb off. (T.03-92,432)  There was something at the end of or in the barrel, fragmented the barrel and the projectile. (T.03-92,444)

The shotgun barrel was close to her body because of burnt gun powder material around the wound. (T.03-91,501)

The back of both of her hands had wounds which indicated her hands were in front of the gun barrel when fired.  (T.03-91,520-47)

On Pace's left thigh was a wound from a knife or sharp instrument or possibly from a shard of glass. (T.03-92,7,33)

The prosecutor's opening words during closing argument were: "Pamela Pace's prophesy came true: 'The next time you see me you are going to find me dead.'  She told Officer Josh Perea of the Los Lunas Police Department.  And sure enough, the next time Josh Perea saw Pamela Pace, he saw her dead." (T.03-103,446)  More references were made by the prosecutor during closing argument to

21

that statement by Pace. (T.03-103,506; T.03-106,225)

## Affidavit for Search Warrant

Affiant James Harris' affidavit for search warrant was filed in the Valencia County Magistrate Court at 8:48 a.m. on December 4, 2001.  The affidavit specifically requested permission to search the following:

1. ANY AREAS OF BLOOD STAINED CARPET AND OR FLOOR TILING LOCATED THROUGHOUT THE RESIDENCE.
2. THE BEDDING LOCATED IN THE FAR EAST BEDROOM OF THE RESIDENCE.
3. THE 12-GAUGE SHOTGUN, AMMUNITION, AND ANY OTHER WEAPONS POSSIBLY USED IN THE HOMICIDE.
4. A COMPLETE COMPUTER SYSTEM WITH MONITOR TO INCLUDE ANY SOFTWARE.
5. ANY BROKEN GLASS.
6. ANY BROKEN POTTERY.
7. ANY FURNITURE ITEMS THAT HAS BLOODSTAIN PRESENT.
8. A SECTION OF CEILING IN THE FAR EAST BEDROOM OF THE RESIDENCE APPROXIMATELY 8 FT. BY 8 FT.
9. ANY ITEMS DISCARDED IN TRASH RECEPTACLES.
10. ANY CUTTING INSTRUMENTS.
11. ANY POTATOES, EITHER HOLE OR PORTIONED.
12. ANY LOCKED CONTAINERS.
13. ANY OTHER ITEMS THAT CAN BE DIRECTLY OR INDIRECTLY LINKED TO THE OFFENSE LISTED.

(Affidavit at 1)

The Affidavit did not contain any assertion that MR. TORRES provided any consent for the police officers to search his residence after he left the property.

The Affidavit alleged the officers did search and evaluate evidence inside TORRES' home before acquiring the search warrant. The Affidavit at 2 alleged, "Upon further investigation of the crime scene, by officers, they learned that a domestic dispute

22

occurred between the victim and TORRES." The Affidavit at 2 alleged the blue cloth and tape found beyond the neighbor's fence "appeared to be the same as a piece of cloth and tape that was found on the butt" of the shotgun. The Affidavit at 2 alleged that "found near the cloth was another amount of duct tape that had been wrapped around a potato." The Affidavit at 2 alleged, "An apparent explosion of some kind had blown the potato apart." The Affidavit at 2 alleged inside the room where Ms. Pace laid dead "officers discovered the remains of potato on the floor and what papered (sic) to be potato in the hair of the victim."

8.  **Grounds for Petition:** The grounds and law, or other legal authorities on which Petitioner is confined and which support the bases for his claims are as follows:

A.

Trial counsel, Mr. Joseph Campbell, failed to provide adequate and effective assistance of counsel to MR. TORRES as required by the Sixth Amendment to the United States Constitution by failing to file and litigate a motion to suppress evidence under the Fourth Amendment to the United States Constitution and consequently denied MR. TORRES his rights to prepare a defense, including denial of a fair trial under the Sixth Amendment, and to due process of law under the Fifth and Fourteenth Amendments.

This issue was not raised by trial counsel below.

TORRES called the LLPD to his residence regarding an

23

apparent suicide by Pace, showed the police the body of Pace inside his residence, agreed to remain outside his residence, and then was transported to the LLPD.  After TORRES departed the scene and Pace was dead inside, no exigent circumstances existed, no consent was provided by MR. TORRES for the night-long search of his residence, and a warrant was not acquired until approximately 8:30 a.m. the next day on December 4 based largely on information learned by police during the unreasonable, warrantless night-long search of MR. TORRES' residence.

Without any evidence of any specific, voluntary consent by TORRES for police to enter his residence after he left the scene, the scene was processed, photographs taken, videotape taken, evidence markers placed, blood patterns analyzed, evidence seized, and the murder theory established by LLPD and NMSP.

Based on these actions, and relying on information learned during the unreasonable nighttime search of his residence, TORRES was questioned at LLPD with the newest investigatory determinations.  Based on the investigation, TORRES was arrested for tampering with evidence.

B.

Trial counsel, Mr. Joseph Campbell, failed to provide adequate and effective assistance of counsel to MR. TORRES as required by the Sixth Amendment to the United States Constitution by not objecting to a prior statement by the decedent based on

24

the confrontation clause of the Sixth Amendment to the United States Constitution.

This issue was not raised by trial counsel below.

Over defense counsel's objection based on hearsay, the trial court allowed Perea to testify that as Pace left TORRES' residence on October 14, 2001 she said to Perea, "The next time you guys see me you're going to find me dead." (T.03-77,472)

The trial court overruled under Rule 11-803(C), N.M.R.A. 2003.

There was no evidence presented that MR. TORRES had a prior opportunity to cross-examine Ms. Pace concerning her October 14, 2001 statement.  Ms. Pace's statement became evidence at MR. TORRES' trial by means of Sgt. Perea's testimony.  Ms. Pace's statement was testimonial.  Due to Ms. Pace's death, Ms. Pace was unavailable to testify at trial.

C.

For any combination of the foregoing allegations, trial counsel Mr. Campbell provided inadequate and ineffective assistance of counsel under the Sixth Amendment, and denied MR. TORRES a fair trial and due process of law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and improperly contributed to MR. TORRES' convictions.

9.  **State of Law,** pursuant to Rule 5-802(B)(7):

A.

25

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." <u>Flippo v. West Virginia</u>, 528 U.S. 11, 13, 120 S.Ct. 7 (1999); <u>Mincey v. Arizona</u>, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412 (1978).

There is not a "murder scene exception" to warrant clause of the Fourth Amendment. <u>Flippo v. West Virginia</u>, 528 U.S. at 12-14.

"It seems implausible that the court found that there was a risk of intentional or accidental destruction of evidence at a 'secured' crime scene or that the authorities were performing a mere inventory search when the premises had been secured for 'investigative purposes' ....'" <u>Flippo v. West Virginia</u>, 528 U.S. at 14, n.2.

The <u>Flippo</u> Court reaffirmed <u>Mincey v. Arizona</u>, 437 U.S. 385, 98 S.Ct. 2408 (1978), where the U.S. Supreme Court rejected any "murder scene exception" or "crime scene exception to the Warrant Clause of the Fourth Amendment." <u>Flippo v. West Virginia</u>, 528 U.S. at 14. Both people who had been present in TORRES' residence, Pace and TORRES, had been located. <u>Mincey v. Arizona</u>, 437 U.S. at 393, 98 S.Ct. at 2414. "Except for the fact that the offense under investigation was a homicide, there were no exigent circumstances in this case". <u>Mincey v. Arizona</u>, 437 U.S. at 394, 98 S.Ct. at 2414. "<u>Mincey</u> controls here." <u>Flippo v. West Virginia</u>, 528 U.S. at 14.

Finally, the call by TORRES for the police due to the apparent suicide by his ex-wife in his residence did not "evidence a diminished expectation of privacy" on his part or constitute consent for police to search TORRES' residence after TORRES was removed from the premises. Thompson v. Louisiana, 469 U.S. 17, 22-23, 105 S.Ct. 409, 411-12, *reh'g denied*, (1984); Mincey v. Arizona, 437 U.S. at 391-92, 98 S.Ct. at 2412-13.

While the State claimed perfunctorily at trial that TORRES consented to the warrantless search of his residence from December 3 to December 4 before acquisition of the search warrant, there was no specific factual basis for any conclusion that TORRES specifically, clearly and unequivocally consented.

To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial courts' results unreliable. State v. Cooper, 1998-NMCA-180, ¶11, 126 N.M. 500, 972 P.2d 1.

Defendant must establish a case of ineffective assistance of counsel where a plausible, rational strategy or tactic cannot explain the conduct of defense counsel, and that, as a result, the defense was prejudiced. Patterson v. LeMaster, 2001-NMSC-013, ¶17, 130 N.M. 179, 21 P.3d 1032; State v. Cooper, 1998-NMCA-180, ¶11. These are the "the reasonableness prong and the prejudice

prong." <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶17.

In determining whether the failure to pursue a motion to suppress constitutes ineffective assistance of counsel, this Court must consider whether the record supports the motion on the ground asserted and whether a reasonably competent attorney could have decided the motion was unwarranted. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶19; <u>State v. Cooper</u>, 1998-NMCA-180, ¶12.

The facts of this case show that a motion to suppress should have been filed.  TORRES' residence was searched for hours before the acquisition of the search warrant on December 4 and evidence developed as a result of that warrantless search.  There are no apparent applicable exceptions to the warrant requirement, particularly no exigent circumstances.  Law from the U.S. Supreme Court existent for the last 25 years from <u>Mincey</u> to <u>Flippo</u> clearly shows that there is no "crime scene exception" to the warrant requirement.  The record supports the motion to suppress. <i>Contra</i> <u>State v. Cooper</u>, 1998-NMCA-180, ¶¶21-22.

A reasonably competent attorney could not have decided that the motion was unwarranted.   "There was no strategic reason for a reasonably competent attorney who was aware of the facts of this case and the governing case law not to try to suppress" the evidence gained as a result of the warrantless search of TORRES' residence. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶27.

TORRES was prejudiced because there was no apparent

indication that TORRES was disposed to plea the case out, the strength of the proper and admissible evidence was not great, and the motion to suppress "was crucial because it could have excluded key evidence". Patterson v. LeMaster, 2001-NMSC-013, ¶¶28-33.  The confidence in  the jury's verdict is consequently undermined.  Id.

Because no evidentiary hearing has ever been held on the merits of TORRES' Fourth Amendment claim, and the State likely will not concede the illegality of the search and seizure issues, TORRES is entitled to a hearing at which to establish the night-long warrantless search of his home violated the Fourth Amendment and the use of the illegally gained evidence as fruit of the poisoned tree for arresting TORRES for tampering with evidence and in the State's subsequent questioning of him at the LLPD tainted TORRES' consequent statements.  Kimmelman v. Morrison, 477 U.S. at 390-91, 106 S.Ct. at 2591; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963); State v. Cassola, 2001-NMCA-072, ¶13, 130 N.M. 791, 32 P.3d 800; State v. Wagoner, 2001-NMCA-014, ¶¶19-40, 130 N.M. 274, 24 P.3d 306.

For any and all of the foregoing reasons, MR. TORRES' trial counsel, by failing to file a motion to suppress evidence, rendered inadequate and ineffective assistance to TORRES in violation of the Fourth and Sixth Amendments and Article II, §§ 10 and 14 of the New Mexico Constitution.

B.

Under the United States Supreme Court's decision in
Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004), the
out-of-court statement by a witness that is testimonial is barred
under the confrontation clause of the Sixth Amendment to the U.S.
Constitution unless the witness is unavailable and the defendant
had a prior opportunity to cross-examine the witness.

The U.S. Supreme Court in Crawford reversed the defendant's
murder conviction by holding a woman's hearsay trial testimony,
admitted as a statement against penal interest, was inadmissible
as a denial of the defendant's Sixth Amendment rights to confront
and cross examine the witness.  Pace's statement to Perea,
admitted as a statement of her state of mind, is very analogous
to the inadmissible statement to police in Crawford.

For any and all of the foregoing reasons, MR. TORRES' trial
counsel, by failing to object to the admission of Ms. Pace's
statement as a violation of TORRES' right to confront the
witnesses under the Sixth Amendment, rendered inadequate and
ineffective assistance to TORRES in violation of the Sixth
Amendment and Article II, § 14 of the New Mexico Constitution.

10.  MR. TORRES does not seek appointment of counsel to
represent him as undersigned counsel is retained to represent
him.

11.  **Relief Requested:**

30

WHEREFORE, the Petitioner, GILBERT TORRES, JR., requests, pursuant to Rule 5-802(B)(8), that this Court grant his petition for writ of habeas corpus, reverse his convictions, vacate his sentence, and order him released from the custody of the New Mexico Department of Corrections.  MR. TORRES also requests such other and further relief as this Court deems just and proper.

Respectfully submitted,

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuqueruqe, New Mexico  87125
Tele. (505) 247-8558

## CERTIFICATE OF SERVICE

I, Todd Hotchkiss, hereby certify that on April 17, 2006 I placed a true and accurate copy of the foregoing petition in the U.S. Mail, first-class postage affixed thereto, for mailing to Mr. Joe Romero, Warden, Central New Mexico Correctional Facility, P.O. Drawer 1328, Los Lunas, New Mexico  87031 and to the Thirteenth Judicial District Attorney, P.O. Box 1919, Los Lunas, New Mexico  87031, the last known addresses.

TODD HOTCHKISS

31

THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO


GILBERT TORRES, JR.,

          Petitioner,

v.                              No. D-1314-CR-2001-43

JOE ROMERO, Warden,
Central New Mexico Correctional Facility,

          Respondent.


### VERIFICATION OF PETITION FOR WRIT OF HABEAS CORPUS

STATE OF NEW MEXICO      )
                         ) ss.
COUNTY OF VALENCIA       )

     I, Gilbert Torres, Jr., being duly sworn and under penalty

of perjury according to the laws of the State of New Mexico,

state that I am the Petitioner in this case, I have read the

foregoing Petition, I know and understand the statements and

contents therein, and the statements and contents of the Petition

are true and correct to the best of my information, knowledge,

and belief.


                         Signed
                         _____
                         GILBERT TORRES, JR.


     SUBSCRIBED AND SWORN TO before me by  on this _3_ day of

_April_____, 2006, by Gilbert Torres, Jr..

_____
My Commission Expires

NOTARY PUBLIC
OFFICIAL SEAL
Vince Wiggins
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: F_____ 11 201_