13TH JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF VALENCIA

FILED
09 MAY 18 AM 10: 22
GER... SANCHEZ
BY_____DEPUTY

GILBERT TORRES, JR.,
    Petitioner,

v.                                  No. D-1314-CR-2001-483

JOE ROMERO, Warden,
Central New Mexico Correctional Facility,
    Respondent.

## RESPONSE TO HABEAS CORPUS PETITION

The State of New Mexico, through Special Assistant District Attorney Michael E. Martinez, hereby responds to the Petition for a Writ of Habeas Corpus.

STATEMENT OF FACTS:

1. The petitioner was indicted on the 13th day of December, 2001. He was charged in count one with murder in the first degree, or in the alternative, with murder in the second degree and manslaughter. He was also charged in count two with tampering with evidence.

2. Petitioner was convicted of the offenses of murder in the second degree and tampering with evidence after a jury trial presided over by the Honorable John Pope. Sentencing was held on the 19th day of May, 2003 and judgment was entered on the 20th day of June, 2003.

3. Petitioner appealed his conviction to the New Mexico Court of Appeals. In State of New Mexico v. Gilbert Torres, 137 N.M. 607, 113 P.3d 877, Petitioner's conviction was affirmed.

4. On the 20th day of may, 2005, the New Mexico Supreme Court denied the petitioner's petition for writ of certiorari which was filed on 27 April, 2005.

5. Respondent does not agree with the statements made in paragraph 5 of the petition. Although the appellate court found that the record "is devoid of facts from which we could determine the effectiveness of defendant's counsel," the court went on to imply that even if ineffective assistance of counsel could have been shown, the Petitioner did not demonstrate that such a showing would have prejudiced his defense. Even in all the authorities cited by the Petitioner, it is clear that a showing of prejudice is a necessary second prong and any effort to prevail on a claim of inadequacy of counsel.

6. Respondent is in substantial agreement with the factual allegations rendered in paragraph 7 of the petition.

ARGUMENT:

Petitioner seeks relief from his conviction based on his assertion that his trial counsel provided inadequate presentation. He bases his argument on two claims. First, he claims that his trial counsel was ineffective for not moving to suppress evidence based on an illegal search. Secondly, he claims that counsel was ineffective for not objecting to a statement by the deceased victim on the basis of the confrontation clause of the sixth amendment. These two issues will be addressed in reverse order.

THE ADMISSION OF A VICTIM'S STATEMENT DID NOT VIOLATE DEFENDANT'S SIXTH AMENDMENT RIGHTS. The victim stated, "next time you guys see me you're going to find me dead." This statement was offered by the state and was objected to by trial counsel on the bases of hearsay. The trial court ruled that the statement was admissible to show the victims state of mind under evidence rule 11-803 (C). The appellate court affirmed the trial court on this point. The court also noted:

> "Defendant argues for the first time in his reply brief that we must address the applicability of the United States Supreme Court's recent holding in Crawford v.

2

Washington, 541 U.S. 36 (2004), with regard to this issue. Essentially defendant argues that the victim statement to officer today was "testimonial" under Crawford and therefore must be barred because it's admission violated defendant's sixth amendment right to "confront and cross-examine the witness." However at trial defendant did not base his objection to the testimony on constitutional grounds, but only objected to the testimony at issue on hearsay grounds. The question of whether a defendant was denied the right to confrontation may not be raised for the first time on appeal."

The appellate court also found that rule 11-803 (C) is applicable in situations in which, as in this case, a defendant puts an alleged victims state of mind at issue by arguing self-defense or suicide. Thus the issue is now whether trial counsel's failure to raise a constitutional objection to the admission of victim's statement arose to a level of ineffective assistance. Respondent maintains that it does not for the following reasons:

1. The statement was properly admitted under a well founded exception to the hearsay rule in that Petitioner placed the victims state of mind at issue by claiming, at various times, self defense and suicide.

2. The inability to confront and cross-examine the witness was due to the Petitioner's conduct in making the witness unavailable. Although the courts have not yet concluded that a witness' unavailability due to the defendant's conduct, taken alone, is not enough to defeat a sixth amendment right to confront and cross-examine, guidance has been provided to aid in determining when denial of cross-examination amounts to a violation of the sixth amendment. In State v. Martinez, 99 N.M. 48, the court provided an illuminating discussion of this situation. There the court stated:

> "Denial of cross-examination is not a violation per se of the confrontation clause. State v. Butcher, 120 Ariz. 234, 585 P.2d 254 (App. 1978). However, absent opportunity for cross-examination of a witness on the

3

part of defendant, the state as a prerequisite to obtaining the admission of such evidence, must demonstrate compliance with the two-pronged test enunciated in Dutton v. Evans, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); [99 NM Page 52]and Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). In Roberts, the court held:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.
>
> There is no constitutional requirement that the victim of every crime must testify, State v. Boodry, 96 Ariz. 259, 394 P. 2d 196, cert. denied, 379 U.S. 949, 85 S. Ct. 448, 13 L. Ed. 2d 546 (1964). But where the state seeks to use statements of a victim not called or present at trial, the prosecution must meet the standards enunciated in Roberts to satisfy the constitutional requirements of the sixth and fourteenth amendments. See State v. Martinez, 95 N.M. 445, 623 P.2d 565 (1981)."

In this case the state clearly demonstrated that the declarant was unavailable due to her death brought about by the defendant's actions. The state also met the second prong of the test and showed that the decedent's statement bore "indicia of reliability" in that the evidence fell within a firmly rooted hearsay exception. On appeal the Petitioner argued that the decedent's statement was improperly admitted under Evidence Rule 803 (C). Responding to this argument, the court stated:

> Rule 11-803(C) is applicable in situations in which a defendant puts an alleged victim's state of mind at issue by arguing self-defense or suicide.

4

State v. Baca, 120 N.M. 383, 389, 902 P.2d 65, 71 (1995); see also State v. Swavola, 114 N.M. 472, 478, 840 P.2d 1238, 1244 (Ct. App. 1992) (stating that an utterance by the victim is relevant to the victim's state of mind under Rule 11-803(C) when the defendant argues self-defense and the statement tends to reduce the likelihood that the victim was the initial aggressor). Defendant took such an approach in this case. His statements to police raised issues of suicide, accidental shooting, and self-defense. He requested and received jury instructions for self-defense and second degree murder. The statement "the next time you guys see me you're going to find me dead" was offered to show that the victim feared Defendant and was unlikely to attack him or commit suicide. Yet, due to its ambiguity, the statement arguably helped Defendant as much as it did the State because the jury could have just as easily interpreted the statement to mean the victim intended to commit suicide. Despite its ambiguity, the statement was relevant to the issues of suicide and self-defense, and the court did not abuse its discretion in admitting it.

EVEN IF THERE WAS A SIXTH AMENDMENT VIOLATION, IT CONSTITUTED HARMLESS ERROR. As stated above, Respondent does not concede that there was a sixth amendment violation. In this case there was more than sufficient evidence of guilt independent of this statement. Unless the Petitioner prevails in his argument that all the other evidence should have been excluded due to an illegal search, the admission of the decedent's statement in violation of the sixth amendment would have been harmless. State v. Martinez, cited above, ruled as follows:

> "A finding of a violation of the right to confront a witness does not, however, automatically require reversal of defendant's conviction. Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); cf. United States v. Albuquerque, 538 F.2d 277 (9th Cir. 1976). Where other properly admitted evidence in the record, overwhelming in its nature, independently establishes proof of defendant's guilt the admission of the challenged evidence is harmless

5

error. See generally State v. Gruender, 83 N.M. 327, 491 P.2d 1082 (Ct. App. 1971); see also Corbin v. State, 627 P.2d 862 (Nev. 1981). Even where an error is of constitutional dimension, it may not mandate reversal if it was harmless beyond a reasonable doubt. State v. Richter, 93 N.M. 55, 596 P.2d 268 (Ct. App.) cert. quashed, 93 N.M. 8, 595 P.2d 1203 (Ct. 1979).

Therefore, if the logic in State v. Martinez is sound, decedent's statement was properly admitted. And even if it was not, its admission was harmless. This being the case, trial counsel's failure to raise a sixth amendment objection in addition to or in lieu of a hearsay objection cannot be a basis for a claim of inadequate representation.

## TRIAL COUNSEL'S REPRESENTATION WAS NOT INADEQUATE FOR FAILING TO MOVE TO SUPPRESS EVIDENCE BASED ON A CLAIM OF AN ILLEGAL SEARCH.

The claim of ineffective representation is the gravamen of this petition for a writ of Habeas Corpus. It is difficult to completely respond to this claim in that Petitioner does not identify what specific evidence should have been excluded. On appeal, the court found no fundamental or plain error. It also found that for purposes of the appeal, there was nothing to support a finding of ineffective assistance. The court noted that "Within the context of a failure to file a motion to suppress evidence, a defendant must establish that the facts support the motion and that a reasonably competent attorney could not have decided that the motion was unwarranted. Id. ¶ 19. To determine whether the facts support the motion, we evaluate the facts present in the record." It went on to state "the record is devoid of facts from which we could determine the effectiveness of Defendant's counsel with regard to whether Defendant consented to a search or when a search warrant was required." Although stating the record was devoid of facts, it contradicted this statement when it noted that on cross-examination of Agent Ortiz the following exchange took place:

> "During the cross-examination of Agent Ortiz, Defendant's counsel stated: "But prior to that search warrant [Defendant] had given consent to search his house, correct?" Agent Ortiz responded in the affirmative."

6

Petitioner does an excellent job of summarizing the facts developed at trial. It would also be helpful to supplement that rendition with the factual development set forth in the appellate opinion. It reads as follows:

"Factual and Procedural History

On December 3, 2001, police officers responded to a possible suicide call at Defendant's home. Officer Dino Roden, one of the responding officers, testified that he could see inside through a glass storm door as he approached the home. He noticed debris and broken pottery on the floor and blood on the carpet. As Officer Roden was about to open the door, Defendant approached and stated "well she finally did it." Officer Roden informed Defendant that he had been dispatched to investigate a suicide and asked where "she" was. Defendant informed the officer that the victim, Defendant's estranged wife, was in the back bedroom.

Officer Roden and Officer Joshua Perea, who arrived shortly after Officer Roden, located the victim in the back bedroom on the bed. She was dead with an apparent shotgun wound to her chest. She had a four-to-five-inch gash on her upper left thigh from which blood flowed up rather than down. Her hands were badly lacerated, and her right thumb, which was missing, was later found beneath a night stand. She had blood stains on the bottom of one of her feet. There were also marks on her throat and around the back side of her neck, as well as evidence of retinal hemorrhaging. The officers saw a 12-gauge shotgun leaning next to the victim. It had a badly damaged barrel that "was peeled back like a banana." There was a wooden backscratcher next to the shotgun. They also saw pieces of shrapnel from the shotgun barrel on the wall in the bedroom and pieces of duct tape and fibers of blue cloth attached to the shotgun. There were shredded pieces of a potato on the ceiling, the victim's body, and the shotgun.

After making these observations, the officers cleared the house, called New Mexico state police crime scene investigators, and set up crime scene tape. Officer Perea stated that Defendant did not appear upset at this point, and, in fact,

7

went outside and began drinking a beer.

The officers questioned Defendant's neighbors. Witnesses stated that they heard yelling coming from Defendant's residence, followed by a loud noise, and that they observed a man exit the residence and throw a bag over the fence into another yard approximately ten minutes before the officers arrived. Upon searching the area described by the witnesses, the officers recovered a blue towel "covered with duct tape." The officers also located a piece of duct tape underneath the bed where the victim was found and a roll of duct tape in one of the other rooms. The evidence indicated to the officers that Defendant had strangled the victim, then used the duct tape to attach the towel to the butt of the weapon and to secure a potato to the end of the barrel, presumably as a silencer. The evidence also indicated to police that Defendant had staged the suicide scene.

Dr. Jeff Nine, a forensic pathologist with the Office of the Medical Investigator, found metal fragments, pieces of duct tape, and potato fragments in the vicinity of the shotgun wound. He testified at trial that the wounds on the victim's hands indicated that her hands were in front of the barrel of the weapon, but not necessarily grabbing it, as it was fired. He concluded that the victim died from a shotgun wound to her chest. However, he also stated that she had been beaten and strangled prior to being shot, but he did not know if the strangulation rendered her unconscious. When questioned regarding the possibility of the victim having committed suicide, Dr. Nine stated: "I don't believe there is any way she could [have] done this [by] herself."

Shortly after the police responded to the incident, Defendant was transported to police headquarters for questioning; he was not yet under formal arrest. Photographs of Defendant, taken at the police station, showed bloodstains on his clothing and a cut on his right hand. There was also blood on Defendant's boot. While awaiting questioning, Defendant stated, "I can't believe she did that." Defendant waived his rights under Miranda v. Arizona, 384 U.S. 436, 479 (1966), and consented to giving a videotaped statement to police. He stated that the victim

8

had a long history of drug abuse. He also stated that she had threatened to commit suicide previously and that she had pointed the shotgun at Defendant's friend on a prior occasion. When initially questioned by police, Defendant reiterated his account that the victim had committed suicide following an argument with Defendant. However, when confronted with physical evidence that was inconsistent with suicide, Defendant varied his story, stating that he and the victim had struggled over the gun in the bedroom and that it had accidentally discharged.

At some point after the interview, the police obtained a search warrant and "processed the scene." Defendant was formally arrested, indicted, and charged with first degree murder and tampering with evidence. After a jury trial, Defendant was convicted of second degree murder and tampering with evidence."

With this rendition of the facts, the Respondent argues as follows:

1. <u>Trial Counsel had a sound basis for determining that consent to search had been granted by his client.</u> The Defendant had called the authorities to the home alleging that his wife had committed suicide. He greeted the police at the door and took them into his home. He fully cooperated with the police, although this cooperation may have simply been his feeble attempt to convince the police that a suicide had occurred. He waived his constitutional rights and gave statements. Defendant never indicated that he did not want his house to be searched, nor did he say anything that could be construed as a withdrawal of his consent. Trial Counsel confirmed that consent had been given when he asked Agent Ortiz on cross if consent to search had been obtained, and the officer replied in the affirmative.

2. <u>Most, if not all, of the evidence obtained at the Defendant's home would have been admissible under the Plain View Exception to the Warrant requirement.</u> There was no motion to suppress before the trial court, therefore there was no discussion, other than trial counsel's inquire on cross of Agent Ortiz, of any warrant requirement or of any

9

applicable exceptions to the warrant requirement. Petitioner summarily states that "there are no apparent applicable exceptions to the warrant requirement." This assertion conveniently overlooks the fact that Defendant called the police to his residence to investigate an alleged suicide. In responding the police had reason to believe that an injury or death involving one or more people had occurred, and that a weapon or weapons were likely involved. In this process, Defendant met the police at the door, took them into his house, and immediately began making statements. The scene was surveyed and secured. The police were in a place where they had a right to be, both by invitation and by their duty to respond to a homicide scene. Petitioner makes much ado about the case law's repeated rejection of a murder scene exception to a warrant requirement. Respondent wholeheartedly agrees with such a rejection. Yet manu of the cases Petitioner cites discuss and approve of the seizure of evidence that is in the plain view of police who are in a place where they have a right to be. Further, many of those cases are easily distinguished from the facts of this case in that what was seized and in question was not in plain view. For example, in Flippo v. West Virginia, 528 U.S. 11, the evidence seized consisted of photographs and negatives that were in a closed briefcase. In Mincey v. Arizona, 437 U.S. 385, a lengthy and exhaustive search through closed drawers and other objects not in plain view produced hundreds of evidentiary items. In Thompson v. Louisiana, 469 U.S. 17, the murder scene was rejected, but what was objectionable was that the defendant's daughter invited the police to the premises and she was not a person with an expectation of privacy in the premises. The court found that the defendant, not the daughter had such an expectation. In State v. Steinzig, 127 N.M. 752, the court enunciated what was required to admit evidence under the plain view exception. It noted:

> "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" State v. Williams, 117 N.M. 551, 555, 874 P.2d 12, 16 (1994) (quoting Payton v. New York, 445 U.S. 573, 587, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980)). The plain view exception "permits seizure of evidence discovered in the course of an intrusion for which there was prior justification,

10

such as a search warrant."

Steinzig involved a search warrant for items related to counterfeiting. Also seized was evidence related to drugs and not listed on the warrant. The court found that while the police were legitimately there on the warrant, they could seize any evidence of crime that was in plain view. Prior to Steinzig there were three requirements that had to be met. First the item seized had to be in plain view of an officer legitimately on location. Second, there had to be probable cause to associate the property with criminal activity. And third, the discovery of the item had to be inadvertent. Steinzig specifically overruled prior cases requiring inadvertence.

3. The Doctrine of Inevitable Discovery would support the denial of a motion to suppress. In State v. Corneau, 109 N.M. 81, The court stated:

> " In Nix v. Williams, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), the United States Supreme Court held that evidence originally obtained through illegal means, which would, in all likelihood, inevitably have been discovered through independent lawful means, is admissible at trial. As described in Nix, the inevitable discovery rule is based on the view that, since the tainted evidence would be admissible if discovered through an independent source, it should be admissible if it inevitably would have been discovered."

In the instant case, based on the facts narrated in Petitioner's appeal and in Petitioner's Petition for a Writ of Habeas Corpus, a warrant surely could have been obtained once the scene was secured. In fact, a search warrant was eventually obtained. The court went on to say:

> "If the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation,

11

the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a worse position than it would have occupied without any police misconduct....

Nix was decided subsequent to our decision in State v. Barry, 94 N.M. 788, 617 P.2d 873 (Ct. App. 1980), in which we held that the inevitable discovery rule would allow admission of evidence obtained without a warrant when the prosecution (1) establishes that the police have not acted in bad faith to hasten the discovery of the evidence in question, and (2) shows the evidence would have been discovered without the impermissible act. Id. at 790, 617 P.2d at 875. Nix apparently removed the good faith requirement."

CONCLUSION:

As the court is aware, a failure to file a non-meritorious motion is not ineffective assistance ( State v. Duarte, 121 N.M. 553, 915 P.2d 309 ). State v. Baca, 115 N.M. 536, 544, 854 P.2d 363, 371 (Ct. App. 1993). Also, trial counsel's strategy and tactics should not be second-guessed on appeal (State v. Baca, 115 N.M. 536). Defendant committed an extremely heinous crime. He beat and chocked his wife. Next he moved her to another room and propped her on a bed. He duck taped a potato to the muzzle of a shotgun as a silencer, and duck taped a towel to the shotgun's stock. He then shot and killed her. The weapon's explosion pierced the back of her hands, peeled back the barrel, severed her thumb, and spread body tissue, duct tape, and potato about the room. He then stripped duct tap and towel from the weapon, placed them in a paper bag, and was seen by neighbors dumping the bag onto an adjoining yard. He then summoned the police and stated that his wife had committed suicide. He invited the police into his home, directed them to the body, and either consented to or at least permitted a search of the home. Upon entering the home on Defendant's invitation, the police discovered in plain view blood and broken pottery on the floor, a woman lying on a bed dead from a shotgun

12

wound, a shotgun on the side of the bed with its barrel split like a banana, blood splatter and scattered tissue, the backside of the woman's hands damaged from the gunshot blast, a severed thumb on the floor, a cut on her leg with blood running uphill, and the scatter of potato and duct tape remnants. It was not necessary to go through drawers, boxes, briefcases, or other hidden places to note these and other items of evidence of the homicide. The bag with duct tape and towel was found where witnesses to the disposal said it would be. The Defendant coldly maintained his story of suicide until such time as the police confronted him with conflicting evidence. He then changed his story to include versions of self-defense or accident. He gave unsolicited statements before being advised of his rights, and statements subsequent to a waiving of his constitutional rights. Trial Counsel knew these facts. Trial counsel objected to the decedent's out of court statement on the basis of hearsay and not on sixth amendment grounds. This could have been a choice based on strategy, a decision by counsel to go with what was in counsel's judgment the best objection, or simply a tactical decision not to weaken the objection with a "shotgun" approach. Or it simply could have been an understanding, supported by the discussion above, that a sixth amendment objection had no merit. Trial counsel did not file a motion to suppress. Counsel apparently believed the search of defendant's home was based on consent. Agent Ortiz under oath stated that that was his understanding. Defendant, in his feigned cooperation, certainly gave the impression that he consented and he never objected in the slightest degree. Even if an argument for consent is not as strong as some would prefer, it hasn't been argued that the police were not where they had a right to be when the above items were seen in plain view. Also, based on the facts and law cited above, there was no overreaching by the police, and the doctrine of inevitable discovery strongly negates the suppression of the items seized.

Finally, Respondent has not elaborated on the second prong of the test to be successful on a claim of ineffective assistance, namely prejudice. The reason is that Respondent maintains that based on the facts and law discussed above, motions to suppress the decedent's statement or the evidence seized at the defendant's home would have been totally without merit and thus would have failed. Therefore, there is no

13

inadequate representation for a failure to raise such motions. Without inadequate representation, there can be no prejudice.

Wherefore, Respondent respectfully prays that the relief requested by Petitioner not be granted, and that he be directed to serve out his justly deserved sengtence.

Respectfully submitted

Michael E. Martinez
Special Assistant District Attorney
2160 Gazelle NE
Rio Rancho, New Mexico 87124
(505) 898-6250
(505) 239-5754 Cell
mmartinez@cableone.net

I certify that a copy of the foregoing was mailed, faxed, or delivered to opposing counsel of record this __18th__ day of May, 2009.

Michael E. Martinez

14