THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO

STATE OF NEW MEXICO,
      Plaintiff,
vs.

Gilbert Torres

      Defendant.

ENDORSED
FILED IN MY OFFICE
DISTRICT COURT CLERK

03 JUN 20  PM 2: 47

JAMIE GOLDBERG

BY:_____DEPUTY

No.  D1314 CR 01 483
DA#  VL 01 1631

## JUDGMENT, SENTENCE AND COMMITMENT

On the 19th day of May, 2003, this case came before the Honorable John W. Pope, District Court Judge, for sentencing, the State appearing by John J. Bogren, Senior Trial Prosecutor, the Defendant appearing personally and by his attorney, Joseph Campbell, and the Defendant having been found guilty convicted on the 14th day of February, 2003 by a jury, accepted and recorded by the Court, of the offense(s) of: **Murder in the Second Degree and Tampering with Evidence**, contrary to NMSA 1978, Sections 30-2-1(B) and 30-22-5, a second and fourth degree felony offenses occurring on or about the 3rd day of December, 2001.

The Defendant is hereby found and adjudged guilty and convicted of said crime(s).

IT IS THE JUDGMENT AND SENTENCE of the Court that the Defendant, Gilbert Torres, be committed to the custody of the Department of Corrections as follows:

1.    For the charge of **Murder in the Second Degree** the defendant shall serve fifteen (15) years;

2.    For the charge of **Tampering with Evidence** the defendant shall serve eighteen (18) months;


EXHIBIT
A

3. That the above sentences shall run consecutive to each other for a period of incarceration of 16 1/2 years;

4. The defendant is to receive 97 days of pre-sentence confinement to date of sentencing;

5. Upon release, the defendant is to be placed on parole for a period of two (2) years.

6. That the Defendant shall provide a sample of biological material sufficient for DNA testing and shall pay a fee of $100.00 for the combined DNA Index System (CODIS) to the Field Services Division of the New Mexico Corrections Department, pursuant to the DNA Identification Act, Section 29-16-1, et.seq., NMSA 1978.

THEREFORE, You Cornell Corrections are hereby commanded to take the above-named Defendant into custody and confine him for the above term.

_____
JOHN W. POPE, DIV. 1
John W. Pope
DISTRICT JUDGE

APPROVED AS TO FORM:
_____
John J. Bogren
SENIOR TRIAL PROSECUTOR

telephonic approval
_____
Joseph Campbell
COUNSEL FOR THE DEFENDANT

ENDORSED

THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO

FILED IN MY OFFICE
DISTRICT COURT CLERK

03 JUN 25 PM 3: 53

No. D-1314-CR-1-483

JAMIE GOLDBERG

STATE OF NEW MEXICO,

BY:_____DEPUTY

                              Plaintiff,

vs.

GILBERT TORRES,

                              Defendant.

## NOTICE OF APPEAL

COMES NOW the Defendant, Gilbert Torres, by and through counsel, and appeals to the New Mexico Court of Appeals from the Judgment of this Court, a copy of which is attached hereto, convicting him of Murder in the Second Degree and Tampering with Evidence.  The Appellate Division of the Office of the Public Defender will represent the Defendant on the appeal, and a copy of the Order appointing the Appellate Division is attached hereto.

Respectfully submitted,

JOHN BIGELOW
CHIEF PUBLIC DEFENDER

By:

_____
Joseph M. Campbell
505 Central Avenue NW
Albuquerque, New Mexico 87102
Phone:  841-5100
Counsel for Defendant

**EXHIBIT**

bbbies'

B

This will certify that a copy
of the foregoing Notice of
Appeal was filed in the
Thirteenth Judicial District
Court on June 26th, 2003.
Copies were served on Judge
John W. Pope and Court
Reporter, Valencia County
Courthouse, P.O. Box 1089, Los
Lunas, NM 87031; John Bogren
of the District Attorney's
Office, P.O. Box 1919, Los
Lunas, NM 87031; the Appellate
Division of the Attorney
General's Office, Bataan
Memorial Building,
P.O. Drawer 1508, Santa Fe,
NM 87503; and the Appellate
Division of the Public
Defender Department,
301 N. Guadalupe Street,
Suite 001, Santa Fe, NM 87501
by mailing copies to them with
sufficient first-class
postage, prepaid, on June 26th.
20June 25, 20033

_____

Joseph M. Campbell
Counsel for Defendant

-2-

IN THE COURT OF APPEALS FOR THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

        Appellee,

v.

                              No. 24,103
                              Thirteenth Judicial Dist.
                              No. D-1314-CR 2001-483

GILBERT TORRES, JR.,

        Appellant.

COURT OF APPEALS OF NEW MEXICO
ALBUQUERQUE
FILED

AUG 2 2 2003

## DOCKING STATEMENT

The Appellant, GILBERT TORRES, JR., by and through his counsel, Todd Hotchkiss of Frechette & Associates, P.C., hereby submits this docketing statement pursuant to Rule 12-208, N.M.R.A. 2003. This docketing statement is timely if filed on or before Friday, August 22, 2003.

### NATURE OF THE PROCEEDINGS

GILBERT TORRES, JR. was originally charged in a Valencia County Grand Jury Indictment dated December 13, 2001 charging MR. TORRES in Count 1 of an open alternative count of murder Pamela Pace in violation of N.M.S.A. 1978, § 30-2-1(A) or (B) as murder in the first degree or second degree on December 3, 2001. Count 2 charged MR. TORRES with tampering with evidence on December 3,

1



2001 in violation of N.M.S.A. 1978, § 30-22-5.  MR. TORRES entered a plea of not guilty and was released on a bond and house arrest pending trial.

On December 6, 2002, the trial court reluctantly granted MR. TORRES' motion to continue trial.  The trial court was very upset that a problem between trial counsel and his investigator arose and necessitated the request for the continuance.

The State prosecuted MR. TORRES in a February 10-14, 2003 trial which resulted in the jury finding MR. TORRES not guilty of first degree murder as charged in Count 1.  No objections or motions were made by MR. TORRES during jury selection.  The jury found MR. TORRES guilty of second degree murder as alternatively charged in Count 1.  The jury found MR. TORRES guilty of tampering with evidence.

On May 19, 2003, Judge Pope convened the sentencing hearing. Pursuant to the June 20, 2003 Judgment, Sentence and Commitment, Judge Pope sentenced MR. TORRES to 15 years in the Department of Corrections on Count 1; 18 months, consecutive to Count 1, on Count 2.  Judge Pope sentenced MR. TORRES to a total of 16½ years incarceration plus two years of parole.

MR. TORRES is incarcerated pending appeal.

On June 25, 2003, MR. TORRES filed notices of appeal in the district court.  Pursuant to one motion for substitution of counsel and to extend time to file docketing statement, this

2

docketing statement is timely if filed on or before Monday, August 22, 2003.

There are no prior or related appeals.

### STATEMENT OF THE CASE

Before the trial began, MR. TORRES made a motion in limine regarding any reference by the State to domestic violence. Judge Pope seemed to agree that the State should not get into it. (T.03-75,20-138)

Also before the trial began, MR. TORRES objected to the prospective opinion testimony by State witnesses as to how the charged incident occurred. (T.03-76,150) The prosecutor stated that he would instruct the police officer witnesses not to testify as to feelings and only to rely on the evidence for opinion testimony. (T.03-76,171) The prosecutor stated that witnesses Perea and Ortiz would testify that their opinions were that the killing of Pamela Pace was not a suicide. (T.03-76,202)

At the conclusion of the State's opening statement, the prosecutor opined, "Just as you have taken an oath and have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our case as fairly, as honestly and as truthfully as possible." (T.03-75,412-14) No objection was made by MR. TORRES.

Los Lunas Police Officer Dino Roten, an accident

reconstructionist, testified that on December 3, 2001 he was dispatched to 932 Las Rosas in Los Lunas, New Mexico regarding a woman who committed suicide by shooting a shotgun to her chest. (T.03-77,25-75)  Roten testified that he arrived at approximately 7:00 p.m. (T.03-77,84)

Roten entered the residence and saw debris, broken pottery and blood stains on the floor. (T.03-77,115-22)  MR. TORRES was present and he said, "Well, she finally did it." (T.03-77,132) MR. TORRES said that Pamela Pace was in the back bedroom of his trailer house. (T.03-77,136)

In the back bedroom laid Pamela Pace dead on a bed with a shotgun blast to her chest. (T.03-77,148)  A 12-gauge shotgun leaned against the bed with a back scratcher nearby. (T.03-77,156) The barrel of the shotgun was "peeled back like a banana". (T.03-77,247)  Ms. Pace also had a gash to her left upper thigh from which blood strangely flowed toward her hip rather than down. (T.03-77,259)

Other officers arrived. (T.03-77,277)

Los Lunas Police Department (LLPD) Sergeant Perea arrived and spoke with Roten. (T.03-77,280)  They then spoke with MR. TORRES, who told them that Ms. Pace and he were previously married a short time and Ms. Pace wanted to get back together with him but MR. TORRES did not want that. (T.03-77,285)  Subsequently, an argument between Ms. Pace and he ensued leading to Ms. Pace throwing a vase

which broke.  Ms. Pace then slipped on the vase and cut her thigh. Ms. Pace then went into the bedroom and committed suicide. (T.03-77,293)

Sgt. Perea and Roten talked about the scene and decided to call Los Lunas Police Department Detective James Harris. (T.03-77,314)

Thereafter, Roten took statements from the neighbors. (T.03-77,323)

**LLPD Sergeant Josh Perea** was dispatched on October 14, 2001 to 932 Las Rosas in Los Lunas on a domestic violence call resulting from MR. TORRES reporting Ms. Pace. (T.03-77,426-41; T.03-78,252)  The house appeared as if a fight had occurred, Ms. Pace and MR. TORRES were not married, and MR. TORRES did not want Ms. Pace in his residence.

Over defense counsel's objection based on hearsay, the trial court allowed Perea to testify that as Ms. Pace left MR. TORRES' residence she said to Perea, "The next time you guys see me you're going to find me dead." (T.03-77,472)

The trial court overruled when the State argued that the October 14, 2001 state of mind of Ms. Pace was somehow relevant to her state of mind on December 3, 2001 and it was relevant to the issue of self defense. (T.03-77,467)

Perea testified that Ms. Pace appeared "groggy" as in under the influence of something. (T.03-77,475)

On December 3, 2001, Perea arrived at 932 Las Rosas at 6:54 p.m.  Inside the residence was in disarray as if a "pretty good fight had taken place." (T.03-77,490)

MR. TORRES was in the living room and he direct Perea to the bedroom where Ms. Pace was dead on the bed with a shotgun blast to her chest. (T.03-77,510)  Perea noticed the shotgun beside the bed with the barrel peeled back like a banana as if it had exploded. (T.03-77510-40)  Ms. Pace had a large laceration to her left upper thigh, her right thumb was found under a bed stand, and in the corner were apparent pieces of potato. (T.03-77,510-40)  On the bottom part of the shotgun he saw some grey duct tape with some blue cloth fibers hanging of it. (T.03-77,542)

Suspicious of suicide, Perea called Detective James Harris. (T.03-77,549)

Perea did not think much of the potato at first. (T.03-78,45)

MR. TORRES did not appear to Perea to be upset and was not crying.  He went outside and drank a better. (T.03-78,69)

Everyone was taken out of the house and crime scene tape was put up. (T.03-78,83)

In talking with the neighbors, one told Perea that he saw a man exit the residence and put an item over a fence. (T.03-78,96)  Perea went over to the residence over the fence and found a blue rag or towel wrapped in duct tape. (T.03-78,101)  Perea did not think of the towel and tape as significant initially. (T.03-

6

78,127)

LLPD Officer Vince Torres arrived at 932 Las Rosas on December 3, 2001 at 6:57 p.m. and went inside the residence. (T.03-78,294-316)   Torres took photographs of the scene at the request of Roten.   Torres notice a door not on its hinges.

Subsequently, Officer Torres took MR. TORRES to the Los Lunas Police Department at the request of Detective Harris. (T.03-78,419)   When MR. TORRES arrived at LLPD, he said, "I can't believe she did that." (T.03-78,485)

Torres testified that MR. TORRES was not under arrest, had not been read any Miranda warnings, and was free to leave the police department at that time. (T.03-78,529-32)

While he testified that MR. TORRES was never handcuffed at the LLPD before the later questioning occurred, he did not recall if MR. TORRES had been handcuffed to a pipe in the interrogation room. (T.03-78,546)

Neighbor Edgar Neal was outside of his house smoking a cigarette after having had a beer with a friend when he saw MR. TORRES exit his residence with a brown bag in his hand, approach the fence line to his property, and throw the bag over the fence into someone else's yard. (T.03-79,48-55)

Earlier that day Mr. Neal saw MR. TORRES arrive at his residence carrying a 20-pack of beer and be swore at by Ms. Pace. (T.03-79,78)   Approximately 10 minutes later, Mr. Neal saw MR.

TORRES exit the residence and throw the bag over the fence. (T.03-79,135)

**Tomasina Baca**, who lives near to MR. TORRES heard screaming and yelling by both a woman and a man from MR. TORRES' residence for approximately 30 minutes on December 3, 2001. (T.03-79,176) 10-15 minutes after the arguing finally ended, Ms. Baca also saw a man, who she did not identify as MR. TORRES, exit the residence and throw a brown bag over a fence. (T.03-79,245,364)  The police arrived approximately 10 minutes later. (T.03-79,287)

**Juan Lopez**, who resided at 942 Las Rosas did not know MR. TORRES.  On December 3, 2001 he heard a loud noise with his wife, who asked Mr. Lopez to go outside and check. (T.03-79,392-419) Mr. Three to four minutes later, Lopez then saw MR. TORRES outside in his yard throwing something in Mr. Lopez's back yard. (T.03-79,420,426)  MR. TORRES then re-entered his residence. (T.03-79,424)  Ten minutes later the police arrived at 932 Las Rosas. (T.03-79,436)

Earlier in the day of December 3, 2001, Mr. Lopez had a conversation with MR. TORRES, who appeared drunk to Mr. Lopez. (T.03-79,478)

**Laurie Lopez**, live with her husband, Mr. Lopez, just south of MR. TORRES' residence.  On December 3, 2001, Ms. Lopez heard a loud noise which made her think that someone had busted a beer bottle in their back yard. (T.03-79,513-17)  She asked Mr. Lopez

8

to check on it. (T.03-79,520)

LLPD Detective James Harris had been called and briefed by Sgt. Perea on December 3, 2001 and arrived at approximately 7:15 p.m. at 932 Las Rosas. (T.03-81,57-85) Harris spoke with the officers at the scene and then to MR. TORRES, who was outside the front door to the residence. (T.03-81,96)

MR. TORRES told Harris, "She finally did it", she committed suicide. (T.03-81,99-102) Harris went inside the residence, saw several pieces of pottery on the floor, blood stains on the floor, and determined that a violent fight had occurred. (T.03-81,107-19) Blood stains were on the couch, the linoleum in the kitchen and in the east bedroom. (T.03-81,127)

Harris went to the back bedroom, saw Ms. Pace dead on the bed, observed the scene, and then approached MR. TORRES. Harris testified that he told MR. TORRES he was not under arrest but that Harris wanted MR. TORRES to go to LLPD to speak with him later. (T.03-81,148) MR. TORRES agreed, and Sgt. Perea told Officer Torres to transport MR. TORRES to LLPD. (T.03-81,165)

After the initial photos taken by LLPD, Harris spoke with Sgt. Perea and decided to call the New Mexico State Police (NMSP) crime scene team because it would be "the best course of action." (T.03-81,175)

Harris admitted they searched the area and found the blue rag or towel with duct tape on it. (T.03-81,193) LLPD collected the

shotgun from the residence. (T.03-81,208)

The barrel of the 12-gauge shotgun exploded and sent shrapnel through the wall between the bedroom and the laundry room. (T.03-81,350)

A piece of potato was found on the right side of the barrel and duct tape was on the barrel. (T.03-82,389)

The ceiling tile from above Ms. Pace's body had gun powder residence, blood, and apparent potato pulp on its surface. (T.03-81,465-90)

An arm of a chair identified as from the kitchen had hair consistent with Ms. Pace's hair. (T.03-81,538)

After photographing the scene and the NMSP crime scene team arrived, Harris went to LLPD to question MR. TORRES. (T.03-82,55)

MR. TORRES' shirt, pants, belt and boots were seized from him, and were found to be stained with blood. (T.03-82,93-127,136-40)

On December 3, 2001, Harris observed bruises or marks around Ms. Pace's neck. (T.03-82,195)

The cut on Ms. Pace's upper left thigh was approximately 4"-5" long. (T.03-82,201)

At approximately 12:35 a.m. on December 4, 2001, at the LLPD, Harris began the questioning of MR. TORRES. (T.03-82,237) MR. TORRES stated that he had no objection to being videotaped. (T.03-82,237-377)

In his first statement during the earliest of morning hours on December 4, 2001, MR. HARRIS told the police that Ms. Pace was mad at him, threw some pottery and a beer bottle, MR. TORRES remained attentive to the computer, MR. TORRES denied there was a big fight, Ms. Pace cut her leg on the broken pottery or beer bottle, MR. TORRES offered to assist Ms. Pace, Ms. Pace profanely rejected MR. TORRES, Ms. Pace went to the master bedroom, minutes later MR. TORRES heard the shotgun blast, MR. TORRES went to the bedroom and shook Ms. Pace to attempt to revive her. (T.03-82, - T.03-85,250)

MR. TORRES told the officers of Ms. Pace's criminal past, which was once unknown to him. (T.03-82,498; T.03-83,210)

MR. TORRES told the officers of how just days previously Ms. Pace pulled the shotgun out on Marvin Gracie at MR. TORRES' residence. (T.03-82,512-23)

MR. TORRES told the officers that he and a friend had gone earlier on December 3, 2001 to get some wood and Ms. Pace was mad that he was gone. (T.03-82,556)

MR. TORRES spoke of Ms. Pace's apparent methamphetamine dominated life, her consequent appearances and disappearances. (T.03-83,55)

MR. TORRES stated that he wanted to help Ms. Pace. (T.03-83,118)

MR. TORRES stated that he kept the shotgun in the closet.

11

(T.03-83,122)

After MR. TORRES heard the shot and went into the bedroom, he called his son on the telephone and then called the Los Lunas Police Department. (T.03-83,170-84)

MR. TORRES stated that at one point he went outside to look for the police and then went inside. (T.03-83,223)

MR. TORRES believed that Ms. Pace had recently been distraught. (T.03-83,263)

The police officers admitted that they lied to MR. TORRES and justified the use of those techniques.

Ms. Pace was not under the influence of methamphetamine at the time of her death. (T.03-83,341)

MR. TORRES denied putting the blue rag and duct tape and potato over the fence into the neighbor's yard. (T.03-83,395,425,441)

MR. TORRES asserted multiple times that Ms. Pace shot herself. (T.03-83,413,495,557; T.03-84,250)

Harris told MR. TORRES that their investigation shows that the blue rag was put on the shotgun butt and MR. TORRES clearly put the rage into the neighbor's yard over the fence. (T.03-83,424)

MR. TORRES denied multiple times shooting Ms. Pace. (T.03-83,449; T.03-84,238,424,486,522)

Harris told MR. TORRES that "our" investigation shows you

were involved. (T.03-83,452)

MR. TORRES proffered the possibility that when he shook Ms. Pace after discovering her body and said, "Pam, Pam, Pam!", his hands may have caused bruises to Ms. Pace's neck. (T.03-83,497)

Harris stated that he wanted to give MR. TORRES a break while Harris called the other agents to ask them what they have learned at the scene. (T.03-83,498)

"Our investigation is showing you are involved in this," asserted Harris to MR. TORRES. (T.03-83.501; T.03-84,147)

Harris returns and says that he spoke with NMSP Agent Art Ortiz, from the scene, "and its not adding up to the way your story is saying, Gilbert." (T.03-83,518)

Harris told MR. TORRES, "They're examining her wounds." (T.03-83,528)

MR. TORRES asserted multiple times that Ms. Pace died on the bed. (T.03-83,541)

Harris told MR. TORRES, "It's clearing up that that rag was taped on that shotgun." (T.03-83,568)

MR. TORRES denied knowing anything about the blue rag and duct tape. (T.03-84,8-30)

MR. TORRES testified that he had not shot a gun in a long time. (T.03-84,170)  MR. TORRES asserted that no gun powder residue will not be found on him or his clothing. (T.03-84,172,186)

13

MR. TORRES denied moving Ms. Pace and instead asserted that Ms. Pace walked into the bedroom. (T.03-84,406-45,545)

A police officer asserted that Ms. Pace's wounds were not consistent with MR. TORRES' statement. (T.03-84,447)

Agent Ortiz then arrives at the interrogation and tells MR. TORRES that Ortiz has looked at the "evidence at the scene" and that Ms. Pace did not commit suicide. (T.03-84,483)

Ortiz asserted that MR. TORRES tried to make it look like Ms. Pace committed suicide. (T.03-84,487)

Ortiz questioned MR. TORRES about hair found in a broken chair which appears to be consistent with Ms. Pace's hair. (T.03-84,516)

Ortiz questioned MR. TORRES about blood stains on the bottom of Ms. Pace's feet without any bloody footprints in the residence. (T.03-84,546)

Ortiz asserted to MR. TORRES, "This scene over there does not add up to what you are saying." (T.03-85,221)

MR. TORRES was informed that he was being arrested and booked on the charge of tampering with evidence and suspicion of murder. (T.03-85,242,250)

30-45 minutes later, MR. TORRES apparently approached Harris and asked if he could talk to Harris again because he wanted to tell the truth. (T.03-85,279)

NMSP crime scene agents had taken the video camera to the

14

scene, so the second statement by MR. TORRES during the very early morning hours of December 4, 2001 was just audio tape recorded. (T.03-85,287-95)

Harris makes clear for the record that the NMSP agents "out at the scene" advised of "additional evidence that they had located and that they wanted to come back and interview him further." (T.03-85,291-94)

MR. TORRES began the second statement, which initially was heard by the jury over audio tape, by changing his version of events. (T.03-85,279)  MR. TORRES claimed that Ms. Pace and he had a big fight, that Ms. Pace had cut herself, that Ms. Pace had run into the master bedroom, MR. TORRES entered the bedroom, Ms. Pace pointed the shotgun at him, they struggled over the shotgun, the shotgun got turned around, the shotgun somehow went off, and Ms. Pace was shot. (T.03-85,344- T.03-88,100)

MR. TORRES continued to deny any knowledge of the blue rag. (T.03-85,350)

MR. TORRES asserted the shooting of Ms. Pace was "an accident". (T.03-85,362,369,466,558)

The police officer asserted there was no way that Ms. Pace walked into the bedroom. (T.03-85,411)

MR. TORRES then started posing the question, "Either way, I'm going to prison, right?" (T.03-85,439)

The police officer testified that Ms. Pace had bruising under

her arms and on her neck. (T.03-85,103)

Ortiz testified that Ms. Pace's blood vessels were blown in her eyes, consistent with strangulation. (T.03-86,108)

At one point the questioner asserts, "There's some more stuff we found over there, its getting deeper...." (T.03-86,173)

Then finally, the questions about the potato start coming after the investigation inside MR. TORRES residence by the NMSP crime scene team shows that a potato was likely put at the end of the shotgun. (T.03-86,227,307,540)  The police officer says that they have learned of potato in Ms. Pace's hair, on the ceiling and on duct tape. (T.03-86,320,463)

MR. TORRES eventually agrees that he did put the blue towel on the shotgun to try to prevent Ms. Pace from being able to use the gun. (T.03-86,397)

MR. TORRES denied any knowledge of the potato. (T.03-86,432)

      *    *    *    *    *

After the videotape ended of MR. TORRES' second statement on December 4, Detective Harris testified that he found some blood drops on the south or back side of the residence on the steps. (T.03-88,282)

On cross examination, Harris agreed that this was his first murder scene investigation as a detective. (T.03-88,458)

After walking through the crime scene, Detective Harris and Sgt. Rivera decided to call the NMSP crime scene team within the

30 minutes of Harris having arrived at the scene. (T.3-90,201-05)
Subsequently, NMSP Agent Applegate arrived at 9:22 p.m., Agent
Arthur arrived at 9:59 p.m., Agent Casaus arrived at 11:02 p.m.,
and Agent Ortiz arrived at 11:24 p.m. on December 3, 2001. (T.03-
90,230)   The medical people arrived first. (T.03-90,260)

After the NMSP crime scene team arrived, according to Harris,
"The only people that were in there [the residence] were myself
and the crime scene unit.   No other officers were allowed back
into the residence once I initially had them leave out of the
scene, no other officers were allowed back in." (T.03-90,410-12)

Harris did not notice the cracked arm of a chair when he
walked through the residence. (T.03-90,469)

No fingerprints were lifted off of the cloth rag. (T.03-
90,540)

Due to what Harris considered as the apparent staging of the
shooting, Harris assumed that Ms. Pace had been strangled. (T.03-
91,17)

No gun powder residue test was performed on MR. TORRES.
(T.03-91,62)

MR. TORRES did not complain of any abuse and allowed to go to
the bathroom during the approximate four hour interrogation.
(T.03-91,232)

**Forensic pathologist Jeffrey Nine** testified that he performed
the autopsy on Ms. Pace on December 5, 2001. (T.03-91,362)

The cause of death was the gun shot wound to the chest. (T.03-91,411)  The manner of death was homicide. (T.03-91,415) The injuries on Ms. Pace, including a purple bruise on her left eyelid, looked fresh and probably occurred around the same time as the shotgun wound. (T.3-91,446)

Some duct tape was found in the shotgun wound indicating that duct tape had to be in front of the barrel. (T.03-91,491; T.03-92,215,383)  The pathologist never said that the duct tape had to be at the tip of the barrel. (T.03-92,408)

It was a possibility that the twisting metal from barrel of the gun could have taken the thumb off. (T.03-92,432)

The pathologist believed there was something at the end of or in the barrel, fragmented the barrel and the projectile. (T.03-92,444)

The shotgun barrel was close to the body, perhaps in contact with the skin at the time of the shot because of burnt gun powder material around the wound. (T.03-91,501)

The back of both Ms. Pace's right and left hands indicated wounds which indicated to the pathologist that Ms. Pace's hands were in front of the barrel of the gun when the gun was fired. (T.03-91,520-47)

On the left thigh of Ms. Pace was a wound from a knife or sharp instrument. (T.03-92,7)  The wound was a clean, straight wound which could have been from a shard of glass. (T.03-92,33)

18

On the neck of Ms. Pace was a ligature mark. (T.03-92,93) The pathologist recognized that Ms. Pace did have a necklace on. (T.03-92,95)

The pathologist noted blood smears on the bottom of both feet without any injuries to the bottom of her feet. (T.03-92,120-23) Because of the marks on her neck, the pathologist looked at Ms. Pace's eyes and saw small hemorrhages to her left eye indicating that strangulation may have been a component. (T.03-92,125-43) Ms. Pace could have been rendered unconscious. (T.03-92,294) The pathologist believed that the abrasion on Ms. Pace's neck could have been caused by yanking off her necklace. (T.03-92,477)

The pathologist believed that he needed to evaluate more than Ms. Pace's eyes to determine if she had been strangled into unconsciousness. (T.03-92,500)

The internal structures of Ms. Pace's neck were fine. (T.03-92,515)

**NMSP Investigator Mike Applegate** was a member of the crime scene team and was the crime scene manager in this case. (T.03-92,549-54; T.03-95,31) Agent Arthur was assigned to do the still photography, Agent Casaus was assigned to do the videotaping, and Agent Ortiz was assigned to process the blood splatter. (T.03-95,52)

The door to the front bedroom was busted off its hinge. (T.03-95,142)   A broken vase was found in the hallway. (T.03-

19

95,200) Blood stains were found in the living room. (T.03-95,240)

The muzzle of the shotgun was peeled back like a banana. (T.03-95,419) Duct tape was on the gun with blue fibers. (T.03-95,425)

22 blood stains were in the master bedroom. (T.03-95,519) Blood stains were on the ceiling and west wall of the master bedroom. (T.03-95,531-42)

The initial assessment was that domestic violence occurred, that Ms. Pace was shot with a shotgun, and the suicide was staged. (T.03-95,553-56)

White material consistent with potato was found on some duct tape and in Ms. Pace's hair, and on her bra, chest or skin. (T.03-92,246)

The toxicology results showed a blood alcohol of .072 and Valium was found in her blood. (T.03-92,252)

The pathologist believed that Ms. Pace was alive when shot. (T.03-92,266)

The pathologist considered suicide but rejected it due to the injuries to the backs of hands and injuries to the rest of her body. (T.03-92,308)  "I don't believe there is any way that she could have done this herself." (T.03-92,323)

The blood that went down Ms. Pace's leg as if Ms. Pace was upright, which would include walking. (T.03-92,463)

Applegate decided to call Agent Art Ortiz to process the

20

blood stains in the kitchen and bedroom. (T.03-95,557; T.03-96,7)

After the crime scene team found the blue rag at 922 Las Rosas, they went to the LLPD to question MR. TORRES. (T.03-96,78) He asked MR. TORRES about the blue rag, duct tape and potato and the use of the potato as a suppressor. (T.03-96,92)

MR. TORRES first admitted dropping the blue rag over the fence but then eventually admitted dropping it. (T.03-96,108)

"We went back to the residence and began processing the scene." (T.03-96,128)   None of the evidence was collected until after a search warrant was obtained. (T.03-96,131)

On cross exam, Applegate acknowledged that he arrived at MR. TORRES' residence at 9:22 p.m. on December 3. (T.03-96,160) Applegate received a briefing from Detective Harris upon arrival at the scene. (T.03-96,168)   After that briefing, Applegate went into the house to look around "to see what you have." (T.03-96,174)   That first time in the house was "Just to get a general fell for what was happening and what type of evidence we needed to look for." (T.03-96,266)

Later on that evening, when processing the scene is when the crack in the chair's arm was brought to his attention. (T.03-96,268)

Applegate estimated that he contacted MR. TORRES during the questioning at approximately 3:30 a.m. on December 4, 2001. (T.03-96,444)

Applegate believed that Ms. Pace was dead or near death when shot. (T.03-96,495)

NMSP **Sergeant Ramon Casaus** testified that about 10:00 p.m. he was called to assist in processing a scene. (T.03-96,526)  Casaus arrived at the scene at approximately 11:00 p.m. on December 3. (T.03-96,531; T.03-97,419) Casaus was assigned to videotape record the scene. (T.03-96,533; T.03-97,457)  He began shooting the videotape just after 11:00 p.m. on December 3, 2001. (T.03-96,550) That videotape, Exhibit 37, was introduced into evidence and played for the jury. (T.03-97,1)

Casaus testified that initially this matter was investigated as a suicide "and then when we found the rag, and stuff like that, we stepped out and decided to get the warrant." (T.3-97,291) Casaus and Applegate left the questioning of MR. TORRES at LLPD to return to the scene when they heard about a potato being involved. (T.03-97,395)

NMSP **Agent Shane Arthur** was a member of the crime scene team who was the first member of the crime scene team to arrive at the scene. (T.03-97,549)  Dino Roten briefed Arthur. (T.03-97,553)

From 9:30 p.m. on December 3, 2001 until the morning of December 4, 2001, Arthur took photographs of the scene. (T.03-98,10)

The triangular things with numbers on them are the evidence markers. (T.03-98,66)

Arthur assisted with the search of the residence and with the interview of MR. TORRES. (T.03-98,264)

No fingerprints of value were found on the duct tape. (T.03-98,310)

Arthur took 433 photos during the search, execution of the search warrant, and afterwards. (T.03-98,318)

**NMSP Agent Art Ortiz** was a member of the crime scene team and accepted as an expert in blood stain pattern analysis and accident reconstruction. (T.03-98,375-473)  Applegate called him to assist at the scene and Ortiz arrived at 11:24 a.m. (T.03-98,482)

Ortiz was briefed about what agents had seen at the scene. (T.03-98,483)  Casaus was videotaping inside the residence. (T.03-98,485)  Ortiz put on shoe covers and Applegate and Harris took him into the scene. (T.03-98,490)

On the south or back side of the residence Ortiz saw some blood stains. (T.03-98,526)

Ortiz demonstrated for the jury and testified about passive blood drops, transfer stains of blood, a wipe of blood, a swipe of blood, and high velocity blood stains. (T.03-99,73-125)

No blood was found on the pieces of pottery, which Ortiz testified contradicted MR. TORRES' statements that Ms. Pace had cut herself with a ceramic pot. (T.03-99,204,224)

Ortiz observed blood stains on the couch, in the living room the kitchen, and the hallway. (T.03-99,250-300)

The blood stains in the living room and in the hallway were "somewhat consistent with length and width of the wound" on Ms. Pace's left upper thigh. (T.03-99,309)

Ortiz believed that the damage to the one bedroom door was fresh. (T.03-99,320)

No transfer patterns were found at a distance that someone would be walking. (T.03-99,426)

There was an L-shaped blood swipe was found (T.03-99,445) No evidence existed to support that Ms. Pace walked to the back. (T.03-99,452)  Ortiz believed that the blood stains "refutes the statement by the defendant." (T.03-99,455)

In the hallway, 10 blood stains were between the kitchen and the master bedroom. (T.03-99,493)  25 blood stains were in the kitchen. (T.03-99,492)

6 or 7 drops of blood existed on the shotgun. (T.03-100,24)

Something was at the top of the shotgun to keep the gases in the gun and caused the explosion. (T.03-100,44)

Blankets were "somewhat piled up" under Ms. Pace. (T.03-100,54)

Ortiz testified that the blood stains and flow patterns evidenced that Ms. Pace had been moved. (T.03-100,64)

Ms. Pace's right upper arm, bra and abdomen had dark staining consistent with gun shot powder residue. (T.03-100,76)

Because there was no evidence of the scene being cleared,

24

according to Ortiz, therefore lumenal was not used. (T.03-100,129)

Contrary to the pathologist, Ortiz testified that no gun shot residue was found in the wound track like Ortiz normally sees as close distance. (T.03-100,160)   According to Ortiz, something stopped or blocked the gun powder residue from getting into the wound track. (T.03-100,164)

According to Ortiz, the shotgun was fired and exploded, with shrapnel lacerated the back of Ms. Pace's hands and abdomen and with gun powder residue blocked from going forward into the wound track. (T.03-100,173)

A piece of suspected potato was on the barrel of the shotgun. (T.03-100,210)

No transfer stains existed in the residence from the stains on the bottom of Ms. Pace's feet. (T.03-100,274,288)   A person with bloody feet did not walk on the floor of the residence. (T.03-100,313)

Along with the blue towel and duct tape found at 922 Las Rosas was found a substance appearing to be potato. (T.03-100,360)

The prosecutor asked Ortiz, "Do you know approximately what time these items were found?" (T.03-100,370)   Ortiz responded, "I would say in the early morning hours of December the 4[th]." (T.03-100,371)

A juror asked the question of whether the blue towel long enough to reach from the trigger to the top of the barrel of the

gun.  Ortiz answered that it was. (T.03-100,385)

On Ms. Pace's neck was found a white substance of suspected potato. (T.03-100,418)

On the ceiling above the bed where Ms. Pace was found was shredded duct tape, potato, gun shot residue and a piece of shrapnel. (T.03-100,459)

Ortiz believed that Ms. Pace was on the bed when shot. (T.03-100,492)

The blood drops on the south or back side of the residence had to come from a bloody object. (T.03-100,496)

A bag of potatoes were found in the refrigerator. (T.03-100,507)

Due to blood stains on MR. TORRES' clothing, Ortiz believed that MR. TORRES had contact with Ms. Pace. (T.03-100,528)

Ortiz rendered the opinion that Ms. Pace did not commit suicide due to the injuries to the back of Ms. Pace's hands, the tape and towel to shield the shooter from gun shot residue, the explosion of the barrel due to the potato at the end of the barrel, and the amputation of Ms. Pace's thumb. (T.03-101,88-117)

Ms. Pace was laying back on the bed when she was shot. (T.03-101,120)

Ortiz opined that Ms. Pace was not accidentally shot. (T.03-101,140)

Defense counsel objected due to lack of foundation. (T.03-

26

101,142) The trial court overruled the objection. (T.03-101,150)

Ortiz opined that the evidence does not support MR. TORRES' statements plus the evidence of the staging of the shooting of Ms. Pace showed that MR. TORRES was trying to mislead the investigators. (T.03-101,151)

Ortiz stated that Ms. Pace could not have been standing up because she was on the bed when shot. (T.03-101,167)

The prosecutor then requested, "Based on your training and experience and as a crime reconstructionist expert, can you just kind of give us a quick synopsis of how you believed this occurred?" (T.03-101,179)

Ortiz responded that it was obvious that the towel was used to shield the shooter.   The potato was used at the end of the barrel with layers of duct tape, done "ahead of time". Ms. Pace, due to her state of dress, possibly was in the bedroom when MR. TORRES went into the room with the shotgun, "maybe with the intent to kill her at that point in time." (T.03-101,183-92) Ms. Pace possibly ran from the room and MR. TORRES pursued her, forced open the other bedroom door.   A struggle ensued, in which Ms. Pace began to bleed, property was broken, and Ms. Pace was strangled. MR. TORRES then carried Ms. Pace back to the master bedroom, placed her on the bed. (T.03-101,193-220)

Defense counsel then requested to approach the bench and asks the trial court if this was the State's closing argument.   The

trial court responded that the prosecutor's witness could reconstruct the scene but to move it along. (T.03-101,238)

Ortiz continued that MR. TORRES then shot Ms. Pace. (T.03-101,248)

The "physical evidence does not lie," continued Ortiz, "and all the physical evidence points to this was a deliberate killing." (T.03-101,253)

Defense counsel did not further object.

On cross exam, Ortiz agreed that while "physical evidence doesn't lie, but there are different interpretations of physical evidence, correct?" (T.03-101,258)

During the evening of December 3, 2001, Ortiz testified, "Well, we took a look at the evidence and it was very suspicious and it was obvious it was staged." (T.03-101,284) This was inside MR. TORRES' residence. (T.03-101,286)

Regarding his synopsis, Ortiz conceded that he could not determine the chronology of the blood stains and that different chronologies were possible. (T.03-101,395)

Ms. Pace was not completely vertical on the bed when shot. (T.03-101,428)

When Ortiz asked MR. TORRES about a polygraph during the December 4, 2001 questioning, MR. TORRES indicated that he wanted to take a polygraph. Ortiz did not give him one and testified that that part of the questioning was merely an interrogation

28

technique. (T.03-102,9-28)   The request of MR. TORRES to take a gun powder residue test was also just an interrogation technique. (T.03-102,67)

Ortiz agreed that he arrived at the LLPD to question MR. TORRES on December 4, 2001 after having been at the crime scene at MR. TORRES' residence and determined what happened. (T.03-102,256)

Regarding the fact that State agents searched MR. TORRES' residence without a warrant prior to the December 4, 2001 search warrant later issued, MR. TORRES' trial counsel asked, "Gilbert had given consent to search his house, correct?" (T.03-102,392) Ortiz responded, "That's correct." (T.03-102,393)   MR. TORRES' trial counsel responded, "I didn't think there's anything really of interest there." (T.03-102,399)

Prior to the acquisition of the search warrant, Ortiz agreed that he noted where the blood drops were. (T.03-102,401)

The State rested. (T.03-102,415)

MR. TORRES then moved for a directed verdict on the first-degree murder charge and second-degree murder charge.   The trial court denied the motion. (T.03-102,417-30)

MR. TORRES then presented two witnesses.

**Marvin Gracie** knew MR. TORRES since 1986 and knew Ms. Pace. (T.03-102,437) Mr. Gracie testified how in January of 2001 at MR. TORRES' residence, Ms. Pace punched Mr. Gracie in the face for no apparent reason. (T.03-102,462)

29

Ms. Pace subsequently telephoned Mr. Gracie and apologized. (T.03-102,494)

Just before her death, Ms. Pace, around Thanksgiving of 2001, when Mr. Gracie visited MR. TORRES at MR. TORRES' residence, pointed the shotgun at Mr. Gracie for no apparent reason. (T.03-102,527)  There was no potato at the end of the gun and no blue towel on the gun. (T.03-13,30)

MR. TORRES did not say much about problems with Ms. Pace but he knew there was a problem. (T.03.103,4)

**Mark Bondi**, a friend of MR. TORRES for 30 years, was with MR. TORRES earlier during the day of December 3, 2001. (T.03-103,55-80)  Bondi, without prior notice, stopped in at MR. TORRES' residence at approximately 11:00 a.m., and as he approached the residence he heard a lot of swearing and cursing before the argument ended. (T.03-103,103)  Bondi remained inside the residence for approximately 30 minutes, then left with MR. TORRES to go get some firewood. (T.03-103,80-113)

Bondi and MR. TORRES returned to MR. TORRES' residence at approximately 1:00 p.m. (T.03-103,146)

The defense rested. (T.03-103,209)

MR. TORRES made another motion for directed verdict, which the trial court denied. (T.03-103,247-60)

The first words by the prosecutor during closing argument were the following: "Pamela Pace's prophesy came true: 'The next

30

time you see me you are going to find me dead.' She told Officer Josh Perea of the Los Lunas Police Department. And sure enough, the next time Josh Perea saw Pamela Pace, he saw her dead." (T.03-103,446) More references were made by the prosecutor during closing argument to that statement by Ms. Pace. (T.03-103,506; T.03-106,225)

After MR. TORRES closed, the State rebutted. The prosecutor asserted to the jury that MR. TORRES, regarding Ms. Pace, "continues to disgrace and deface her memory. Shame on you, Gilbert Torres! And I hope you feel my outrage. I hope that as a society ...." (T.03-107,1-4)

Defense counsel objected. (T.03-107,3) A bench conference ensued, with an apparent statement by the trial court to "tone it down." (T.03-107,8)

The prosecutor continued, "And as a society we should feel outraged. We are a nation of law, not of men. The true test of our greatness is how well wee treat the least of our citizens. The true test of our greatness is how we uphold the principle that everybody's entitled to life, liberty and the pursuit of happiness." (T.03-107,9-15)

MR. TORRES objected and approached the bench. (T.03-107,16) Again the bench conference is difficult to understand but at one point MR. TORRES' attorney asserted that the jury was not supposed to consider the consequences of their verdict. (T.03-107,20)

31

Defense counsel asserted that the jury's deliberations were not going to have an impact on the constitution or our moral fiber as a nation. (T.03-107,23)  The trial court overruled the objection. (T.03-107,24)

The prosecutor's final words during closing were, "On behalf of Pamela Pace, the family and myself, I'm going to thank you for our consideration in this matter.  It should be an easy verdict." (T.03-107,64-67)

The jury returned guilty verdicts for MR. TORRES on the second-degree murder and tampering with evidence charges. (T.03-107,105-07)

### RECORDING OF PROCEEDINGS

The February 10-14, 2003 trial proceeding and the May 19, 2003 sentencing hearing were audio tape recorded.

### ISSUES PRESENTED ON APPEAL

### I.

Did plain or fundamental error occur when MR. TORRES failed to file a motion to suppress seeking to suppress the evidence, including specifically seeking the district court to find that MR. TORRES' constitutional rights under the Fourth Amendment to the United States Constitution and Article II, § 10 of the New Mexico Constitution when State agents searched MR. TORRES' residence

32

without a search warrant for hours before seeking and acquiring a search warrant on December 4, 2001 and failed to establish a sufficient factual basis that MR. TORRES' knowingly and voluntarily consented to the search of his residence?

### Legal Authorities

1.   Rule 12-216(B)(2), N.M.R.A. 2003 (An exception to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party.").

2.   Rule 11-103(D), N.M.R.A. 2003 ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.").

3.   <u>Flippo v. West Virginia</u>, 528 U.S. 11, 120 S.Ct. 7 (1999)(There is no "murder scene exception" to Warrant Clause of the Fourth Amendment that would allow warrantless search of everything found within crime scene after area is secured).

4.   <u>Mincey v. Arizona</u>, 437 U.S. 385, 98 S.Ct. 2408 (1978)(Defendant did not, by shooting person, forfeit his expectations of privacy in his residence where the shooting occurred).

## II.

Did trial counsel provide ineffective assistance of counsel when trial counsel failed to move to suppress the physical evidence gained as a result of the multi-hour search of MR. TORRES' residence after MR. TORRES called the police to report the suicide of his ex-wife at his residence, after the police arrived to learn no one else was present at the residence, after the police convinced MR. TORRES to go to the police department for questioning, when no warrantless exception to the warrant requirement of the Fourth Amendment to the U.S. Constitution or Article II, § 10 of the New Mexico Constitution applies, when the police used information gained and determination made as a result of the warrantless search to question MR. TORRES at the police department, and when no plausible, rational or reasonable strategy existed for the failure of trial counsel to move for the suppression of the evidence learned during the warrantless search of the residence and the fruits of the warrantless search?

### Legal Authorities

1.  <u>State v. Cooper</u>, 1998-NMCA-180, 126 N.M. 500, 972 P.2d 1, *cert. denied*, (1998)(To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial courts' results unreliable. Defendant

must establish a prima facie case of ineffective assistance of counsel where a plausible, rational strategy or tactic can explain the conduct of defense counsel.   In determining whether the failure to pursue a motion to suppress constitutes ineffective assistance of counsel, this Court addresses: (1) whether the record supports the motion on the ground asserted; and (2) whether a reasonably competent attorney could have decided that the motion was unwarranted.).

    2.   <u>Flippo v. West Virginia</u>, 528 U.S. 11, 120 S.Ct.   7 (1999)(There is no "murder scene exception" to Warrant Clause of the Fourth Amendment that would allow warrantless search of everything found within crime scene after area is secured).

    3.   <u>Mincey v. Arizona</u>, 437 U.S. 385, 98 S.Ct. 2408 (1978)(Defendant did not, by allegedly shooting person, forfeit his expectations of privacy in his residence where the shooting occurred).


III.

    Did the trial court err and prejudice MR. TORRES when overruling MR. TORRES' objection regarding the scope of opinion testimony by the State's proffered experts, specifically Agents Perea and Ortiz, beyond their qualified opinion whether Ms. Pace committed suicide and the State agents then provide detailed testimony about how the whole entire murder circumstances

35

occurred?

## Legal Authorities

1.  Rule 11-702, N.M.R.A. 2003 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.")

2.  <u>Duran v. Lovato</u>, 99 N.M. 242, 656 P.2d 905 (Ct. App. 1982)(A police officer who relies on a diagram and his notes to render an opinion regarding the area of impact and whether speed was a contributing factor in an automobile accident may be an expert witness).

3.  <u>Stat v. Vigil</u>, 103 N.M. 643, 711 P.2d 920 (1985)(An accident reconstructionist shown to be possessed of the education and experience necessary to form an opinion on the movement of bodies within a vehicle may properly be admitted to testify).

## IV.

Did plain or fundamental error occur when, without objection from defense counsel, the prosecutor stated, "Just as you have taken an oath and have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our

case as fairly and as honestly and as truthfully as possible"?

## Legal Authorities

1.    Rule 12-216(B)(2), N.M.R.A. 2003 (An exception to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party.").

2.    State v. Baca, 120 N.M. 383, 902 P.2d 65 (1995)(Prosecutor's statement during closing argument, that he had higher ethical duty than defense counsel because prosecutors are bound by law to seek the truth whereas criminal defense attorneys are not, implying that prosecutor would not have pursued case unless defendant was guilty, was impermissible expression of personal opinion on defendant's guilt or innocence).

## V.

Did the trial court err by overruling MR. TORRES' objection to the hearsay testimony of Ms. Pace from October 14, 2001, and argued by the State as state of mind evidence under Rule 11-803(C), N.M.R.A. 2003 or relevant to MR. TORRES' anticipated self defense claim, that "The next time you guys see me you're going to find me dead"?

## Legal Authorities

1.    Rule 11-803(C), N.M.R.A. 2003.  Hearsay exceptions;

37

availability of declarant immaterial. ("**Then existing mental, emotional or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to rove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.").

2. <u>State v. Baca</u>, 120 N.M. 383, 902 P.2d 65 (1995)(The statement of the victim of attempted murder, made in relation to her fear of dogs because a dog allegedly bit her "at the house where they killed me", was inadmissible because, although Paragraph C allows hearsay statements that sow the declarant's then existing mental condition, it does not permit state of mind).

3. <u>State v. Baca</u>, 120 N.M. 383, 902 P.2d 65 (1995)(The statement of fear of her father (the defendant) made by the victim of attempted murder was inadmissible under Paragraph C either because it was irrelevant as an attempt to demonstrate a fact of consequence other than the declarant's state of mind, or because it was unfairly prejudicial).

4. Rule 11-401, N.M.R.A. 2003 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

38

evidence.").

5.   Rule 11-402, N.M.R.A. 2003 ("All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules adopted by the supreme court.   Evidence which is not relevant is not admissible.").

6.   Rule 11-403, N.M.R.A. 2003 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.").

7.   <u>State v. Vallejos</u>, 98 N.M. 798, 653 P.2d 174 (Ct. App.1982)(Items are admissible which show either an admission by conduct or consciousness of guilt).

8.   <u>State v. Espinosa</u>, 107 N.M. 293, 756 P.2d 573 (1988)(The state may not introduce into evidence a handgun not used in the perpetration of a crime for which the defendant is charged if the State does so to link the defendant to the commission of another crime).

9.   <u>Coates v. Wal-Mart Stores, Inc.</u>, 1999-NMSC-013, 127 N.M. 47, 976 P.2d 999 (In action for mental distress arising out of sexual harassment, evidence of plaintiff's husband's incarceration for murder, while somewhat probative as to plaintiff's mental state, was properly excluded because of the danger of unfair prejudice).

39

10. <u>State v. Wrighter</u>, 1996-NMCA-077, 122 N.M. 200, 922 P.2d 582 (Testimony regarding the defendant's prior cocaine sales to the witness was inadmissible as an attempt by the State to insinuate that the defendant sold cocaine to the witness on the day in question because he had done so in the past; the testimony was not highly probative to prove context, and the probative value, if any, was substantially outweighed by the danger of unfair prejudice).

## VI.

Did the trial court commit reversible error by overruling MR. TORRES' objection to the testimony of Agent Ortiz, or did plain or fundamental error occur, regarding how, as a an expert in blood stain pattern analysis and accident reconstruction, he narrated outside his expertise, and tantamount to a closing argument by the prosecutor, that he believed that MR. TORRES intentionally killed Ms. Pace and vouched for the undisputed truthfulness of the physical evidence to show MR. TORRES deliberately and intentionally killed Ms. Pace?

### Legal Authorities

1. <u>State v. Lucero</u>, 116 N.M. 450, 863 P.2d 1071 (1993)(Admission in prosecution for criminal sexual contact of a minor of testimony of clinical psychologist concerning posttraumatic stress syndrome (PTSS) constituted plain error where

psychologist commented directly on credibility of child complainant, named perpetrator, which was tantamount to saying that complainant was telling the truth, and testified that cause of complainants's PTSS symptoms was in fact sexual molestation).

2.   Rule 12-216(B)(2), N.M.R.A. 2003 (An exception to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party.").

3.   Rule 11-103(D), N.M.R.A. 2003 ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.").

## VII.

Did the trial court err or did plain or fundamental error occur when the trial court overruled MR. TORRES' objection to the prosecutor's rebuttal closing argument that MR. TORRES "continues to disgrace and deface her memory.  Shame on you, Gilbert Torres. And I hope you feel my rage.  I hope that as a society ...." and deny MR. TORRES a fair trial?

### Legal Authorities

1.   <u>State v. Vallejos</u>, 86 N.M. 39, 519 P.2d 135 (Ct. App. 1974)(Prosecutor's comment during rebuttal closing argument that

of personal opinion that defendant was guilty was error).

    2.  <u>State v. Ferguson</u>, 111 N.M. 191, 803 P.2d 676 (Ct. App.), *cert. denied*, (1990)(A prosecutor is prohibited from expressing his or her personal view concerning the defendant's guilt).

    3.  Rule 12-216(B)(2), N.M.R.A. 2003 (An exception to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party.").


## VIII.

    Did the trial court err or did plain or fundamental error occur when the trial court overruled MR. TORRES' objection to the State's rebuttal closing when the prosecutor argued that MR. TORRES was less worthy of constitutional protection than the memory of the victim, Ms. Pace, and when the prosecutor ended the closing argument by thanking the jury for its consideration on behalf of Ms. Pace and her family?

### Legal Authorities

    1.  Rule 12-216(B)(2), N.M.R.A. 2003 (An exception to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party.").

2.   <u>State v. Sanchez</u>, 86 N.M. 713, 526 P.2d 1306 (Ct. App. 1974)(New Mexico has no rule that would support the defendant's assertion that an allegedly improper comment of the prosecutor on the victim's "constitutional rights" can be raised for the first time on appeal on the basis that the comment was plain error).

## IX.

Did cumulative error occur based on the foregoing errors?

### Legal Authorities

1.   <u>State v. Baca</u>, 120 N.M. 383, 902 P.2d 65 (1995)("Under the doctrine of cumulative error, this Court must reverse a conviction 'when the cumulative impact of the errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial.' <u>State v. Martin</u>, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984).".).

2.   <u>State v. Vallejos</u>, 86 N.M. 39, 519 P.2d 135 (Ct. App. 1974)(The cumulative impact of errors, including erroneous comments by the prosecutor during closing argument, prejudiced the defendant's right to a fair trial).

3.   <u>State v. Diaz</u>, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983)(The cumulative effect of the prosecutor's improper and over extensive references to the authority he represented, improper remarks about the defendant and derogation of the intoxication defense warranted reversal).

43

Respectfully submitted,

_____

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico 87125
Tele. (505) 247-8558

## CERTIFICATE OF SERVICE

I, Todd Hotchkiss, hereby certify that on August 22, 2003 I placed a true copy of the foregoing docketing statement in the U.S. Mail, first-class postage paid, for mailing to opposing counsel of record, Mr. John Bogren, Senior Trial Prosecutor, Thirteenth Judicial District Attorney, P.O. Box 1919, Los Lunas, New Mexico 87031; the Honorable John W. Pope, Thirteenth Judicial District Court, P.O. Box 1089, Los Lunas, New Mexico 87031; Thirteenth Judicial District Court Monitors or Reporters, P.O. Box 1089, Los Lunas, New Mexico 87031; Thirteenth Judicial District Court Clerk, P.O. Box 1089, Los Lunas, New Mexico 87031; New Mexico Attorney General, Criminal Appeals Division, P.O. Drawer 1508, Santa Fe, New Mexico 87504-1508; and New Mexico Public Defender, Appellate Division, 301 N. Guadalupe St., #101, Santa Fe, New Mexico 87501, the last known addresses.

_____
TODD HOTCHKISS

44

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

        **Plaintiff-Appellee,**

**vs.**
                                  **No.  24,103**
                                  **Valencia County**
                                  **D-1314-CR-01-483**

**GILBERT TORRES,**

        **Defendant-Appellant.**

## NOTICE
## ASSIGNMENT TO THE GENERAL CALENDAR

You are hereby notified that the:

**Record Proper**

was filed in the above-entitled cause on **September 5, 2003.**

    This case has been assigned to the **GENERAL CALENDAR** pursuant to Rule 12-210(B) NMRA 2003.

---

**Note:**  The transcript of proceedings shall be filed as provided for in **Rule 12-211 NMRA 2003**.  Any designation or request for exhibits or depositions shall be made pursuant to **Rule 12-212 NMRA 2003**.  Briefing shall proceed as provided for in **Rules 12-210(B) and 12-213 NMRA 2003**.

See Rule 12-210(B) NMRA 2003.

---

**RODERICK T. KENNEDY, Judge**

