IN THE COURT OF APPEALS FOR THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.                              No. 24,102

GILBERT TORRES, JR.,

       Defendant-Appellant.


## APPELLANT'S BRIEF-IN-CHIEF

APPEAL FROM THIRTEENTH JUDICIAL DISTRICT COURT
FOR VALENCIA COUNTY, NEW MEXICO

HONORABLE JOHN W. POPE, District Judge

No. D-1314-CR 2001-483


TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorneys for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558



## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES............................   iv

GUIDE TO CITATIONS..................................   v

SUMMARY OF PROCEEDINGS.............................   1

    Nature of the Case............................   1

    Course of Proceedings.........................   1

    Summary of Material Facts.....................   2

ARGUMENT OF BRIEF-IN-CHIEF........................   22

    I.   MR. TORRES' Counsel Failed To File a
        Motion to Suppress the Evidence,
        Under the Fourth Amendment to the U.S.
        Constitution and Article II, § 10 of
        The New Mexico Constitution when
        State Agents Searched  TORRES' Residence
        Without a Search Warrant...................   22

        A.   Plain Error Occurred..................   22

        B.   Trial Counsel Provided Ineffective
            Assistance of Counsel When No Plausible,
            Rational or Reasonable Strategy Existed
            For the Failure of Trial Counsel to Move
            For the Suppression of the Evidence....   25

    II.   Evidentiary Issues Created Error..........   27

        A.   The Trial Court Erred and Prejudiced
            TORRES When Overruling TORRES' Objection
            Regarding the Scope of Opinion Testimony
            By the State's Proffered Expert as
            Blood Stain Pattern Analysis and Accident
            Reconstruction, Specifically Agent Ortiz,
            Beyond His Qualified Opinion that Pace
            Did Not Commit Suicide and Detailing How
            He Believed the Entire Murder
            Circumstances Occurred..................   27

i

    B.   The Trial Court Erred by Overruling
        TORRES' Objection to the Hearsay
        Testimony of Pace from October 14, 2001,
        And Argued by the State as State of
        Mind Evidence Under Rule 11-803(C),
        N.M.R.A. 2003 or Relevant to TORRES'
        Anticipated Self Defense Claim that
        "The next time you guys see me you're
        going to find me dead"................ 29

III.   Prosecutor's Statements and Arguments
      Created Error............................. 32

    A.   Fundamental Error Occurred
        When the Prosecutor Stated, "Just as
        you have taken an oath and have raised
        your hand to fairly and truthfully judge
        this case, on behalf of the People of
        the State of New Mexico, I promise you
        that Ms. Garcia and myself will conduct
        our case as fairly and as honestly and
        as truthfully as possible"............. 32

    B.   The Trial Court Erred or
        Fundamental Error Occurred When the
        Trial Court Overruled TORRES' Objections
        To the Prosecutor's Rebuttal Closing
        Argument that TORRES "continues to disgrace
        and deface her memory.  Shame on you,
        Gilbert Torres.  And I hope you feel my
        rage.  I hope that as a society ...."
        And that  TORRES was Less Worthy of
        Constitutional Protection Than the
        Memory of Pace........................... 33

IV.   Cumulative Error Occurred Based on the
     Foregoing Errors.......................... 34

CONCLUSION........................................ 35

CERTIFICATE OF SERVICE............................ 35

# TABLE OF AUTHORITIES

Page No.

### Cases

Duran v. Lovato, 99 N.M. 242, 656 P.2d 905
(Ct. App. 1982).................................   28

Flippo v. West Virginia, 528 U.S. 11,
120 S.Ct. 7 (1999)...........................   23,24,26

Mincey v. Arizona, 437 U.S. 385,
98 S.Ct. 2408 (1978)..........................   23,24,26

Patterson v. LeMaster, 2001-NMSC-013,
130 N.M. 179, 21 P.3d 1032....................   25,26

State v. Baca, 120 N.M. 383, 902 P.2d 65 (1995).....  30,31,32,34

State v. Cooper, 1998-NMCA-180, 126 N.M. 500,
972 P.2d 1, *cert. denied*, (1998)..............   25,26

State v. Diaz, 100 N.M. 210, 668 P.2d 326
(Ct. App. 1983)...............................   32,33,34,35

State v. Espinosa, 107 N.M. 293, 756 P.2d 573 (1988)   31

State v. Ferguson, 111 N.M. 191, 803 P.2d 676
(Ct. App.), *cert. denied*, (1990)..............   34

State v. Lucero, 116 N.M. 450, 863 P.2d 1071 (1993).   28,29

State v. Martin, 101 N.M. 595, 686 P.2d 937 (1984)..   34

State v. Richardson, 114 N.M. 725,
845 P.2d 819 (Ct. App.), *cert. denied*, (1992)..   27

State v. Vallejos, 98 N.M. 798, 653 P.2d 174
(Ct. App.1982)................................   34,35

State v. Vigil, 103 N.M. 643, 711 P.2d 920 (1985)...   28

State v. Wrighter, 1996-NMCA-077, 122 N.M. 200,
922 P.2d 582..................................   31

Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409,
*reh'g denied*, (1984)..........................   24

<u>United States v. Brown</u>, 490 F.2d 758
     (D.C. Cir. 1973)................................    30,31

## New Mexico Constitution

Article 10, § 10....................................    25

Article II, § 14....................................    25,29,32

## United States Constitution

IV Amend............................................    23,24,25

VI Amend............................................    29,32

## Statutes and Court Rules

N.M.S.A. 1978, § 30-2-1.............................    1

N.M.S.A. 1978, § 30-22-5............................    1

Rule 11-103(D), N.M.R.A. 2003......................    22,29

Rule 11-403, N.M.R.A. 2003.........................    31

Rule 11-404, N.M.R.A. 2003.........................    31

Rule 11-702, N.M.R.A. 2003.........................    28

Rule 11-803(C), N.M.R.A. 2003......................    29,30

Rule 12-216(B)(2), N.M.R.A. 2003...................    22

## GUIDE TO CITATIONS

The February 10-14, 2003 trial proceeding was audio tape recorded.   The trial proceedings shall be cited by tape number and tape counter as (T.__,___).   Counsel listened to the tapes on a SONY Cassette-Corder, model No. TCM-919, with an average of 585 counting units per side.   The Record Proper has consecutively numbered pages and shall be cited as (RP___).

v

## SUMMARY OF PROCEEDINGS

### Nature of the Case

GILBERT TORRES, JR. appeals the June 20, 2003 Judgment, Sentence and Commitment convicting him of second degree murder and tampering with evidence, and sentencing him to 16½ years of incarceration plus two years of parole. (RP 194-95)

### Course of Proceedings

A Valencia County Grand Jury indicted MR. TORRES in Count 1 with an open alternative count of murder Pamela Pace in violation of N.M.S.A. 1978, § 30-2-1(A) or (B) as murder in the first degree or second degree on December 3, 2001.  Count 2 charged TORRES with tampering with evidence on December 3, 2001 in violation of N.M.S.A. 1978, § 30-22-5.  TORRES entered pleas of not guilty.

MR. TORRES filed a motion in limine regarding officers testifying to their subjective beliefs regarding the events that led to Ms. Pace's death. (RP 115)

Trial defense counsel did not file a motion to suppress evidence seized from TORRES' residence or learned about before the issuance of a search warrant on December 4, 2001.

At the February 10-14, 2003 trial jury found TORRES not guilty of first degree murder, and guilty of second degree murder and tampering with evidence. (RP at 177-79)

The district court ordered a diagnostic evaluation of TORRES. (RP at 187)  On May 19, Judge Pope convened the sentencing hearing.

1

Judge Pope sentenced TORRES to 15 years in prison on Count 1 and 18 months consecutively on Count 2. (RP at 194-96)

TORRES is incarcerated pending appeal.

On June 25, TORRES filed his notice of appeal. (RP at 197) TORRES filed the docketing statement on July 10. (RP at 203) Pursuant to this Court's October 9 Calendar Notice, this case was assigned to the general calendar.   The notice transcript of proceedings was filed.  Pursuant to this Court's November 20 and December 11 Orders, this brief is timely if filed on or before Tuesday, December 23, 2003.  There are no prior or related appeals.

<u>Summary of Material Facts</u>

Before the trial began,  TORRES made a motion in limine regarding any reference by the State to domestic violence.  Judge Pope seemed to agree that the State should not get into it. (T.03-75,20-138)

Also before the trial began, TORRES objected to the prospective opinion testimony by State witnesses as to how the charged incident occurred. (T.03-76,150)  The prosecutor stated that he would instruct the police officer witnesses not to testify as to feelings and only to rely on the evidence for opinion testimony. (T.03-76,171)  The prosecutor stated that witnesses Perea and Ortiz would testify that their opinions were that the killing of Pamela Pace was not a suicide. (T.03-76,202)  The trial court indicated that it wanted voir dire before such opinion

2

evidence was offered. (T.03-76,224)

At the conclusion of the State's opening statement, the prosecutor opined, "Just as you have taken an oath and have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our case as fairly, as honestly and as truthfully as possible." (T.03-75,412-14) TORRES did not object.

### The State's Case

Los Lunas Police Officer Dino Wroten, an accident reconstructionist, on December 3 was dispatched to TORRES' residence regarding a woman who committed suicide. (T.03-77,25-75) Wroten arrived at approximately 7:00 p.m. (T.03-77,84)

Wroten entered the residence and saw debris, broken pottery and blood stains on the floor. (T.03-77,115-22)   TORRES was inside and said, "Well, she finally did it." (T.03-77,132)   Pamela Pace was in the back bedroom of his trailer house. (T.03-77,136)

In the back bedroom laid Pamela Pace dead on a bed with a shotgun wound to her chest. (T.03-77,148)   A 12-gauge shotgun leaned against the bed with the barrel of the shotgun "peeled back like a banana". (T.03-77,156,247)   Pace had a gash to her left upper thigh from which blood flowed toward her hip rather than down. (T.03-77,259)

Los Lunas Police Department (LLPD) Sergeant Perea arrived and spoke with Wroten. (T.03-77,280)   TORRES told them Pace and he were

3

previously married and Pace wanted to get back together but he did
not. (T.03-77,285)  Pace and he argued leading to Pace breaking a
vase, slipping on the vase and cut her thigh, and went into the
bedroom and committed suicide. (T.03-77,293)

Sgt. Perea and Wroten decided to call LLPD Detective James
Harris. (T.03-77,314, 549)

**LLPD Sergeant Josh Perea** was dispatched on October 14, 2001 to
TORRES' residence on a domestic violence call from TORRES reporting
Pace.  (T.03-77,426-41;  T.03-78,252)   Over  defense  counsel's
objection based on hearsay, the trial court allowed, as a statement
of Pace's state of mind under Rule 11-803(C), N.M.R.A. 2003, Perea
testified Pace said, "The next time you guys see me you're going to
find me dead." (T.03-77,467-72)  Pace appeared "groggy", under the
influence of something, and Pace had been drinking. (T.03-77,475)

On December 3, Perea arrived at TORRES' residence at 6:54 p.m.
Inside was in disarray as if a "pretty good fight had taken place."
(T.03-77,490)

TORRES was in the living room.  Perea went to the bedroom
where Pace was dead on the bed. (T.03-77,510)  Perea noticed the
shotgun beside the bed with the barrel peeled back. (T.03-77510-40)
Pace had a large laceration to her left upper thigh, her right
thumb was found under a bed stand, and in the corner were apparent
pieces of potato. (T.03-77,510-40)  On the bottom part of the
shotgun he saw some grey duct tape with some blue cloth fibers

4

hanging of it.  (T.03-77,542)   Perea did not initially consider the potato.  (T.03-78,45)

TORRES did not appear upset, and went outside and drank a beer.  (T.03-78,69)   Police removed everyone from the house and put up crime scene tape.  (T.03-78,83)

A neighbor told Perea he saw a man exit the residence and put an item over a fence.  (T.03-78,96)   Perea went over to the spot and found a blue rag or towel wrapped in duct tape.  (T.03-78,101)   Perea did not initially consider them as significant.  (T.03-78,127)

LLPD Officer Vince Torres arrived at TORRES' residence on December 3 at 6:57 p.m. and went inside.  (T.03-78,294-316)   Torres took photographs of the scene.  (T.03-78,350)

Subsequently, Officer Torres took TORRES to the LLPD at the request of Detective Harris.  (T.03-78,419)   TORRES, at LLPD, said, "I can't believe she did that."  (T.03-78,485)   TORRES was not under arrest, had not been read any Miranda warnings, waited in the "pink room", and was free to leave LLPD at that time.  (T.03-78,529-32)

Neighbor Edgar Neil saw TORRES exit his residence with a brown bag in his hand, approach the fence line, and throw a bag over the fence into someone else's yard.  (T.03-79,48-55)   Earlier Mr. Neil heard Pace swear at TORRES.  (T.03-79,78)

Neighbor Tomasina Baca heard screaming and yelling by both a woman and a man from TORRES' residence for approximately 30 minutes on December 3.  (T.03-79,176)   10-15 minutes after the arguing

ended, Ms. Baca also saw a man, not identified as TORRES, exit the residence and throw a brown bag over a fence. (T.03-79,245,364) The police arrived approximately 10 minutes later. (T.03-79,287)

**Neighbor Juan Lopez** on December 3 heard a loud noise with his wife. (T.03-79,392-419)  **Lori Lopez** thought someone had busted a beer bottle in their back yard. (T.03-79,513-17)  Three to four minutes later, Mr. Lopez saw TORRES outside, throw something in Lopez's yard, and re-enter his residence. (T.03-79,420-26)  Ten minutes later the police arrived. (T.03-79,436)

**LLPD Detective James Harris** on December 3 arrived at 7:15 p.m. with the scene secured. (T.03-81,57-85) Harris spoke with officers at the scene and then to TORRES, who was outside. (T.03-81,96)

TORRES said Pace committed suicide. (T.03-81,99-102)  Harris went inside the residence, saw several pieces of pottery and blood stains, and believed a fight had occurred. (T.03-81,107-19)

Harris went to the back bedroom, saw Pace dead on the bed, observed the scene, and then approached TORRES.  Harris told TORRES he was not under arrest but that Harris wanted TORRES to go to LLPD to speak with him later. (T.03-81,148)  TORRES was transported to LLPD. (T.03-81,165)

After the initial photos taken by LLPD, Harris and Sgt. Perea decided to call the New Mexico State Police (NMSP) crime scene team. (T.03-81,175)  Perea within the 30 minutes of Harris having arrived at the scene. (T.3-90,201-05)

LLPD searched the area and found the blue rag or towel with duct tape on it. (T.03-81,193) LLPD collected the shotgun from the residence. (T.03-81,208) It was concluded that the barrel of the 12-gauge shotgun exploded and sent shrapnel through the wall between the bedroom and the laundry room. (T.03-81,350) A piece of potato was found on the right side of the barrel and duct tape was on the barrel. (T.03-82,389) The ceiling tile from above Pace's body had gun powder residence, blood, and apparent potato pulp on its surface. (T.03-81,465-90) An arm of a chair had hair consistent with Pace's hair. (T.03-81,538) Harris observed bruises or marks around Pace's neck. (T.03-82,195) The cut on Pace's upper left thigh was approximately 4"-5" long. (T.03-82,201)

Subsequently, the NMSP crime scene team arrived: Applegate at 9:22 p.m., Arthur at 9:59 p.m., Casaus at 11:02 p.m., and Ortiz at 11:24 p.m. on December 3. (T.03-90,230)

At approximately 12:35 a.m. on December 4, at LLPD, Harris began the questioning of TORRES who had no objection to being videotaped. (T.03-82,237-377)

In his first statement on December 4, TORRES told police that Pace was mad at him, and threw some pottery and a beer bottle. TORRES remained attentive to the computer. TORRES denied there was a big fight. Pace cut her leg on the broken pottery or beer bottle, TORRES offered to assist Pace, and Pace profanely rejected TORRES. Pace went to the master bedroom. Minutes later TORRES

7

heard the shotgun blast.  TORRES went to the bedroom and shook Pace to attempt to revive her. (T.03-85,250)

TORRES told the officers of Pace's criminal past, which was once unknown to him. (T.03-82,498; T.03-83,210)  TORRES told the officers of how just days previously Pace pulled the shotgun out on Marvin Gracie at TORRES' residence. (T.03-82,512-23)

TORRES told the officers that he and a friend had gone earlier on December 3 to get some wood and Pace was mad that he was gone. (T.03-82,556)  TORRES spoke of Pace's apparent methamphetamine dominated life, her appearances and disappearances. (T.03-83,55) TORRES stated that he wanted to help Pace. (T.03-83,118)

TORRES kept the shotgun in the closet. (T.03-83,122)  After TORRES heard the shot and went into the bedroom, he called his son and then called LLPD. (T.03-83,170-84)  At one point TORRES went outside to look for the police and came inside. (T.03-83,223)

TORRES believed that Pace had recently been distraught. (T.03-83,263)  Pace was not under the influence of methamphetamine at the time of her death. (T.03-83,341)

TORRES denied putting the blue rag and duct tape and potato over the fence into another's yard. (T.03-83,395,425,441)  TORRES asserted that Pace shot herself. (T.03-83,413,495,557; T.03-84,250)

Harris told TORRES that police investigation showed TORRES put the blue rag on the shotgun butt and the rag over the fence. (T.03-83,424) This was one of many references in the videotape by police

8

officers of the continuing investigation in TORRES' residence. (T.03-83,436,452,501,568; T.03-84,147,252,447)

TORRES denied shooting Pace. (T.03-83,449; T.03-84,238,424,486,522) Harris told TORRES that "our" investigation showed he was involved. (T.03-83,452)

TORRES proffered the possibility that, when he shook Pace after discovering her body, he said, "Pam, Pam, Pam!", his hands may have caused bruises to Pace's neck. (T.03-83,497)

Harris wanted to give TORRES a break while Harris called the other agents to ask them what they have learned at the scene. (T.03-83,498) "Our investigation is showing you are involved in this." (T.03-83,501; T.03-84,147)

Harris returned, had spoke with NMSP Agent Ortiz at the scene, said, "its not adding up to the way your story is saying, Gilbert." (T.03-83,518) Harris said, "They're examining her wounds." (T.03-83,528) TORRES said Pace died on the bed. (T.03-83,541)

Harris told TORRES, "It's clearing up that that rag was taped on that shotgun." (T.03-83,568) TORRES denied knowing anything about the blue rag and duct tape. (T.03-84,1-30)

TORRES asserted that no gun powder residue will not be found on him or his clothing. (T.03-84,172,186)

TORRES denied moving Pace and instead asserted that Pace walked into the bedroom. (T.03-84,406-45,545)

A police officer asserted that Pace's wounds were not

9

consistent with TORRES' statement. (T.03-84,447)

Agent Ortiz then arrived and told TORRES that, based on the "evidence at the scene", Pace did not commit suicide. (T.03-84,483) Ortiz asserted that TORRES tried to make it look like Pace committed suicide. (T.03-84,487) The police theory of Pace's murder was based on their investigation at the scene. (T.03-84,491)

Ortiz questioned TORRES about hair found in a broken chair which appears to be consistent with Pace's hair. (T.03-84,516) Ortiz questioned TORRES about blood stains on the bottom of Pace's feet without any bloody footprints in the residence. (T.03-84,546) Ortiz said too much of the evidence pointed to TORRES. (T.03-85,180) "This scene over there does not add up to what you are saying." (T.03-85,221)

TORRES was informed that he was being arrested and booked on the charge of tampering with evidence and suspicion of murder. (T.03-85,242,250)    30-45 minutes later, TORRES apparently approached Harris and asked if he could talk to Harris again because he wanted to tell the truth. (T.03-85,279)

NMSP agents took the video camera back to the scene, so the second statement by TORRES during the very early morning hours of December 4 was only audio tape recorded. (T.03-85,287-95)

Harris stated the NMSP agents "out at the scene" advised of "additional evidence that they had located and that they wanted to come back and interview him further." (T.03-85,291-94)

TORRES began the second statement by changing his version of events. (T.03-85,279)   Pace and he had a big fight, Pace had cut herself, Pace had run into the master bedroom, TORRES entered the bedroom, Pace pointed the shotgun at him, they struggled over the shotgun, the shotgun got turned around, the shotgun somehow went off, and Pace was shot. (T.03-85,344- T.03-88,100)

TORRES denied any knowledge of the blue rag. (T.03-85,350)

Pace was " accident[ally]" shot. (T.03-85,362,369,466,558)

The police officer asserted Pace did not walk into the bedroom. (T.03-85,411)   Pace was bruised under her arms and on her neck. (T.03-85,103)

TORRES then started posing the question, "Either way, I'm going to prison, right?" (T.03-85,439)

Pace's blood vessels were blown in her eyes, consistent with strangulation. (T.03-86,108)

At one point the questioner asserts, "There's some more stuff we found over there, its getting deeper...." (T.03-86,173)

Then, questions about the potato start after the investigation inside TORRES' residence by the NMSP crime scene team shows that a potato was likely put at the end of the shotgun. (T.03-86,227,307,540)   Police learned of potato in Pace's hair, on the ceiling and on duct tape. (T.03-86,320,463)

TORRES eventually agreed that he did put the blue towel on the shotgun to try to prevent Pace from using the gun. (T.03-86,397)

TORRES denied any knowledge of the potato. (T.03-86,432)

An officer told TORRES that it looked like premeditated murder. (T.03-87,524)   An officer indicated that it TORRES tampered with evidence to cover up the killing Pace. (T.03-88,100)

*     *     *     *     *

After TORRES was booked on the tampering with evidence charge, Harris collected TORRES' blood stained clothes and boots. (T.03-82,93-127,136-40;T.03-88,336)

Thereafter, "The only people that were in there [the residence] were [Harris] and the crime scene unit.   No other officers were allowed back into the residence once I initially had them leave out of the scene, no other officers were allowed back in." (T.03-90,410-12)

**Forensic pathologist Jeffrey Nine** performed the autopsy on Pace on December 5. (T.03-91,362)   The cause of death was the gun shot wound to the chest. (T.03-91,411)   The manner of death was homicide. (T.03-91,415) The injuries on Pace, including a purple bruise on her left eyelid, looked fresh and probably occurred around the same time as the shotgun wound. (T.3-91,446)

Some duct tape was found in the shotgun wound indicating that duct tape had to be in front, not necessarily at the tip, of the barrel. (T.03-91,491; T.03-92,215,383,408)

White material consistent with potato was found on some duct tape and on Pace's hair, bra, chest or skin. (T.03-92,246)   The

12

toxicology results showed a blood alcohol of .072 and Valium in her blood. (T.03-92,252)   Pace was alive when shot. (T.03-92,266)

Nine considered suicide but rejected it due to the injuries to the backs of hands and injuries to the rest of her body. (T.03-92,308)   "I don't believe there is any way that she could have done this herself." (T.03-92,323)

The blood that went down  Pace's leg as if  Pace was upright, which would include walking. (T.03-92,463)

The twisting metal from barrel of the gun possibly cut her thumb off. (T.03-92,432)   There was something at the end of or in the barrel, fragmented the barrel and the projectile. (T.03-92,444)

The shotgun barrel was close to her body because of burnt gun powder material around the wound. (T.03-91,501)

The back of both of her hands had wounds which indicated her hands were in front of the gun barrel when fired.  (T.03-91,520-47)

On the left thigh of  Pace was a wound from a knife or sharp instrument possibly from a shard of glass. (T.03-92,7,33)

On the neck of Pace was a ligature mark and she had on a necklace. (T.03-92,95)

Nine looked at her eyes and saw small hemorrhages to her left eye indicating that strangulation may have been a component. (T.03-92,125-43)   Nine believed that the abrasion on Pace's neck could have been caused by yanking off her necklace. (T.03-92,477)

Nine needed to evaluate more than Pace's eyes to determine if

she had been strangled into unconsciousness. (T.03-92,500)

The internal structures of her neck were fine. (T.03-92,515)

**NMSP Investigator Mike Applegate**, a member of the crime scene team and the crime scene manager in this case, assigned Arthur to photograph and Casaus to videotape, and Ortiz to process the blood splatter at the residence and scene. (T.03-92,549-54;T.03-95,52)

The door to the front bedroom was busted off its hinge. (T.03-95,142)   A broken vase was found in the hallway. (T.03-95,200) Blood stains were found in the living room. (T.03-95,240)   Duct tape was on the gun with blue fibers. (T.03-95,425)   22 blood stains were and on the ceiling and west wall of the master bedroom. (T.03-95,519-42)

The initial assessment was domestic violence occurred, Pace was shot with a shotgun, and suicide was staged. (T.03-95,553-56)

Applegate called Ortiz to process the blood stains. (T.03-95,557; T.03-96,7)

The crime scene team went to LLPD to question TORRES about the blue rag, duct tape and potato and the use of the potato as a suppressor. (T.03-96,78-92)

"We went back to the residence and began processing the scene." (T.03-96,128)   None of the evidence was collected until after a search warrant was obtained. (T.03-96,131)

Applegate arrived at TORRES' residence at 9:22 p.m. on December 3. (T.03-96,160) After Harris' briefing, Applegate went

14

into the house to look around "to see what you have." (T.03-96,168-74)  That first time in the house, with Detective Harris, was "Just to get a general fell for what was happening and what type of evidence we needed to look for." (T.03-96,266)

Later on that evening, when processing the scene, the crack in the chair's arm was brought to his attention. (T.03-96,268)

Applegate contacted TORRES during the questioning at approximately 3:30 a.m. on December 4. (T.03-96,444)

**NMSP Sergeant Ruben Casaus** arrived at the scene to assist at approximately 11:00 p.m. on December 3. (T.03-96,531; T.03-97,419) Casaus videotaped the scene just after 11:00 p.m. on December 3. (T.03-96,550-53;T.03-97.457)  That videotape, Exhibit 37, was introduced into evidence and played for the jury. (T.03-97,1)

Initially this matter was investigated as a suicide "and then when we found the rag, and stuff like that, we stepped out and decided to get the warrant." (T.3-97,291)

**NMSP Agent Shane Arthur**, the first member of the crime scene team to arrive at the scene, after Wroten briefed Arthur, photographed the scene in TORRES' residence from 9:30 p.m. on December 3 until the morning of December 4. (T.03-97,549-53;T.03-98,10) Evidence markers were in place. (T.03-98,66)  Arthur assisted with the search of the residence and with the questioning of TORRES. (T.03-98,264)  Arthur took 433 photos during the search, execution of the search warrant, and afterwards. (T.03-98,318)

**NMSP Agent Art Ortiz**, a member of the crime scene team arrived at 11:24 p.m. and was an expert at trial in blood stain pattern analysis and accident reconstruction. (T.03-98,375-482)

Ortiz was briefed. (T.03-98,483)   Casaus was videotaping inside the residence. (T.03-98,485)   Ortiz put on shoe covers and Applegate and Harris took him into the scene. (T.03-98,490)

No blood was found on the pottery, which contradicted TORRES' statements Pace cut herself with a ceramic pot. (T.03-99,204,224)

Ortiz saw blood stains on the couch, living room kitchen, and hallway. (T.03-99,250-300)   The blood stains in the living room and hallway were "somewhat consistent with length and width of the wound" on Pace's left upper thigh. (T.03-99,309)   No transfer patterns were found at a walking distance. (T.03-99,426)

An L-shaped blood swipe was found (T.03-99,445)   No evidence existed that Pace walked to the back. (T.03-99,452)   The blood stains "refute[] the statement by the defendant." (T.03-99,455)

In the hallway, 10 blood stains were between the kitchen and the master bedroom. (T.03-99,493)   25 blood stains were in the kitchen. (T.03-99,492)

6 or 7 drops of blood existed on the shotgun. (T.03-100,24)   Something was at the top of the shotgun to keep the gases in the gun and caused the explosion. (T.03-100,44)   Blankets were "somewhat piled up" under Pace. (T.03-100,54)   The blood stains and flow patterns evidenced that Pace had been moved. (T.03-100,64)

16

Pace's right upper arm, bra and abdomen had dark staining consistent with gun shot powder residue. (T.03-100,76)

Contrary to Nine, no gun shot residue was found in the wound track like Ortiz normally sees as close distance, something stopped or blocked the gun powder residue. (T.03-100,160-64)

The shotgun was fired and exploded, shrapnel lacerated the back of Pace's hands and abdomen, and gun powder residue was blocked from the wound track. (T.03-100,173)  A piece of suspected potato was on the barrel of the shotgun. (T.03-100,210)

No transfer stains existed in the residence from the stains on the bottom of Pace's feet. (T.03-100,274,288)  A person with bloody feet did not walk on the floor. (T.03-100,313)   A substance appearing to be potato was found in the residence. (T.03-100,360)

The prosecutor asked Ortiz, "Do you know approximately what time these items were found?" (T.03-100,370)  Ortiz responded, "I would say in the early morning hours of December the 4th." (T.03-100,371)

On Pace's neck was found a white substance of suspected potato. (T.03-100,418)  On the ceiling above the bed was found was shredded duct tape, potato, gun shot residue and a piece of shrapnel. (T.03-100,459)

A bag of potatoes were in the refrigerator. (T.03-100,507)

Due to blood stains on TORRES' clothing, Ortiz believed that TORRES had contact with Pace. (T.03-100,528)

17

Ortiz rendered the opinion that Pace did not commit suicide. Pace laid back on the bed when she was shot. (T.03-101,117-20)

Pace was not accidentally shot. (T.03-101,140)

Defense counsel objected due to lack of foundation. (T.03-101,142) The trial court overruled the objection. (T.03-101,150)

Ortiz opined that the evidence does not support TORRES' statements and showed that TORRES was trying to mislead the investigators. (T.03-101,151)

The prosecutor then requested, "Based on your training and experience and as a crime reconstructionist expert, can you just kind of give us a quick synopsis of how you believed this occurred?" (T.03-101,179)

Ortiz responded that it was obvious that the towel was used to shield the shooter.  The potato was used at the end of the barrel with layers of duct tape, done "ahead of time".  Pace, due to her state of dress, possibly was in the bedroom when TORRES went into the room with the shotgun, "maybe with the intent to kill her at that point in time." (T.03-101,183-92)  Pace possibly ran from the room and TORRES pursued her, forced open the other bedroom door. A struggle ensued, in which Pace began to bleed, property was broken, and Pace was strangled.  TORRES then carried ace back to the master bedroom, placed her on the bed. (T.03-101,193-220)

Defense counsel then requested to approach the bench and asked if this was the State's closing argument.  The trial court

18

responded that the prosecutor's witness could reconstruct the scene but to move it along. (T.03-101,238)

Ortiz continued that TORRES then shot Pace. The "physical evidence does not lie," and "all the physical evidence points to this was a deliberate killing." (T.03-101,248-53) TORRES did not object.

On cross exam, Ortiz agreed that while "physical evidence doesn't lie, but there are different interpretations of physical evidence, correct?" (T.03-101,258)

During the evening of December 3, Ortiz testified, "we took a look at the evidence [inside TORRES' residence] and it was very suspicious and it was obvious it was staged." (T.03-101,284-86)

Regarding his synopsis, Ortiz conceded that he could not determine the chronology of the blood stains and that different chronologies were possible. (T.03-101,395)

Ortiz arrived at LLPD to question TORRES on December 4 after having been at the crime scene at TORRES' residence. (T.03-102,256)

Regarding the fact that State agents searched TORRES' residence without a warrant prior to the December 4 search warrant later issued, TORRES' trial counsel asked, "Gilbert had given consent to search his house, correct?" (T.03-102,392)   Ortiz responded, "That's correct." (T.03-102,393)  TORRES' trial counsel responded, "I didn't think there's anything really of interest there." (T.03-102,399)

After the State rested, the trial court denied TORRES' motion for a directed verdict on the first-degree and second-degree murder charges. (T.03-102,415-30)

### The Defense Case

**Marvin Gracie** knew TORRES since 1986 and knew Pace. (T.03-102,437)   Pace in January of 2001 at  TORRES' residence punched Gracie in the face for no apparent reason. (T.03-102,462)   Pace subsequently apologized. (T.03-102,494)

Just before her death, Pace, when Gracie visited TORRES at TORRES' residence, pointed the shotgun at Gracie for no apparent reason. (T.03-102,527)

**Mark Vandi**, TORRES' friend for 30 years, was with TORRES earlier during the day of December 3. (T.03-103,55-80)   Vandi stopped at TORRES' residence at approximately 11:00 a.m., and heard a lot of swearing and cursing before the argument ended. (T.03-103,103)   Vandi remained inside the residence for 30 minutes, then left with TORRES to go get some firewood. (T.03-103,80-113)   They returned to  TORRES' residence at 1:00 p.m. (T.03-103,146)

After the defense rested, the trial court denied TORRES' renewal of his motion for directed verdict. (T.03-103,209-60)

### Closing Arguments

The prosecutor's opening words during closing argument were: "Pamela Pace's prophesy came true: 'The next time you see me you

are going to find me dead.'  She told Officer Josh Perea of the Los
Lunas Police Department.  And sure enough, the next time Josh Perea
saw Pamela Pace, he saw her dead." (T.03-103,446)  More references
were made by the prosecutor during closing argument to that
statement by Pace. (T.03-103,506; T.03-106,225)

After TORRES closed, the State rebutted that TORRES, regarding
Pace, "continues to disgrace and deface her memory.  Shame on you,
Gilbert Torres!  And I hope you feel my outrage.  I hope that as a
society ...." (T.03-107,1-4)

Defense counsel objected. (T.03-107,3) A bench conference
ensued, with an apparent statement by the trial court to "tone it
down." (T.03-107,8)

The prosecutor continued, "And as a society we should feel
outraged.  We are a nation of law, not of men.  The true test of
our greatness is how well we treat the least of our citizens.  The
true test of our greatness is how we uphold the principle that
everybody's entitled to life, liberty and the pursuit of
happiness." (T.03-107,9-15)

TORRES objected and approached the bench. (T.03-107,16) Again
the bench conference is difficult to understand but at one point
TORRES' attorney asserted that the jury was not supposed to
consider the consequences of their verdict. (T.03-107,20)
Defense counsel asserted that the jury's deliberations were not
going to have an impact on the constitution or our moral fiber as

21

a nation. (T.03-107,23) The trial court overruled. (T.03-107,24)

The prosecutor's final words during closing were, "On behalf of Pamela Pace, the family and myself, I'm going to thank you for our consideration in this matter. It should be an easy verdict." (T.03-107,64-67)

### ARGUMENT OF BRIEF-IN-CHIEF

Under Rule 11-103(D), N.M.R.A. 2003, "plain errors affecting substantial rights" can be taken notice of concerning evidentiary rulings and evidentiary matters. State v. Lucero, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). Under Rule 12-216(B)(2), N.M.R.A. 2003, an exception exists to the general rule that to preserve a question for review on appeal the appealing party must fairly invoke a ruling by the district court is a question involving "fundamental error or fundamental rights of a party."

I. **Mr. TORRES' Counsel Failed to File a Motion to Suppress The Evidence Under the Fourth Amendment to the U.S. Constitution and Article II, § 10 of the New Mexico Constitution when State Agents Searched TORRES' Residence Without a Search Warrant.**

A. **Plain Error Occurred.**

This issue was not raised by trial counsel below.

The facts of this case are quite plain. TORRES called the LLPD to his residence regarding an apparent suicide by Pace, showed the police the body of Pace inside his residence, agreed to remain outside his residence, and then was transported to the LLPD. After TORRES departed the scene and Pace was dead inside, no exigent

22

circumstances existed and a warrant was not acquired until approximately 8:30 a.m. on December 4.

Meanwhile, without any evidence of any specific, voluntary consent by TORRES for police to enter his residence thereafter, the scene was processed, photographs taken, videotape taken, evidence markers placed, blood patterns analyzed, evidence seized, and the murder theory established by LLPD and NMSP.

Based on these actions, TORRES was questioned at LLPD with the newest investigatory determinations.

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." Flippo v. West Virginia, 528 U.S. 11, 13, 120 S.Ct. 7 (1999); Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412 (1978).

In a case involving striking similarities to the present case, the U.S. Supreme reversed the trial court's denial of defendant's motion to suppress and reaffirmed that there was not any applicable exceptions or "murder scene exception" to Warrant Clause of the Fourth Amendment. Flippo v. West Virginia, 528 U.S. at 12-14.

"It seems implausible that the court found that there was a risk of intentional or accidental destruction of evidence at a 'secured' crime scene or that the authorities were performing a mere inventory search when the premises had been secured for 'investigative purposes' ...."" Flippo v. West Virginia, 528 U.S.

at 14, n.2.

The Flippo Court determined that the trial court's "position squarely conflicts" with Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408 (1978), where the U.S. Supreme Court rejected any "murder scene exception" or "crime scene exception" to the Warrant Clause of the Fourth Amendment." Flippo v. West Virginia, 528 U.S. at 14. Both people who had been present in TORRES' residence, Pace and TORRES, had been located. Mincey v. Arizona, 437 U.S. at 393, 98 S.Ct. at 2414. "Except for the fact that the offense under investigation was a homicide, there were no exigent circumstances in this case". Mincey v. Arizona, 437 U.S. at 2414, 98 S.Ct. at 394. "Mincey controls here." Flippo v. West Virginia, 528 U.S. at 14.

Finally, the call by TORRES for the police due to the apparent suicide by his ex-wife in his residence did not "evidence a diminished expectation of privacy" on his part or constitute consent for police to search TORRES' residence after TORRES was removed from the residence. Thompson v. Louisiana, 469 U.S. 17, 22-23, 105 S.Ct. 409, 411-12, reh'g denied, (1984); Mincey v. Arizona, 437 U.S. at 391-92, 98 S.Ct. at 2412-13.

While the State claimed perfunctorily at trial that TORRES consented to the warrantless search of his residence on December 3 and December 4 before acquisition of the search‛warrant, there was no specific factual basis for any conclusion that TORRES

24

specifically, clearly and unequivocally consented.

For any and all of the foregoing reasons, plain error occurred and TORRES' constitutional rights under the Fourth and Sixth Amendments and Article II, §§ 10 and 14 of the New Mexico Constitution.

### B. Trial Counsel Provided Ineffective Assistance of Counsel When No Plausible, Rational or Reasonable Strategy Existed for the Failure of Trial Counsel to Move for the Suppression of the Evidence.

To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial courts' results unreliable. State v. Cooper, 1998-NMCA-180, ¶11, 126 N.M. 500, 972 P.2d 1, cert. denied, (1998).

Defendant must establish a prima facie case of ineffective assistance of counsel where a plausible, rational strategy or tactic cannot explain the conduct of defense counsel, and that, as a result, the defense was prejudiced. Patterson v. LeMaster, 2001-NMSC-013, ¶17, 130 N.M. 179, 21 P.3d 1032; State v. Cooper, 1998-NMCA-180, ¶11.   These are the "the reasonableness prong and the prejudice prong." Patterson v. LeMaster, 2001-NMSC-013, ¶17.

In determining whether the failure to pursue a motion to suppress constitutes ineffective assistance of counsel, this Court addresses: (1) whether the record supports the motion on the ground asserted; and (2) whether a reasonably competent attorney could

have decided that the motion was unwarranted. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶19; <u>State v. Cooper</u>, 1998-NMCA-180, ¶12.

The facts of this case show that a motion to suppress should have been filed. TORRES' residence was searched for hours before the acquisition of the search warrant on December 4 and evidence developed as a result of that warrantless search. There are no apparent applicable exceptions to the warrant requirement, particularly no exigent circumstances. Law from the U.S. Supreme Court existent for the last 25 years from <u>Mincey</u> to <u>Flippo</u> clearly shows that there is no "crime scene exception" to the warrant requirement. The record supports the motion to suppress. *Contra* <u>State v. Cooper</u>, 1998-NMCA-180, ¶¶21-22.

A reasonably competent attorney could not have decided that the motion was unwarranted. "There was no strategic reason for a reasonably competent attorney who was aware of the facts of this case and the governing case law not to try to suppress" the evidence gained as a result of the warrantless search of TORRES' residence. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶27.

TORRES was prejudiced because there was no apparent indication that TORRES was disposed to plea the case out, the strength of the proper and admissible evidence was not great, and the motion to suppress "was crucial because it could have excluded key evidence". <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶¶28-33. The confidence in the jury's verdict is consequently undermined. <u>Id</u>.

26

This Court should find that TORRES has established a *prima facie* showing of ineffective assistance of counsel, reverse the convictions of TORRES and/or remand the matter for an evidentiary hearing on a motion to suppress evidence. *See* <u>State v. Richardson</u>, 114 N.M. 725, 845 P.2d 819 (Ct. App.), *cert. denied*, (1992).

II.   **Evidentiary Issues Created Error.**

     A.   **The Trial Court Erred and Prejudiced TORRES When Overruling TORRES' Objection Regarding the Scope of Opinion Testimony by the State's Proffered Expert as Blood Stain Pattern Analysis and Accident Reconstruction, Specifically Agent Ortiz, Beyond His Qualified Opinion that Pace Did Not Commit Suicide and Detailing How He Believed the Entire Murder Circumstances Occurred.**

Ortiz was accepted as an expert at trial in blood stain pattern analysis and accident reconstruction.

Ortiz and Perea testified regarding their interpretations of the physical evidence and how the physical evidence must be interpreted to implicate TORRES in the murder of Pace. The "physical evidence does not lie," testified Ortiz, "and all the physical evidence points to this was a deliberate killing." (T.03-101,253)

During the evening of December 3, 2001, Ortiz testified, "Well, we took a look at the evidence and it was very suspicious and it was obvious it was staged." (T.03-101,284)  This was inside TORRES' residence. (T.03-101,286)

The fundamental problem with Ortiz's testimony is that is was

the closing argument for the prosecutor rather than providing a scientific foundation for the prosecutor's closing argument. Ortiz substituted advocacy for the State's murder theory for the scientific foundation necessary for such advocacy. *Contra* State v. Vigil, 103 N.M. 643, 711 P.2d 920 (1985); Duran v. Lovato, 99 N.M. 242, 656 P.2d 905 (Ct. App. 1982).

Under Rule 11-702, N.M.R.A. 2003, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

In this case, Ortiz improperly commented directly on the credibility of TORRES. State v. Lucero, 116 N.M. 450, 454, 863 P.2d 1071, 1075 (1993). Ortiz's testimony could not be offered to establish that the State's witnesses were telling the truth by alleging TORRES murdered Pace. State v. Lucero, 116 N.M. at 454, 863 P.2d at 1075. Ortiz vouched for the credibility of the State's case against TORRES and encroached into the province of the jury to determine the truthfulness of the evidence and testimony. State v. Lucero, 116 N.M. at 454, 863 P.2d at 1075. Ortiz provided "no scientifically valid or reliable means by which to determine whether a particular event has in fact happened." State v. Lucero, 116 N.M. at 454, 863 P.2d at 1075.

Ortiz's testimony consisted of interpreting the physical evidence and his testimony that the "physical evidence does not lie" was an expert's improper validation of the State's case. State v. Lucero, 116 N.M. at 454, 863 P.2d at 1075.

Consequently, TORRES' substantial rights to a fair trial and a jury trial as a plain error on a vital evidentiary matter under Rule 11-103(D). MR. TORRES' constitutional rights to a fair trial and a jury trial under the Sixth Amendment to the U.S. Constitution and Article II, § 14 of the New Mexico Constitution were violated.

> B. The Trial Court Erred by Overruling TORRES' Objection to the Hearsay Testimony of Pace From October 14, 2001, and Argued by the State as State Of Mind Evidence Under Rule 11-803(C), N.M.R.A. 2003 Or Relevant to TORRES' Anticipated Self Defense Claim that "The next time you guys see me you're going to find me dead"?

Over defense counsel's objection based on hearsay, the trial court allowed Perea to testify that as Pace left TORRES' residence on October 14, 2001 she said to Perea, "The next time you guys see me you're going to find me dead." (T.03-77,472)

The trial court overruled under Rule 11-803(C), N.M.R.A. 2003 when the State argued that the October 14 state of mind of Pace was somehow relevant to her state of mind on December 3 and it was relevant to the issue of self defense. (T.03-77,467)

Under Rule 11-803(C), N.M.R.A. 2003, regarding hearsay exceptions when availability of declarant immaterial, specifically a "Then existing mental, emotional or physical condition":

> A statement of the declarant's then existing state
> of mind, emotion, sensation or physical condition
> (such as intent, plan, motive, design, mental feeling,
> pain and bodily health), but not including a statement
> of memory or belief to prove the fact remembered or
> believed unless it relates to the execution,
> revocation, identification or terms of declarant's
> will.

The statement at issue in this case was made by Pace on October 14, 2001 to a police officer who responded to TORRES' call for police assistance on that date.  That statement from October 14, 2001 was admitted concerning Pace's possible state of mind on December 3, 2001.  There was no evidence admitted concerning the time in between those dates.

The New Mexico Supreme Court has ruled that a statement of a daughter's fear of her father, the defendant, made by the victim of attempted murder was inadmissible under Rule 11-803(C) either because it was irrelevant as an attempt to demonstrate a fact of consequence other than the declarant's state of mind, or because it was unfairly prejudicial. State v. Baca, 120 N.M. 383, 389-90, 902 P.2d 65, 71-72 (1995).

"In general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, the evidence must be excluded." State v. Baca, 120 N.M. at 389, 902 P.2d at 71 (quoting United States v. Brown, 490 F.2d 758, 763 n.10 (D.C. Cir. 1973). "The principle danger is that the jury will consider the victim's

statement of fear somehow reflecting the *defendant's* state of mind rather than the victim's - i.e., as a true indication of defendant's intentions, actions or culpability.  Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident." State v. Baca, 120 N.M. at 390, 902 P.2d at 72 (quoting U.S. v. Brown, 490 F.2d at 766 (footnote omitted)).

Because Pace's October 14, 2001 statement concerned her fear of TORRES was inadmissible under Rule 11-803(C) "either because it was an attempt to demonstrate a fact of consequence other than the declarant's state of mind or, as emphasized in Brown, 490 F.2d at 775-77, because it was unfairly prejudicial." State v. Baca, 120 N.M. at 390, 902 P.2d at 72.

The state may not introduce into evidence a handgun not used in the perpetration of a crime for which the defendant is charged if the State does so to link the defendant to the commission of another crime.  State v. Espinosa, 107 N.M. 293, 756 P.2d 573 (1988).

Furthermore, Perea's hearsay testimony of Pace's October 14 statements was not highly probative to prove context, and the probative value, if any, was substantially outweighed by the danger of unfair prejudice under Rules 11-403 and 11-404, N.M.R.A. 2003. State v. Wrighter, 1996-NMCA-077, ¶11, 122 N.M. 200, 922 P.2d 582.

For any and all of the foregoing reasons, the trial court

erred in overruling TORRES' objection to the admission of Pace's October 14, 2001 statement and denied TORRES a fair trial under the Sixth Amendment to the U.S. Constitution or Article II, § 14 of the New Mexico Constitution.

III.   Prosecutor's Statements and Arguments Created Error.

A.   Fundamental Error Occurred When the Prosecutor Stated, "Just as you have taken an oath and Have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our case as fairly and as honestly and as truthfully as possible".

Trial defense counsel did not object to the prosecutor's statement during opening. This matter must be reviewed for fundamental error. State v. Diaz, 100 N.M. 210, 212, 668 P.2d 326, 328 (Ct. App. 1983).

Prosecutor's statement during closing argument, that he had higher ethical duty than defense counsel because prosecutors are bound by law to seek the truth whereas criminal defense attorneys are not, implying that prosecutor would not have pursued case unless defendant was guilty, was impermissible expression of personal opinion on defendant's guilt or innocence. State v. Baca, 120 N.M. at 392, 902 P.2d at 74.

The "prosecutor in this case made substantial reference to the authority he represented." State v. Diaz, 100 N.M. at 213, 668 P.2d at 329. The "comments referring to the prosecutor's authority could have had the effect of communicating to the jury that the

32

prosecutor would not have brought the case against the defendant unless the prosecutor believed defendant" committed the charged crimes. <u>State v. Diaz</u>, 100 N.M. at 213, 668 P.2d at 329.   The prosecutor also suggested that the jury may base its decision on something other than the evidence presented. <u>Id</u>.

> **B. The Trial Court Erred or Fundamental Error Occurred When the Trial Court Overruled TORRES' Objection to the Prosecutor's Rebuttal Closing Argument that TORRES "continues to disgrace and deface her memory.  Shame on you, Gilbert Torres. And I hope you feel my rage.  I hope that as a society ...." and that TORRES was Less Worthy of Constitutional Protection Than the Memory of Pace.**

During the State's rebuttal closing the prosecutor asserted to the jury that TORRES, regarding Pace, "continues to disgrace and deface her memory.  Shame on you, Gilbert Torres!  And I hope you feel my outrage.  I hope that as a society ...." (T.03-107,1-4)

Defense counsel objected. (T.03-107,3) A bench conference ensued, with an apparent statement by the trial court to "tone it down." (T.03-107,8)

The prosecutor continued, "And as a society we should feel outraged.  We are a nation of law, not of men.  The true test of our greatness is how well we treat the least of our citizens.  The true test of our greatness is how we uphold the principle that everybody's entitled to life, liberty and the pursuit of happiness." (T.03-107,9-15)

Prosecutor's comment during rebuttal closing argument that of

personal opinion that defendant was guilty was error. <u>State v. Vallejos</u>, 86 N.M. 39, 519 P.2d 135 (Ct. App. 1974).

A prosecutor is prohibited from expressing his or her personal view concerning the defendant's guilt. <u>State v. Ferguson</u>, 111 N.M. 191, 803 P.2d 676 (Ct. App.), *cert. denied*, (1990).

The prosecutor inappropriately used abusive or vituperative language against TORRES "which tends solely to prejudice him" and "had the effect of inflaming the jury." <u>State v. Diaz</u>, 100 N.M. at 214, 668 P.2d at 330.

"The expression of the personal opinion of the district attorney in the guilt of defendant[] was misconduct." <u>State v. Vallejos</u>, 86 N.M. at 42, 519 P.2d at 138. "There can be no excuse for such comment." <u>Id</u>.

For any and all of the foregoing reasons, the trial court erred or fundamental error occurred.

IV. **Cumulative Error Occurred Based on the Foregoing Errors.**

"Under the doctrine of cumulative error, this Court must reverse a conviction 'when the cumulative impact of the errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial.' <u>State v. Martin</u>, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984)." <u>State v. Baca</u>, 120 N.M. at 392, 902 P.2d at 74.

The cumulative impact of errors, including trial counsel's failure to file a motion to suppress evidence, evidentiary matters,

and statements by the prosecutor to the jury cumulatively prejudiced the defendant's right to a fair trial. <u>State v. Vallejos</u>, 86 N.M. 39, 519 P.2d 135 (Ct. App. 1974).

The cumulative effect of the prosecutor's improper and over extensive references to the authority he represented, improper remarks about the defendant and derogation of the intoxication defense warranted reversal. <u>State v. Diaz</u>, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983).

### CONCLUSION

WHEREFORE, the Appellant, GILBERT TORRES, JR., respectfully requests that this Court reverse the district court's convictions and sentence, and to remand this case for further proceedings. TORRES also requests such other and further relief as this Court deems just and proper.

Respectfully submitted,

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558

### CERTIFICATE OF SERVICE

I, Todd Hotchkiss, hereby certify that on December 23, 2003 I placed a copy of the foregoing Brief-in-Chief in the U.S. Mail, first-class postage paid, for mailing to opposing counsel Mr. Artie Pepin, Director of Criminal Appeals, New Mexico Attorney General, P.O. Drawer 1508, Santa Fe, New Mexico, 87504-1508, the last known address.

TODD HOTCHKISS

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

vs.                                                                No. 24,103

GILBERT TORRES, JR.,

      Defendant-Appellant.

COURT OF APPEALS OF NEW MEXICO
ALBUQUERQUE
**FILED**

APR 1 6 2004

*Patricia R. Wallace*

APPEAL FROM
THE THIRTEENTH JUDICIAL DISTRICT COURT
VALENCIA COUNTY
THE HONORABLE JOHN W. POPE, DISTRICT JUDGE

### PLAINTIFF-APPELLEE STATE OF NEW MEXICO'S
### ANSWER BRIEF

PATRICIA A. MADRID
Attorney General for the
State of New Mexico

M. ANNE KELLY
Assistant Attorney General
Attorneys for Plaintiff-Appellee
111 Lomas NW, Suite 300
Albuquerque, NM  87102
(505) 222-9000



EXHIBIT
F

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

SUMMARY OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    I.    THE RECORD DOES NOT ESTABLISH THAT FAILURE TO FILE
        A MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM
        DEFENDANT'S RESIDENCE WAS ERROR OR INEFFECTIVE
        ASSISTANCE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

        A.  Plain Error is Not Implicated . . . . . . . . . . . . . . . . . . . . . . . . .   3

        B.  Defendant Has Not Established Ineffective Assistance of Counsel . . .   4

    II.    THE TRIAL COURT DID NOT ERR IN ALLOWING THE
        ADMISSION OF CERTAIN EVIDENCE . . . . . . . . . . . . . . . . . . . . . . .   8

        A.  Perea's Hearsay Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

        B.  Ortiz's Opinion Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    III.    THE PROSECUTOR'S ARGUMENTS DID NOT CONSTITUTE
        ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

        A.  Opening Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

        B.  Closing Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

    IV.    THE DOCTRINE OF CUMULATIVE ERROR DOES NOT APPLY . .   25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

i

## STATEMENT REGARDING CITATIONS TO THE RECORD

The proceedings below were taped and subsequently transcribed pursuant to this Court's order. The trial is contained in two volumes of transcript with consecutive page numbers and citations are made to the volume number (I or II) and the page number. However, the transcripts are not complete and counsel referred to a set of tapes provided by defense counsel for the last six trial tapes (on February 13 and 14, 2003) marked as 03-100, 03-101, 03-102, 03-103, 03-106, and 03-107. For those tapes, counsel used a Panasonic transcriber with approximately 500 counters per side of tape and citations are to the tape number and counter number, e.g. Tape 03-102 at 45. As of April 16th, when this brief will be filed, those tapes are not yet part of the official record of this Court. Citations to the record proper are denoted by "RP."

ii

## TABLE OF AUTHORITIES

**New Mexico Cases**

Clark v. State, 112 N.M. 485, 816 P.2d 1107 (1991) . . . . . . . . . . . . . . . . . . . . . . . 14

Duncan v. Kerby, 115 N.M. 344, 851 P.2d 466 (1993) . . . . . . . . . . . . . . . . . . . . . 8

Lytle v. Jordan, 2001-NMSC-016, 130 N.M. 198, 22 P.3d 666 . . . . . . . . . . . .  4, 5

State v. Alberico, 116 N.M. 156, 861 P.2d 192 (1993) . . . . . . . . . . . . . . . . . 17, 18

State v. Armendarez, 113 N.M. 335, 825 P.2d 1245 (1992) . . . . . . . . . . . . . . . . 20

State v. Alfred Baca, 120 N.M. 383, 902 P.2d 65 (1995) . . . . . . . . . . . . 11, 21, 22

State v. Mario Arthur Baca, 1997-NMSC-059, 124 N.M. 333, 950 P.2d 776 . .  8, 24

State v. Barraza, 110 N.M. 45, 791 P.2d 799 (Ct. App. 1990) . . . . . . . . . . . . . . . 20

State v. Chamberlain, 112 N.M. 723, 819 P.2d 673 (1991) . . . . . . . . . . . . . . . . . 20

State v. Chavez, 116 N.M. 807, 867 P.2d 1189 (Ct. App. 1993) . . . . . . . . . . . . . 24

State v. Diaz, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983) . . . . . . . . . . 21, 22, 23

State v. Ellis, 89 N.M. 194, 548 P.2d 1212 (Ct. App. 1976) . . . . . . . . . . . . . . . . 18

State v. Gilbert, 100 N.M. 392, 671 P.2d 640 (1983),
cert. denied, 465 U.S. 1073 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Gonzales, 113 N.M. 221, 824 P.2d 1023 (1992) . . . . . . . . . . . . . . . . . . . 20

State v. Gutierrez, 2003-NMCA-077, 133 N.M. 797, 70 P.3d 787,
cert. denied, No. 28,071 (6/5/03) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

State v. Herrera, 2001-NMCA-073, 131 N.M. 22, 33 P.3d 22,
cert. denied, No. 27,027 (9/19/01) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8

State v. Holden, 85 N.M. 397, 512 P.2d 970 (Ct. App. 1973) . . . . . . . . . . . . . .   19

State v. Jacobs, 2000-NMSC-026, 129 N.M. 448, 10 P.3d 127 . . . . . . . . . . . .   5, 7

State v. Jett, 111 N.M. 309, 805 P.2d 78 (1991) . . . . . . . . . . . . . . . . . . . . . . . .   25

State v. Lamure, 115 N.M. 61, 846 P.2d 1070 (Ct. App. 1992) . . . . . . . . . . .   22, 24

State v. Landgraf, 121 N.M. 445, 913 P.2d 252 (Ct. App. 1996) . . . . . . . . .   18, 19

State v. Lucero, 116 N.M. 450, 863 P.2d 1071 (1993) . . . . . . . . . . . . .   3, 4, 17, 18

State v. Mann, 103 N.M. 660, 712 P.2d 6 (Ct. App. 1985) . . . . . . . . . . . . . . . . .   6

State v. Martin, 101 N.M. 595, 686 P.2d 937 (1984) . . . . . . . . . . . . . . . . . . .   18, 25

State v. McClaugherty, 2003-NMSC-006, 133 N.M. 459, 64 P.3d 486 . . . .   8, 13, 19

State v. Orona, 97 N.M. 232, 638 P.2d 1077 (1982) . . . . . . . . . . . . . . . . . . . . . .   5

State v. Osbourne, 111 N.M. 654, 808 P.2d 624 (1991) . . . . . . . . . . . . . . . .   20

State v. Phillips, 2000-NMCA-028, 128 N.M. 777, 999 P.2d 421 . . . . . . . . .   20, 24

State v. Powers, 111 N.M. 10, 800 P.2d 1067 (Ct. App. 1990) . . . . . . . . . . . .   7-8

State v. Rojo, 1999-NMSC-001, 126 N.M. 438, 971 P.2d 829 . . . . . . . . . . . . . .   20

State v. Sanchez, 98 N.M. 781, 652 P.2d 1232 (Ct. App. 1982) . . . . . . . . . . . . .   7

State v. Scott, 113 N.M. 525, 828 P.2d 958 (Ct. App. 1991) . . . . . . . . . . . . . . . .   5

State v. Stampley, 1999-NMSC-027, 127 N.M. 426, 982 P.2d 477 . . . . . . . . . . .   13

State v. Swavola, 114 N.M. 472, 840 P.2d 1238 (Ct. App. 1992) . . . . . . . . . . . .   12

State v. Victorian, 84 N.M. 491, 505 P.2d 436 (1973) . . . . . . . . . . . . . . . . . . . .   20

State v. Wilson, 117 N.M. 11, 868 P.2d 656 (Ct. App. 1993) . . . . . . . . . . . . . . . .   7

**Federal Cases**

Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354 (2004) . . . . . . . . . . 9, 10, 13

Ohio v. Roberts, 448 U.S. 56 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

United States v. Brown, 490 F.2d 758 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . 12

**New Mexico Rules and Statutes**

Rule 5-802, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Rule 11-401, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rule 11-403, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Rule 11-704, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Rule 11-803(C), NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Rule 12-213(A)(4), NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

UJI 14-5050, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

UJI 14-5183, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

UJI 14-6006, NMRA 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

## SUMMARY OF RELEVANT FACTS

Pamela Pace, Defendant's estranged wife, was killed by one shotgun blast to the chest in the home of the Defendant.  She and Defendant were the only two persons at the house at the time of her death.   Although the Defendant called 911 to report her death as a suicide, the responding officers became immediately suspicious due to a number of inconsistencies between the physical evidence at the scene and the Defendant's claim of suicide and his later claim of an accidental shooting.

Officers responding to the scene observed broken pottery shards and bloodstains in the living room and hallway, indicative of some kind of violent fight or struggle.  (Tr I and II at 99-100, 107, 117, 139, 181, 197-199, 408-415).  The victim was found in the back bedroom sitting propped up with a shotgun wound to the chest; the shotgun was found lying beside her with the barrel severely mangled and "peeled back like a banana."  (Id. at 101-104, 118, 182, 418).  The victim had a large laceration to her left thigh with blood that appeared to be flowing up rather than down, her hands were severely lacerated, and her right thumb had been shot off (and was found under the nightstand).  (Id. at 105, 119, 206).  The officers also noted evidence of duct tape with blue fibers on the shotgun, as well as shredded pieces of potato in the bedroom.  (Id. at 120-121, 418-420).  The Defendant let the officers in when they arrived and said she "finally did it", i.e. committed suicide.  (Id. at 101, 180).  The Defendant did not appear to be upset and proceeded to drink a beer.  (Id. at 122).

Although the cause of death was the gunshot wound, the pathologist and officers also noted some evidence of strangulation due to marks on the victim's neck and some retinal hemorrhaging.  (Id. at 206, 320, 363-364, 372, 383-385).  Due to the strangulation, the pathologist could not definitely say if the victim was conscious when she was shot, but she was

alive. (Tr II at 389). The pathologist did, however, conclude that her death was not a suicide because the severe injuries to her hands showed that they were in front of the barrel when it was fired; "I don't believe there is any way she could of [sic] done this by herself." (Tr II at 391). The pathologist also found pieces of potato and duct tape in the gunshot wound (Tr II at 375-377, 388). Three neighbors also saw the Defendant throw something over the fence to the neighboring vacant yard, and the police recovered a blue towel covered with duct tape at that location. (Id. at 123, 148, 155-156, 166, 184, 425). The shotgun showed evidence that a blue towel had been duct-taped to it, and that a potato had been duct-taped to the end of the barrel, presumably as a silencer. (Id. at 187-188, 191-192).

Defendant waived his rights and agreed to talk to police. The Defendant did not testify at trial but his statements were played for the jury. Initially, Defendant contended that he and the victim had argued, she cut her leg on the broken pottery, and that he then heard the shotgun blast from the bedroom as he sat at his computer. He told the police in detail about the victim's problems with drugs and the law, and stated that she had threatened suicide before. (Id. at 210-244; Tr Vol. II at 250-280). After the officers confronted Defendant with the physical evidence that was inconsistent with the victim's suicide, the Defendant changed his story and said that they had struggled for the gun in the bedroom and it had accidentally gone off. (Id. at 283-312). Defendant denied any knowledge of the duct tape, blue towel, or potato, but then later said he put the towel on the gun trigger to keep her from firing it. (Id. at 230-234, 303-304)

Defendant was indicted on first-degree murder and tampering with evidence. (RP at 1). A jury convicted him of second-degree murder and tampering with evidence. (RP at 177-178). Other facts will be discussed as they relate to the issues.

## ARGUMENT

### I.   THE RECORD DOES NOT ESTABLISH THAT FAILURE TO FILE A MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM DEFENDANT'S RESIDENCE WAS ERROR OR INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims for the first time on appeal that his attorney was ineffective in failing to file a suppression motion regarding evidence seized before the search warrant was obtained, and that this failure constituted plain error. However, plain error is not implicated in such a situation, and the record does not establish a prima facie case of ineffective assistance of counsel.

Defense counsel did not litigate the issue of the search of Defendant's home and the only references to it in the record are casual references made by the testifying officers. (Tr II at 351-352 (Detective Harris notes that they were searching for duct tape but cannot recall if duct tape was specifically listed in the search warrant affidavit); 429 (Agent Applegate testifies that no evidence was collected until the warrant was obtained); 462, 467 (Agent Casados notes that the warrant was obtained)). Defense counsel did not cross-examine the State's witnesses in any depth about the circumstances or details of Defendant's consent, or the subsequent warrant. Because Defendant did not raise the issue below, there is little information on the record about the search warrant, and the search warrant affidavit is not in the record. Error cannot be premised upon such a record.

### A. Plain Error is Not Implicated

Plain error applies only to errors in evidentiary matters. State v. Gutierrez, 2003-NMCA-077, ¶ 19, 133 N.M. 797, 70 P.3d 787, cert. denied, No. 28,071 (6/5/03). Our Supreme Court has held that the "predicate for review on the basis of plain error is less stringent than for fundamental error." State v. Lucero, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). Thus, although the court need not find that the defendant's guilt is so doubtful as to shock the

conscience of the court, or find a miscarriage of justice, the court must find that the matter relates to an evidentiary issue that affected substantial rights. The Court in <u>Lucero</u> clarified that plain error applies to evidentiary matters, and not just rulings, so that a party may avail himself of the doctrine even if no objection was made at trial. <u>Id</u>. Plain error is applied sparingly and only if the Court has "grave doubts" about the validity of the verdict, "due to an error that infects the fairness or integrity of the judicial proceeding." <u>Gutierrez</u> <u>id</u>.

The failure of defense counsel to challenge the search of Defendant's house is not an evidentiary matter that is appropriate for plain error review. Although no objection need be made at trial to trigger plain error review, the matter at issue must be evidentiary. Here, there was no admission of evidence as to the search, other than general comments from police officers that the house was searched pursuant to Defendant's consent and later pursuant to a search warrant. The search warrant affidavit was not proffered or admitted into evidence, and the doctrine of plain error should not be applied in this situation. Even though the Supreme Court clarified that plain error can apply to evidentiary matters, and not just rulings, this issue is not an evidentiary matter that arose at trial. Defendant is complaining about the failure of his attorney to file a motion to suppress and not about a discrete evidentiary ruling or matter; the issue is thus more appropriately decided under an ineffective assistance of counsel claim.

## B. Defendant Has Not Established Ineffective Assistance of Counsel

New Mexico follows the test for ineffective assistance of counsel as established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>e.g.</u> <u>Lytle v. Jordan</u>, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666. Proving ineffective assistance of counsel under the <u>Strickland</u> standard is two-fold: 1) defendant must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness; and 2) that the defendant suffered prejudice

4

in that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland at 689-694.

The Defendant has the burden of proving both prongs of the test. Assistance of counsel is presumed to be competent unless the Defendant clearly demonstrates otherwise. State v. Jacobs, 2000-NMSC-026, ¶ 48, 129 N.M. 448, 10 P.3d 127. In particular, bad tactics or improvident strategies do not necessarily translate into ineffective assistance. The Sixth Amendment demands only reasonable competence; a defendant is not guaranteed an errorless defense. State v. Orona, 97 N.M. 232, 638 P.2d 1077 (1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." State v. Scott, 113 N.M. 525, 531, 828 P.2d 958, 964 (Ct. App. 1991) (quoting Strickland 466 U.S. at 686). The ineffective assistance of counsel inquiry is highly deferential, cannot rely on hindsight, and must take into account all the circumstances surrounding the defense. Lytle v. Jordan, ¶ 26. The court must find that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland at 687. The issue of ineffective assistance of counsel is reviewed de novo on appeal as a mixed question of fact and law. Lytle v. Jordan, ¶ 28.

Here, Defendant can show neither prong on this record. The only references to the search made at trial indicate that the Defendant consented to the search, and that a warrant was later obtained. Defendant claims that the State only "perfunctorily" claimed at trial that Defendant gave consent for the search of his home. (Brief-in-Chief at 24). However, the Defendant never challenged the issue of consent and the State thus had no reason to establish it for the record. The State did not rely upon a perfunctory showing of consent; rather, the issue was simply not

raised and thus was only alluded to at trial. The State's burden to show that the search and seizure comes within a valid and recognized exception to the search warrant requirement is dependent upon a defendant putting facts in issue to allege a violation. State v. Mann, 103 N.M. 660, 663, 712 P.2d 6, 9 (Ct. App. 1985). The Defendant did not contest the issue of his consent, or claim that it was invalid. In such a situation, the State cannot be expected to prepare extensive proof to establish the voluntary nature of that consent.

Trial counsel was very active in this case and filed extensive pre-trial motions. (RP at 27-49). Other than counsel's active participation in other issues at trial, the record also affirmatively establishes that defense counsel was aware that Defendant had consented, presumably had discussed the issue with Defendant, and apparently made a decision that the consent was voluntary. During cross-examination of Agent Ortiz the following colloquy took place as defense counsel was asking Ortiz about his initial suspicions at the scene:

A. It was suspicious. We knew at that point we were going to need a search warrant so we contacted the District Attorney's Office.
Q. But prior to that search warrant Gilbert had given consent to search his house, correct?
A. That's correct.

(Tape 03-102 at 322-325). After a couple of other questions, the defense attorney again alluded to the fact that a search warrant was "eventually" secured, and then said, presumably thinking out loud and referring to the time it took to get the warrant, "I know there's a large lapse of time there, but I didn't think there was anything really of interest there." (Id. at 337). Defense counsel did not cross-examine any State witness on the details of either Defendant's consent to the search or the warrant. The only conclusion that the record supports is that counsel was aware of, but chose not to pursue, the issue. Without more information, this cannot be found to be ineffective assistance of counsel as a matter of law. Given the paucity of the record on the issue,

it cannot be said that defense counsel's decision was not strategic or was outside the realm of competency.

Defendant also cannot show prejudice because it is simply unknown on this record if a motion to suppress based on Defendant's consent and/or the warrant was meritorious and would have succeeded. Failure to file a non-meritorious motion cannot be declared ineffective assistance of counsel. State v. Sanchez, 98 N.M. 781, 783, 652 P.2d 1232, 1234 (Ct. App. 1982). If the motion was meritless, the court would not have granted it and the Defendant cannot show prejudice.

Thus, Defendant's conviction cannot be reversed on appeal for ineffective assistance of counsel. Nor is this case appropriate for a remand for an evidentiary hearing in the trial court. Such a remand is appropriate only when the record on appeal establishes a prima facie case of ineffective assistance of counsel. "A prima facie case is made out when: (1) it appears from the record that counsel acted unreasonably; (2) the appellate court cannot think of a plausible, rational strategy or tactic to explain counsel's conduct; and (3) the actions of counsel are prejudicial." State v. Herrera, 2001-NMCA-073, ¶ 35, 131 N.M. 22, 33 P.3d 22, cert. denied, No. 27,027 (9/19/01) (internal citation omitted). A reviewing court will not attempt to second-guess a tactical decision made by counsel. Jacobs, ¶ 49. In addition, there must be a basis on the record for concluding that counsel's conduct was prejudicial. State v. Wilson, 117 N.M. 11, 18, 868 P.2d 656, 663 (Ct. App. 1993). Here, the appellate record does not contain anything to support a conclusion that defense counsel's failure to file a motion to suppress was an egregious error, as opposed to a strategic decision, or that any such motion would have been granted.

Defendant can still afford himself of the post-conviction proceedings provided for in Rule 5-802, NMRA 2004. See State v. Powers, 111 N.M. 10, 12, 800 P.2d 1067, 1069 (Ct. App.

1990) (record did not contain essential factual basis for claim of ineffective assistance of counsel and case was more appropriate for a post-conviction proceeding).  "When the record on appeal does not establish a prima facie case of ineffective assistance of counsel, this Court has expressed its preference for resolution of the issue in habeas corpus proceedings over remand for an evidentiary hearing."  Herrera, ¶ 37.  And, as the Supreme Court has noted, "[a] record on appeal that provides a basis for remanding to the trial court for an evidentiary hearing on ineffective assistance of counsel is rare" in part because "'ineffective assistance usually can be reached only after an adversarial proceeding exploring the reasons for the action or inaction of defense counsel.'"  State v. Baca, 1997-NMSC-059, ¶ 25, 124 N.M. 333, 950 P.2d 776 (internal citation omitted).  Rule 5-802 is "specifically designed to address such post-conviction constitutional claims and is the procedure of choice in this situation."  Duncan v. Kerby, 115 N.M. 344, 347, 851 P.2d 466, 469 (1993).  The record in this case is not one of those rare cases that establishes a prima facie case of ineffective assistance of counsel and it should not be remanded for an evidentiary hearing.

## II.   THE TRIAL COURT DID NOT ERR IN ALLOWING THE ADMISSION OF CERTAIN EVIDENCE

### A.   Perea's Hearsay Testimony

A trial court's admission of hearsay testimony is well within the court's discretion and is reviewed only for a clear abuse of that discretion.  State v. McClaugherty, 2003-NMSC-006, ¶ 17, 133 N.M. 459, 64 P.3d 486.

Officer Perea began his testimony by describing his involvement in a domestic violence call to the same residence about two months before the victim's death; the Defendant wanted the victim out of the house and the police helped her leave.  There was no objection to this line of testimony.  The following colloquy then occurred during his direct examination:

MS. GARCIA: And is there anything that she directly said that evening.
MR. CAMPBELL: Objection your Honor, hearsay.
MS. GARCIA: Goes to victim's state of mind.
JUDGE: Overruled, go ahead.
MS. GARCIA: Okay and can you tell us what was said that evening?
OFFICER PEREA: After they were done loading the car with the stuff, we were all getting ready to leave and she was getting off from the couch, just before she got up she made a statement uh, next time you guys see me you're going to find me dead.

(Tr I at 116). The prosecutor then asked Perea if it appeared that the victim had been drinking; Perea responded that she seemed "kind of groggy" but he was not completely sure if she was under the influence of anything, but thought she had been drinking. (Id.). Defendant challenges the admission of this statement under the state of mind hearsay exception. See Rule 11-803(C), NMRA 2004.

Initially, the recent United States Supreme Court decision of Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354 (2004), must be considered (Defendant's brief was filed before Crawford was decided on March 8, 2004). In Crawford, the prosecution relied on the out-of-court statement of the accused's wife to overcome the spousal testimonial privilege under Washington law. The prosecutors relied on her statement against penal interest under the theory that the statement was admissible under a firmly rooted exception to the hearsay rules and carried sufficient indicia of reliability pursuant to Ohio v. Roberts, 448 U.S. 56 (1980). In Crawford, the Supreme Court overruled Roberts and held that the admission of a "testimonial" hearsay statement of an unavailable witness violates the Confrontation Clause. Writing for a majority of seven, Justice Scalia concluded that the Sixth Amendment requires that an accused be afforded the opportunity to directly confront a witness against him. Thus, in the wake of Crawford, "testimonial" statements are not longer admissible as substantive evidence against an accused, regardless of whether they meet some hearsay exception.

Crawford is limited to "testimonial" statements:

> Where testimonial evidence is at issue … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of the term "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with the closest kinship to the abuses at which the Confrontation Clause was directed.

124 S.Ct. at 1374. However, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law – as does Roberts, - and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Id.

Although the delineation between testimonial and non-testimonial statements is not yet fully developed, the victim's statement in this case was clearly non-testimonial. It was made in the presence of a police officer, but it was not made during any kind of formal, or even informal, interrogation. Rather, it appears the remark was made in passing to the officers or whoever else was present and was not the type of testimonial statement envisioned by the majority in Crawford. Thus, it survives Crawford and may be considered under New Mexico's law regarding exceptions to hearsay.

The State offered the statement under the state of mind hearsay exception. The applicable rule provides that the following statements are not excluded by the hearsay rule regardless of the declarant's availability:

> A statement of a declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of the declarant's will.

Rule 11-803(C), NMRA 2004.

The state of mind hearsay exception applies when the state of mind of the declarant is relevant; i.e. that it "tends to make the existence of any fact of consequence to the determination of the action more probable than it would be without the evidence." State v. Baca, 120 N.M. 383, 389, 902 P.2d 65, 73 (1995); Rule 11-401, NMRA 2004. And, as the Supreme Court held in Baca, the admissibility of the out-of-court statement depends upon whether it is consequential to the determination of the declarant's conduct. Defendant, relying on Baca, argues that the statement does not apply because it is relevant only to the victim's fear of the Defendant. (BIC at 30-31). In Baca, the Court considered a statement made by a young witness that she feared her father. That statement ran afoul of the hearsay exception because it was offered not to prove some relevant fact of the young girl's state of mind, but only that she feared her father and that he must therefore have killed her mother. As such, the statement was probative only because it reflected on the defendant's state of mind, not the victim's, and thus encouraged the jury to reach an improper inference. Id. at 389-390, 902 P.2d at 71-72.

However, the Court in Baca also specifically noted that the state of mind of the victim of a crime is a fact in consequence where there are issues of self-defense, suicide, or accident. That is, a claim of suicide can be rebutted by statement that are "inconsistent with a suicidal bent", and claims of accident can be "rebutted by victim's fear of placing self in way of such harm." Id.

Here, Defendant's statements to police raised the issues of suicide accidental shooting, and self-defense. His attorneys defended him on the same issues at trial and received the applicable self-defense instructions. (RP at 162-164, 168). See UJI 14-5183, NMRA 2004. Defendant told the police in his second statement that he took the gun from the victim to avoid being shot himself because "she had it on me" and he believed that she intended to use the gun

on him.  (Tr II at 284-285, 291).  Statements as to the victim's fear of the Defendant are thus

relevant, as they tend to disprove the claim of self-defense.  See e.g., State v. Swavola, 114 N.M.   *time line*

472, 478, 840 P.2d 1238, 1244 (Ct. App. 1992) (victim's hearsay testimony that he wanted to

reconcile with his wife was admissible under the state of mind hearsay exception because it was

relevant to defendant's claim of self-defense as it reduced the likelihood that the victim was the

first aggressor); United States v. Brown, 490 F.2d 758, 767 (D.C. Cir. 1973) (claim of self-

defense can be rebutted by victim's expressions of fear because such fear renders it unlikely that

the victim was the first aggressor).  The victim's statement that the police would next see her

dead, and the officer's understanding of her statement that she expected more violence from

Defendant, tends to refute the assumption that she was suicidal or that the Defendant acted in

self-defense.  The Defendant's only witnesses, Mark Vandi and Marvin Gracie, testified about

the victim's violent and irrational behavior toward the Defendant to bolster the defense that the

shooting was accidental and instigated by the victim's use of the gun.  (Tape 03-102 at 404-431;

Tape 03-103 at 11-120).  Thus, the victim's fear of Defendant hurting her was a relevant fact, not

because it proved that Defendant would in fact hurt her in the future, but because it tended to

refute the notion that she was likely to commit suicide or instigate violence against the

Defendant.

The Defendant put the victim's state of mind at issue and a statement that tended to

prove her state of mind was relevant.  The statement was probative because it showed the

victim's state of mind shortly before her death, and because it tended to refute the Defendant's

witnesses.  Under these circumstances, the court did not abuse its discretion in admitting it.  See

Rule 11-403, NMRA 2004.

Moreover, even if found to be error under <u>Crawford</u> or New Mexico law, the error in admitting the statement was harmless.  Reversal is not warranted if the error is not prejudicial. <u>See</u> <u>e.g.</u>, <u>State v. Stampley</u>, 1999-NMSC-027, ¶ 38, 127 N.M. 426, 982 P.2d 477.  For error to be harmless, there must be:  (1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so miniscule that it could not have contributed to the conviction; and (3) no substantial conflicting evidence to discredit the State's testimony.  <u>McClaugherty</u>, ¶ 32.

Here, there was overwhelming evidence that the Defendant shot the victim and that the shooting was not suicide, accidental, or in self-defense.  There was no dispute that the victim was shot at close range with a shotgun and that she had been partially strangled before her death. Defendant and the victim were the only two persons at the house and the house showed evidence of a violent altercation contemporaneous with the victim's death.  Both Ortiz and the pathologist opined that suicide was impossible due to the position the victim's hands would have had to be in to receive the severe injuries from the shotgun blast.  The presence of the potato, apparently used as a silencer, and the blue towel on the gun, bolstered the conclusion that the gun was prepared to avoid undue noise and gun residue.  Defendant changed his statement to police, and was unable to explain the presence of the potato at the end of the gun, despite irrefutable evidence that it was there.  As such, faced with the wealth of inculaptory evidence, the comment made by the victim two months before her death is miniscule in comparison to the admissible evidence and could not have reasonably contributed to Defendant's conviction.

There was also no substantial conflicting evidence to discredit the State's testimony.  The only evidence offered by the Defendant were two witnesses who testified as to some fights

between the victim and Defendant, to bolster the theory that the shooting was accidentally caused by Defendant in an effort to get the gun away from the victim.  The Defendant's actions after the shooting, including his calm demeanor with the officers, his ready story of suicide and the victim's problems, as well as his throwing the blue towel over the fence, all served to discredit any theory of an accidental shooting.  This case is not a close call on harmless error as there is no reasonable possibility that the victim's statement contributed to the conviction.  See Clark v. State, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991).  Reversal is not warranted.

### B.  Ortiz's Opinion Evidence

Admission of expert testimony is within the sound discretion of the trial court and will not be overturned absent a clear abuse of that discretion.  State v. Gilbert, 100 N.M. 392, 400, 671 P.2d 640, 648 (1983), cert. denied, 465 U.S. 1073 (1984).

At the beginning of Ortiz's testimony the prosecutor detailed Ortiz's specialized education and experience in the areas of blood splatter and analysis and crime scene reconstruction.  (Tr Vol. II at 481-486).  Ortiz testified that:

> Crime Scene Reconstruction is to evaluate the evidence at the scene.  Gather physical evidence and you evaluate it to determine to arrive at a conclusion as to what occurred, what happened at the scene.

(Id. at 482).  He also testified that blood splatter analysis can tell you many things including the origin of the blood stain, the direction of the blood, the distance from impact, the type of force used, the velocity, the number of gunshots, and relative positions and movements of the parties. He stated that, "It will also assist you in supporting or refuting any statements by witnesses or defendants."  (Id. at 485).  No objection was made to any of this testimony, and defense counsel had no objection to the prosecutor's proffer of Ortiz as an expert in blood splatter analysis and crime scene reconstruction.  (Id. at 486).

Ortiz went through the crime scene in painstaking detail, explaining his opinion as to the significance of blood drops and other evidence found in the bedroom, the hallway, and on the victim.  He opined that the physical evidence did not support Defendant's statement that the victim walked down the hallway to the bedroom because there were no carpet fibers on the bottom of her bloody bare feet that would have adhered to them if she had walked, the blood in the hallway were passive drops from a foot above and were too spread out to correspond to footprints, and there was a transfer blood stain with visible ridging on the door jamb of the bedroom that was consistent with a foot swipe and consistent with a theory that victim was carried and her body turned to accommodate the doorway to the bedroom.  (Id. at 505-509, Tape 3-100 at 153-178).  He testified that there was some expected blood flow from the gunshot wound but also some horizontal motion on the leg wound that indicated the victim had been moved and the leg had been elevated; this was also consistent with her being carried rather than walking.  (Tape 3-100 at 30-35, 104, 132).

Ortiz also opined that the fact that the barrel of the shotgun was peeled back like a banana indicated that some object was placed over the barrel of the gun, trapping the gasses inside and causing the explosion.  (2/13/03 Tape 3-100 at 18-20).  He also noted that the gunshot wound was clean and contained no gunshot residue within its track that indicated that some other object intercepted the blast to receive the residue.  (Id. at 84-94).  He also saw pieces of duct tape and potato on the victim and in her hair indicating that those substances were over the barrel of the gun; there was also shredded duct tape, potato, and gunshot residue on the bedroom ceiling.  (Id. at 285-292, 336).  The tip of the victim's right thumb was severed by the shotgun blast and the outside of both her hands had significant lacerations.  (Id. at 46-54).   The marks on her neck, as well as the bloodstains and hair in the living room, were indicative of a forceful struggle.  (Id. at

298). Ortiz was also able to track the trajectory of the victim's thumb based upon transfer blood stains in the room, and opined that she was shot in the propped-up position on the bed in which she was found. (Id. at 350-373). Ortiz also took pictures of the Defendant that night and observed blood stains on his shirt, which were consistent with the wiping of bloody hands. Defendant also had potato particles on his clothing. (Id. at 407-448).

Ortiz opined, without objection, that the victim's death could not have been a suicide because the lacerations on her hands indicated that her hands were up near the barrel when it discharged and thus could not have pulled the trigger. (2/13/03 Tape 03-101 at 38-40). In addition, the covering of the weapon with the duct tape and towel, as well as the presence of the potato wrapped in duct tape in front of the barrel were all consistent with an effort to prevent gunshot residue depositing on the person who fired the gun. (Id. at 42-45). He further testified that Defendant's statement that it was suicide was "just not consistent" with the physical evidence; there was no objection to this testimony. (Id. at 60-65).

Ortiz also gave a detailed synopsis as a crime reconstructionist as to how the crime occurred, based upon the foregoing evidence. (Id. at 90-129). The defense attorney asked for a bench conference and argued that Ortiz's testimony was closing argument; the court asked the prosecutor to move along. (Id. at 129-134). Ortiz then opined that Defendant fired the shotgun using the potato as a silencer and then called the police because of the unexpectedly loud explosion. Ortiz concluded by saying that Defendant's statements were not consistent with the physical evidence, that "physical evidence does not lie", and that the evidence at the scene pointed to a deliberate killing. (Id. at 138-142).

On appeal, Defendant claims that Ortiz's testimony was "advocacy for the State's murder theory" rather than scientific testimony, and that it improperly directly commented on the

Defendant's credibility. (BIC at 28).[1] Defendant objects on appeal to Ortiz's testimony that the "physical evidence does not lie" and that the physical evidence pointed to a deliberate killing. (BIC at 27). Defendant contends this testimony vouched for the credibility of the State's case and encroached into the jury's province to determine the truthfulness of the evidence and testimony. (BIC at 28). Defendant claims that this resulted in plain error and violated his due process right to a fair trial.

Defendant's authority for his position that Ortiz impermissibly commented directly on Defendant's credibility is State v. Lucero, 116 N.M. 450, 863 P.2d 1071 (1993). Defendant's reliance on Lucero is misplaced. In Lucero, which followed State v. Alberico, 116 N.M. 156, 861 P.2d 192 (1993), the Supreme Court's holding was limited to expert testimony commenting on the credibility of the victim of alleged sexual abuse. Id. 116 N.M. at 454, 863 P.2d at 1075. The Supreme Court found such testimony to be inappropriate, especially in a case where the evidence consisted primarily of the victim's allegation and the defendant's denial. Id. An expert comment on the credibility of the victim became close to an instruction to the jury how to decide the case because the credibility of the victim was the ultimate factual issue. Id. Alberico and Lucero are limited to those facts in which the Supreme Court wished to avoid the danger of allowing psychological experts too much leeway in giving their opinion on the credibility of sexual abuse victims, particularly in cases where the only evidence is the word of the victim.

Such dangers are not present here. Ortiz was not testifying as an expert in psychology as were the witnesses in Alberico and Lucero, but instead based his opinions upon physical facts

---

[1] Defendant asserts, without argument or citation to authority or the record, that Perea's testimony also interpreted the physical evidence to implicate Defendant. (BIC at 27). However, because Defendant does not brief the issue as to Perea, it is unclear if this is part of his appellate argument. At any rate, it should be disregarded for failure to brief it. See Rule 12-213(A)(4), NMRA 2004.

and observations. An expert can otherwise discuss his conclusions, even if it touches on the ultimate issue. See Rule 11-704, NMRA 2004; State v. Martin, 101 N.M. 595, 605, 686 P.2d 937, 947 (1984); State v. Ellis, 89 N.M.194, 198, 548 P.2d 1212, 1216 (Ct. App. 1976). Alberico and its progeny merely limited Rule 704 from being used in all cases to have an expert witness tell the jury that a witness is truthful. Id. 116 N.M. at 175, 861 P.2d at 201. Nothing in Alberico or Lucero prevents an officer from offering his opinion or conclusion based upon physical evidence at the scene. Ortiz's testimony relied on his physical observations of the scene, his conclusions drawn from those observations, and his specialized knowledge and training in the area. Ortiz did not testify that he did not believe the Defendant because he simply thought Defendant was lying; rather, he testified as to the conclusions he drew based upon the observable physical evidence and opined that the evidence was inconsistent with Defendant's statements.

This case is controlled by State v. Landgraf, 121 N.M. 445, 913 P.2d 252 (Ct. App. 1996). Landgraf was charged with depraved mind murder and claimed, relying on Alberico, that the police officers could not give opinions on the ultimate issue; i.e. whether the automobile crash he caused was intentional or accidental. The officers testified, based on their physical perceptions of the scene, that the defendant had a depraved mind and no regard for human life, that his "complex motor reactions demonstrated deliberation", and that the crash was therefore intentional. Id. at 451, 913 P.2d at 258. This Court found that the defendant "misconstrued" Alberico which "recognized and acknowledged" the principle that expert testimony can concern the ultimate issue for the trier of fact and that the jury is free to disregard such an opinion. The testimony was admissible and was "rationally based on the witnesses' perceptions and helpful to

the jury's determination of the depraved mind murder charges." Id.  This case is in the same posture.

Ortiz's testimony did not run afoul of the principle set forth in Alberico and Lucero and the district court did not err in admitting it.  The jury was free to give whatever weight it felt the opinion deserved and was specifically instructed that it could disregard the opinion entirely.  (RP at 158).  See UJI 14-5050, NMRA 2004.  The purpose of this instruction is not caution the jury that an opinion need not be accepted as conclusive.  See e.g., State v. Holden, 85 N.M. 397, 399, 512 P.2d 970, 972 (Ct. App. 1973) (jury is free to believe or disbelieve expert testimony on the issue of diminished responsibility).

Even assuming the officer's opinion was inadmissible, its admission was harmless error. McClaugherty.  The vast majority of Ortiz's testimony, and his conclusions from his observations, were admissible and not objected to.  The only objected portion to was his ultimate conclusions as to how the crime happened.  However, the pathologist had already testified as to similar conclusions, noting that the crime could not have been a suicide due to the position of the victim's hands.  The pathologist also noted the presence of potato and duct tape on the victim indicating that these substances were over the gun barrel.  Officers at the scene noted that a violent altercation had taken place and the officers also saw the potato shreds and the mangled gun barrel.  Ortiz's final opinion was cumulative at that point and could not have prejudiced Defendant.

### III.   THE PROSECUTOR'S ARGUMENTS DID NOT CONSTITUTE ERROR

#### A. Opening Statement

At the conclusion of his opening statement, Mr. Bogren said the following:  "Just as you have taken an oath and have raised your hand to fairly and truly judge this case, on behalf of the

people of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct this case as fairly and as honestly and as truthfully as possible. Thank you." (Tr I at 91).

No objection was made to this argument. Therefore, the prosecutor's remarks can be reviewed only for fundamental error. "Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error." State v. Gonzales, 113 N.M. 221, 229, 824 P.2d 1023, 1031 (1992). See also State v. Phillips, 2000-NMCA-028, ¶ 32, 128 N.M. 777, 999 P.2d 421 (if not challenged, prosecutor's closing remarks are only reviewed for fundamental error to determine if they were sufficiently egregious to deny defendant of a fair trial); State v. Victorian, 84 N.M. 491, 495, 505 P.2d 436, 440 (1973) (defendant has the burden to make a timely objection that the prosecutor's remarks exceed the bounds of propriety; he cannot wait until the trial is concluded before seeking relief). Fundamental error occurs only when the question of guilt is so doubtful that the upholding of the conviction would shock the conscience or where substantial justice has not been done. State v. Osborne, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991). In order to find fundamental error, the reviewing court "must be convinced that admission of the testimony constituted an injustice that creates grave doubts concerning the validity of the verdict." State v. Barraza, 110 N.M. 45, 49, 791 P.2d 799, 803 (Ct. App. 1990). In the context of alleged improper argument, "fundamental error arises when the prosecutor engages in misconduct that compromises the defendant's right to a fair trial." State v. Rojo, 1999-NMSC-001, ¶ 55, 126 N.M. 438, 971 P.2d 829. Moreover, parties are afforded reasonable latitude in closing argument. State v. Chamberlain, 112 N.M. 723, 729, 819 P.2d 673, 679 (1991). Comments are also to be reviewed in context to "gain a full understanding of the comments and their potential effect on the jury." State v. Armendarez, 113 N.M. 335, 338, 825 P.2d 1245, 1248 (1992).

Defendant relies upon State v. Diaz, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983), for his claim that this remark constituted fundamental error because it improperly referred to the prosecutor's authority. Such is not the case. In Diaz, the prosecutor's references to his authority were much more clear, pervasive, and egregious than in this case. In Diaz the prosecutor told the jurors that the taxpayers paid him and that he represented all the people in the district:

> You are my clients. I'm here to protect your rights. I'm here to protect the security of your homes, your places of business. The people of New Mexico come in here and presented this case to you …. When you start putting judges on trial, Supreme Court Justices, prosecutors who represent the people …. Just remember, the style of this case is State of New Mexico versus [defendant's name] …. And the people of this district ask you to find him guilty of both counts.

Id. at 213, 668 P.2d at 329. This Court found that such remarks were improper in that they encouraged the jury to infer that the prosecutor would not have brought the case unless he personally believed in defendant's guilt. Id. This Court reversed the case on the basis of cumulative error, due to the above quoted comments and other improper comments. Id. at 215, 668 P.2d at 331.

Defendant's reliance on State v. Baca, 120 N.M. 383, 902 P.2d 65 (1995), is also misplaced. In Baca, the prosecutor explicitly stated that he had a higher ethical duty then defense counsel because prosecutors "are bound by law to seek the truth whereas criminal defense attorneys are not." Thus, the prosecutor not only impugned the credibility of defense counsel but also clearly implied that he would not have brought the case unless the defendant was guilty. Id. at 392, 902 P.2d at 74.

The prosecutor did not engage in such misconduct here; his only comment that arguably invoked his authority was that he promised to present the case as "honestly" and "truthfully" as possible. The remarks were not similar to those in Diaz and Baca where the prosecutor used his position to sway the jury to convict on considerations other than the evidence presented. Here,

21

the prosecutor did not specifically refer to his authority, intimate that his authority was more powerful than that of defense counsel, or denigrate the credibility of defense counsel. Defendant's interpretation of the prosecutor's comment to be of the same ilk as those in <u>Diaz</u> and <u>Baca</u> reads too much into the comment. The remark could be read merely as an assurance that the State would not knowingly present false or perjured testimony. To the extent that it does present the prosecutor's personal belief in the Defendant's guilt, it is sufficiently ambiguous to escape fundamental error. "We will not find fundamental error in an ambiguous comment when a timely objection would have afforded the court and the prosecutor an opportunity to cure any problem by resolving the ambiguity." <u>State v. Lamure</u>, 115 N.M. 61, 68, 846 P.2d 1070, 1077 (Ct. App. 1992).

Moreover, the prosecutor's remark was a passing one made at the beginning of a long case with significant inculpatory evidence against Defendant. The jury was instructed that they were the sole judges of the facts of the case and that their duty was to determine the facts from the evidence presented. (RP at 156). <u>See</u> UJI 14-6006, NMRA 2004. There is no reason to suppose on this record that the prosecutor's isolated and opening comment swayed the jury to believe that they had to accept all the State's evidence as completely true, thereby ignoring the Court's explicit instruction to the contrary. Juries are presumed to follow the given instructions. <u>Gonzales</u>, 113 N.M. at 230, 824 P.2d at 1032. There is nothing on this record to indicate that the jury disregarded that instruction due to the prosecutor's comment. <u>Diaz</u> and <u>Baca</u> are clearly distinguishable on its facts. Fundamental error does not apply.

**B. Closing Statement**

In closing argument, the prosecutor stated, "Shame on you, Gilbert Torres and I hope you feel my outrage." Defense counsel objected and although the ensuing bench conference is

difficult to hear, the court can be heard telling the prosecutor to "tone it down." (Tape 03-107 at 2-4). The prosecutor continued, "And as a society we should feel outraged. We are a nation of law, not of men. The true test of our greatness is how well we treat the least of our citizens. The true test of our greatness is how we uphold the principle that everybody's entitled to life, liberty and the pursuit of happiness." (Id. at 4-7). Defense counsel objected again and the court can be heard saying that the prosecutor has some latitude. (Id. at 11). Defense counsel apparently did not request any instruction from the court to the jury. Defendant claims that these remarks were in error because they expressed the prosecutor's personal belief in Defendant's guilt and inappropriately used vituperative language against Defendant. (BIC at 33-34).

The State contends that although the prosecutor's initial statement that he hopes Defendant "feels his outrage" was improper as it implied the prosecutor's personal belief in Defendant's guilt, the prosecutor then complied with the court's directive to "tone it down" and continued his argument in a much more impersonal vein. The one comment about the prosecutor's outrage is not sufficient to find reversible error or to cast any doubt on the validity of the verdict. The prosecutor did not abuse Defendant with derogatory language or urge the jury to do anything other than convict on the evidence before it.

Defendant again relies upon Diaz in which this Court found cumulative error, based in part upon the prosecutor's abusive language in closing argument in which he repeatedly called the defendant a "yo yo", "stupid", and a "crook." Id. at 214, 668 P.2d at 330. This Court disapproved, finding that "It is one thing to place defendant's character in issue and quite another to vilify and make him appear an evil person before the jury by the use of derogatory terms." Id. The prosecutor did not go so far in this case and did not call the Defendant names.

Moreover, other cases with much more egregious comments have found misconduct but not fundamental error. See e.g., State v. Baca, 1997-NMSC-059, ¶ 55, 124 N.M. 333, 950 P.2d 776 (the prosecutor made a comparison during closing of the victim's mother holding her son with "the Pieta, the Madonna holding Jesus off the cross", and "[y]ou want to talk about things that indicate a mind, a depraved mind without regard for human life. They go to Village Inn to eat while [the victim's] mother is holding that towel trying to keep his life blood from flowing out."). Here, there was no such personal or colorful appeal to sympathy for the victim and the remarks were not sufficiently egregious to call the validity of the verdict into doubt, especially given the wealth of evidence available to convict the Defendant. See also, State v. Phillips, 2000-NMCA-028, ¶ 32, 128 N.M. 777, 999 P.2d 421 (no fundamental error where the prosecutor argued in closing that people in defendant's house were "peddling poison" to the community even though there was no evidence that defendant was involved in distribution; this Court disapproved of the prosecutor's tactics but found the argument was not sufficiently egregious to deny defendant a fair trial).

In addition, the evidence showed that Defendant tried to cover up his crime, repeatedly lied to police officers about what happened, and tried to portray the victim in a bad light to the officers by stressing her drug use and criminal background. (Tr I at 211-222; Tr II at 281). An argument that Defendant continued to disgrace the victim's memory even after her death could be seen as a fair comment on the evidence. See e.g. Lamure, 115 N.M. at, 67, 846 P.2d at 1076 ("The right of a prosecuting attorney to draw in his argument all legitimate inferences from the evidence authorizes him to assert a belief based on the evidence that the accused is guilty.") (internal citations omitted); State v. Chavez, 116 N.M. 807, 815, 867 P.2d 1189, 1197 (Ct. App. 1993) (prosecutor's characterization of defendant as a "loose cannon", "a macho tough guy", and

a "very, very dangerous" person was not overly abusive and was "arguably justified" considering his bragging about the killing and his ability to kill again).

## IV.    THE DOCTRINE OF CUMULATIVE ERROR DOES NOT APPLY

The cumulative error doctrine is not available if there were no irregularities at trial or if the record as a whole demonstrates that the Defendant received a fair trial. State v. Martin, 101 N.M. 595, 601, 686 P.2d 937 (1984). See also, State v. Jett, 111 N.M. 309, 315, 805 P.2d 78 (1991). As discussed above, Defendant has not identified any error at his trial and his trial was fair. He may not therefore rely on the cumulative error doctrine.

## CONCLUSION

For the foregoing reasons, the State respectfully requests this Court to affirm Defendant's convictions.

Respectfully submitted,

PATRICIA A. MADRID
Attorney General

M. ANNE KELLY
Assistant Attorney General
Attorneys for Plaintiff-Appellee
111 Lomas NW, Suite 300
Albuquerque, NM  87102
(505) 222-9000

CERTIFICATE OF SERVICE

I hereby certify that a true and correct
copy of the foregoing was served by
first class mail on
Todd Hotchkiss
Frechette & Associates, P.C.
P.O. Box 26807
Albuquerque, NM 87125
on this 16 day of April, 2004.

Assistant Attorney General