IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

     Plaintiff-Appellee-Respondent,

v.

                                      No.
                                      Ct. App. No. 24,103

GILBERT TORRES, JR.,

     Defendant-Appellant-Petitioner.

## PETITION FOR WRIT OF CERTIORARI
## TO THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

DECIDED BY THE COURT OF APPEALS, NO. 24,103
ON APPEAL FROM THE THIRTEENTH JUDICIAL DISTRICT COURT
FOR VALENCIA COUNTY
HONORABLE John W. Pope, Presiding

Respectfully submitted,

SUPREME COURT OF NEW MEXICO
FILED

APR 2 7 2005

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558

EXHIBIT
5

GILBERT TORRES, JR. petitions this Court, pursuant to Rule 12-502, N.M.R.A. 2005, to issue a writ of certiorari to review the attached April 7, 2005 Opinion ("Op.") of the New Mexico Court of Appeals ("COA").  A district court jury found MR. TORRES guilty of second-degree murder and tampering with evidence.  (Op. at 1)

## QUESTIONS PRESENTED FOR REVIEW

I.  Whether the COA erroneously held that the trial court did not abuse its discretion by admitting, over objection, victim's statement to a police officer two months before her death that "next time you guys see me you're going to find me dead" as a state of mind exception to the hearsay and relevant under Rules 11-803(C), 11-403 and 11-404, N.M.R.A. 2003?

II.  Whether the COA erroneously held that the trial court did not abuse its discretion by overruling defendant's objection to the prosecutor's closing argument that defendant "continues to disgrace and deface [the victim's] memory.  Shame on you, Gilbert Torres.  And I hope you feel my rage.  I hope that as a society ...."?

III.  Whether the COA erroneously held that the trial court abused its discretion in overruling defendant's objection regarding the scope of opinion testimony by the State's proffered expert as blood stain pattern analysis and accident reconstruction was beyond his qualified opinion that the victim did not commit suicide and detailing how he believed the entire murder circumstances occurred?

IV.  Whether the COA erroneously held that fundamental error

1

did not occur when the prosecutor said in opening statement, "Just as you have taken an oath and have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our case as fairly and as honestly and as truthfully as possible"?

V.   Whether the COA erroneously held that plain error did not occur when defense counsel failed to file a motion to suppress when the State searched defendant's residence without a search warrant?

VI.   Whether the COA erroneously held that trial counsel did not provide ineffective assistance of counsel when no plausible, rational or reasonable strategy existed for the failure of trial counsel to move for the suppression of evidence?

VII.   Whether the COA erroneously found no cumulative error?

## FACTS MATERIAL TO THE QUESTIONS PRESENTED

On October 14, 2001, Defendant called the police to his residence to remove Pamela Pace from his residence. (Op. at 12) Ms. Pace appeared "groggy", under the influence of something, and had been drinking. (Brief-in-Chief at 4; Reply Brief at 8)[1]   As an officer escorted her from the residence, she said, "next time you guys see me you're going to find me dead." (Op. at 12)    At Defendant's trial for the December 3, 2001 victim's death, the State introduced that statement, over objection, as a state of mind

---

[1]Hereinafter, Brief-in-Chief is cited as BIC, Answer Brief is cited as AB, and Reply Brief is cited as RB.

hearsay exception under Rule 11-803(C), N.M.R.A. (Op. at 12)

On December 3, 2001, police officers responded to a possible suicide call at Defendant's home. (Op. at 1)  One of the responding officers, Officer Roden, saw inside through a glass storm door as he approached the home. (Op. at 1)  He noticed debris and broken pottery on the floor and blood on the carpet. (Op. at 1)  Defendant approached and stated, "well she finally did it." (Op. at 2)  Roden asked where the alleged suicide victim was, and Defendant said that she was in the back bedroom. (Op. at 2)

Officers located the victim in the back bedroom on the bed, dead with an apparent shotgun wound to her chest, injuries to her body and blood stains on her feet, and evidence of retinal hemorrhaging. (Op. at 2)  A 12-gauge shotgun, "peeled back like a banana", was nearby. (Op. at 2)  Pieces of the shotgun barrel were on the bedroom wall, pieces of duct tape and fibers of blue cloth attached to the shotgun, and shredded pieces of potato were on the bedroom ceiling, victim's body and shotgun. (Op. at 2)

The officers cleared the house, called the New Mexico state police crime scene team, and set up crime scene tape. (Op. at 2)

Officers asked Defendant to go to the police station for questioning and was transported without being arrested. (Op. at 4)

The evidence indicated to the officers that Defendant had strangled the victim, then used duct tape to attach a towel to the butt of the weapon and to secure a potato to the end of the barrel,

presumably as a silencer, to stage the suicide scene. (Op. at 3)

The forensic pathologist concluded the victim died from a shotgun wound to her chest. (Op. at 3) The victim had been beaten and strangled prior to being shot, but did not know if the strangulation rendered her unconscious. (Op. at 3-4) When questioned about the possibility of suicide, the pathologist stated, "I don't believe there is any way she could [have] done this [by] herself." (Op. at 4)

Photographs of Defendant taken at the police station showed bloodstains on his clothing, blood on a boot, and a cut on his right hand. (Op. at 4)

Defendant waived his rights under Miranda v. Arizona, 384 U.S. 436, 479 (1966), and consented to giving a videotaped statement to police. (Op. at 4) He said that the victim had a long history of drug abuse, previously threatened to commit suicide, and pointed the shotgun at Defendant's friend on a prior occasion. (Op. at 4)

Initially, Defendant stated that victim committed suicide after an argument. (Op. at 4) After being confronted with physical evidence seized from the residence and scene, Defendant later changed his account to a struggle in the bedroom between the victim and him over the gun, which accidentally discharged. (Op. at 4)

Defendant was arrested. (Op. at 5) At some point later, the police secured a search warrant for Defendant's residence and executed the search warrant. (Op. at 4) Defendant was indicted for

4

first degree murder and tampering with evidence. (Op. at 5)

The State's closing argument began with, "Pamela Pace's prophesy came true; 'The next time you see me you are going to find me dead.'  ....  And sure enough, the next time Josh Perea saw Pamela Pace, he saw her dead." (BIC at 21; RB at 8)

## ARGUMENT

I.   The COA Erroneously Held that the Trial Court Did Not Abuse Its Discretion by Admitting, Over Objection, Victim's Statement to a Police Officer Two Months Before Her Death that "next time you guys see me you're going to find me dead" as a State of Mind Exception to Hearsay and Relevant under Rules 11-803(C), 11-403 and 11-404, N.M.R.A. 2003.

Argument Raised:  BIC at 29; AB at 8; RB at 8.

Basis for Granting the Writ:  Rule 12-502(C)(4)(a), N.M.R.A. 2005, as the COA panel majority's opinion conflicts with State v. Baca, 120 N.M. 383, 902 P.2d 65 (1995) and State v. Woodward, 121 N.M. 1, 908 P.2d 231 (1995).

The panel majority did not cite any authority for its holding that the trial court did not abuse its discretion by admitting the statement under Rule 11-803(C), N.M.R.A. (Op. at 12-17)

The panel majority found Defendant "raised issues of suicide, accidental shooting, and self-defense" and "requested and received jury instructions for self-defense and second-degree murder." (Op. at 14-15)  The State offered the statement "to show that the victim feared Defendant and was unlikely to attack him or commit suicide." (Op. at 15)  The statement's "ambiguity ... arguably helped

5

Defendant as much as it did the State ...." (Op. at 15)

The panel majority found <u>State v. Baca</u>, 120 N.M. at 389, 902 P.2d at 71, distinguishable because its statement "was not offered to show the victim's state of mind and was therefore irrelevant and prejudicial", could risk the jury to consider the victim's fear as reflecting on the defendant's state of mind, and the defendant in <u>Baca</u> did not raise the issue of self-defense. (Op. at 15)

The panel majority deflected, due to "the wide latitude afforded prosecutors ... during closing argument", Defendant's argument in his RB at 9 that the State significantly began its closing argument with direct reference to the statement (Op. at 16)

Judge Vigil dissented from the panel majority on this issue because "the statement was not admissible ... under Rule 11-803(C) and "its admission" was "reversible error." (Op. at 29)

The statement was introduced as substantive evidence "before any statements of Defendant were admitted into evidence". (Op. at 31) The statement was "ambiguous", "at best, ... a declaration", "not an expression of a state of mind or emotion", and not admissible under Rule 11-803(C). (Op. at 32)

The dissent also found the statement to be "irrelevant" under <u>Baca</u>, 120 N.M. at 389, 902 P.2d at 71, and not relevant to a claim of self-defense or suicide. (Op. at 32-33) The State introduced two recorded statements by Defendant to police "<u>after</u> Officer Perea testified as part of its effort to prove first degree murder" and

when Defendant did not testify. (Op. at 34)  The statement "did not tend to prove or disprove whether she killed herself" and "did not tend to prove or disprove whether the victim attacked defendant two months later, or whether she was accidentally killed." (Op. at 34)

The State used the statement "as a belief by the victim that Defendant was going to kill her." (Op. at 34)

> "In general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, the evidence must be excluded." Baca, 120 N.M. at 389, 902 [P.2d] at 71 (quoting United States v. Brown, 490 F.2d 758, 763 n.10 (D.C. Cir. 1973). The rule itself excludes the admission of "a statement of memory or belief to prove the fact remembered or believed." Rule 11-803(C).

> (Op. at 34-35)

The dissent also relied upon State v. Woodward, 121 N.M. 1, 9, 908 P.2d 231, 239 (1995) as authority for the inadmissibility of a "'statement of memory or belief' rather than a statement of then-existing mental, emotional, or physical condition". (Op. at 35)

The dissent found "the erroneous admission of the victim's hearsay statement was not harmless error" under State v. Baca, 120 N.M. at 389-90, 902 P.2d at 71-72, because, when "strong likelihood" exists the jury would infer victim's statement reflected on Defendant's state of mind, "'injurious prejudice' is 'particularly evident.'" (Op. at 37)  The prosecutor's prominent reliance on the statement in the closing argument that the error was not harmless under Baca because the 'inadmissible evidence was

7

therefore used to demonstrate that Defendant killed the victim and to show his state of mind, not the victim's." (Op. at 37)

II. The COA Erroneously Held that the Trial Court did not Abuse its Discretion in Overruling Defendant's Objection to the Prosecutor's Closing Argument that Defendant "continues to disgrace and deface [the victim's] memory. Shame on you, Gilbert Torres. And I hope you feel my rage. I hope that as a society ...."

Argument Raised: BIC at 33; AB at 22; RB at 13.

Basis for Granting the Writ: Rule 12-502(C)(4)(b), as the COA opinion conflicts with State v. Ferguson, 111 N.M. 191, 803 P.2d 676 (Ct. App.), cert. denied, 111 N.M. 144, 802 P.2d 1290 (1990); State v. Diaz, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983); State v. Vallejos, 86 N.M. 39, 519 P.2d 135 (Ct. App. 1974).

III. The COA Erroneously Held that the Trial Court Abused its Discretion in Overruling Defendant's Objection Regarding the Scope of Opinion Testimony by the State's Proffered Expert as Blood Stain Pattern Analysis and Accident Reconstruction was Beyond His Qualified Opinion that the Victim did not Commit Suicide and Detailing how He Believed the Entire Murder Circumstances Occurred.

Argument Raised: BIC at 27; AB at 14; RB at 5.

Basis for Granting the Writ: Rule 12-502(C)(4)(a), as the COA opinion conflicts with State v. Lucero, 116 N.M. 450, 454, 863 P.2d 1071, 1075 (1993). Rule 12-502(C)(4)(b), as the COA opinion conflicts with State v. Landgraf, 1996-NMCA-024, 121 N.M. 445, 913 P.2d 252.

IV. The COA Erroneously Held that Fundamental Error did not Occur When the Prosecutor Stated During Opening

Statement, "Just as you have taken an oath and have raised your hand to fairly and truthfully judge this case, on behalf of the People of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct our case as fairly and as honestly and as truthfully as possible".

Argument Raised:  BIC at 32; AB at 19; RB at 12.

Basis for Granting the Writ: Rule 12-502(C)(4)(a), as the COA opinion conflicts with State v. Baca, *supra*.  Rule 12-502(C)(4)(b), as the COA opinion conflicts with State v. Diaz, *supra*.

> V.   The COA Erroneously Held that Plain Error did not Occur When Defense Counsel Failed to File a Motion to Suppress the Evidence When State Agents Searched Defendant's Residence Without a Search Warrant.

Argument Raised:  BIC at 22; AB at 3; RB at 2.

Basis for Granting the Writ: Rule 12-502(C)(4).(c), as the COA opinion involves a significant question of law under the Fourth Amendment to the United States Constitution as interpreted in Flippo v. West Virginia, 528 U.S. 11 (1999), Thompson v. Louisiana, 469 U.S. 17, *reh'g denied*, (1984), and Mincey v. Arizona, 437 U.S. 385 (1978).

> VI.  The COA Erroneously Held that Trial Counsel did not Provide Ineffective Assistance of Counsel When No Plausible, Rational or Reasonable Strategy Existed for the Failure of Trial Counsel to Move for the Suppression of Evidence.

Argument Raised:  BIC at 25; AB at 4; RB at 3.

Basis for Granting the Writ: Rule 12-502(C)(4)(a), as the COA opinion conflicts with Patterson v. LeMaster, 2001-NMSC-013, 130

9

N.M. 179, 21 P.3d 1032 (1995). **Rule 12-502(C)(4)(c)**, as the COA opinion involves a significant question of law under the Fourth Amendment to the United States Constitution as interpreted in Flippo v. West Virginia, *supra*, Thompson v. Louisiana, *supra*, and Mincey v. Arizona, *supra*.

**VII.  The COA Erroneously Found No Cumulative Error.**

Argument Raised:  BIC at 34; AB at 25; RB at 14.

Basis for Granting the Writ: **Rule 12-502(C)(4)(b)**, as the COA opinion conflicts with State v. Diaz, *supra* and State v. Vallejos, *supra*.

### REQUEST FOR RELIEF

The Petitioner, GILBERT TORRES, JR., respectfully requests this Court, for any and all of the foregoing reasons, grant this petition, reverse the COA, and remand to the trial court.

Respectfully submitted,

_____
TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558

### CERTIFICATE OF SERVICE

I, Todd Hotchkiss, hereby certify that on April 27, 2005 I placed in the U.S. Mail, first-class postage paid, an endorsed photocopy of the foregoing petition to opposing counsel Ms. M. Anne Kelly, Assistant New Mexico Attorney General, Criminal Appeals Division, P.O. Drawer 1508, Santa Fe, New Mexico 87504-1508.

_____
TODD HOTCHKISS

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number _____

Filing Date:  4/7/2005

Docket No. 24,103


STATE OF NEW MEXICO,

                    Plaintiff-Appellee,

vs.

GILBERT TORRES, JR.,

                    Defendant-Appellant.


APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY
John W. Pope, District Judge


Patricia A. Madrid
Attorney General
M. Anne Kelly
Assistant Attorney General
Albuquerque, NM

            for Appellee


Todd Hotchkiss
Frechette & Associates, P.C.
Albuquerque, NM

            for Appellant

O P I N I O N

**WECHSLER, Judge.**

{1}    Defendant appeals his convictions for second degree murder and tampering with evidence.  On appeal, Defendant argues that plain error occurred due to his trial counsel's failure to file a motion to suppress evidence because the police did not obtain a search warrant prior to collecting evidence from Defendant's home.   In the alternative, Defendant argues that his counsel was ineffective in failing to file the motion.   Additionally, Defendant argues that the trial court erred in allowing a witness to testify to a statement made by the victim over Defendant's hearsay objection, that it erroneously admitted testimony of two police officers, and that statements made by the prosecutor during opening statements and closing arguments constituted fundamental error.    After the State filed its brief, Defendant filed a motion to supplement the record and to allow the State the opportunity to address the supplemental record in further briefing.  We now deny the motion and affirm.

**Factual and Procedural History**

{2}    On December 3, 2001, police officers responded to a possible suicide call at Defendant's home.  Officer Dino Roden, one of the responding officers, testified that he could see inside through a glass storm door as he approached the home. He noticed debris and broken pottery on the floor and blood on the carpet.   As Officer Roden was about to open the door, Defendant approached and stated "well she finally did it."

1    Officer Roden informed Defendant that he had been dispatched to

2    investigate a suicide and asked where "she" was.   Defendant

3    informed the officer that the victim, Defendant's estranged

4    wife, was in the back bedroom.

5    {3}   Officer Roden and Officer Joshua Perea, who arrived

6    shortly after Officer Roden, located the victim in the back

7    bedroom on the bed.   She was dead with an apparent shotgun

8    wound to her chest.   She had a four-to-five-inch gash on her

9    upper left thigh from which blood flowed up rather than down.

10   Her hands were badly lacerated, and her right thumb, which was

11   missing, was later found beneath a night stand.   She had blood

12   stains on the bottom of one of her feet.   There were also marks

13   on her throat and around the back side of her neck, as well as

14   evidence of retinal hemorrhaging.   The officers saw a 12-gauge

15   shotgun leaning next to the victim.   It had a badly damaged

16   barrel that "was peeled back like a banana."   There was a

17   wooden backscratcher next to the shotgun.   They also saw pieces

18   of shrapnel from the shotgun barrel on the wall in the bedroom

19   and pieces of duct tape and fibers of blue cloth attached to

20   the shotgun.   There were shredded pieces of a potato on the

21   ceiling, the victim's body, and the shotgun.

22   {4}   After making these observations, the officers cleared the

23   house, called New Mexico state police crime scene

24   investigators, and set up crime scene tape.   Officer Perea

25   stated that Defendant did not appear upset at this point, and,

2

1  in fact, went outside and began drinking a beer.

2  {5}   The officers questioned Defendant's neighbors.  Witnesses

3  stated  that  they  heard  yelling  coming  from  Defendant's

4  residence, followed by a loud noise, and that they observed a

5  man exit the residence and throw a bag over the fence into

6  another  yard  approximately  ten  minutes  before  the  officers

7  arrived.   Upon searching the area described by the witnesses,

8  the officers recovered a blue towel "covered with duct tape."

9  The officers also located a piece of duct tape underneath the

10 bed where the victim was found and a roll of duct tape in one

11 of  the  other  rooms.   The  evidence  indicated  to  the  officers

12 that  Defendant  had  strangled  the  victim,  then  used  the  duct

13 tape  to  attach  the  towel  to  the  butt  of  the  weapon  and  to

14 secure  a  potato  to  the  end  of  the  barrel,  presumably  as  a

15 silencer.   The evidence also indicated to police that Defendant

16 had staged the suicide scene.

17 {6}   Dr.  Jeff Nine, a forensic pathologist with the Office of

18 the Medical Investigator, found metal fragments, pieces of duct

19 tape,  and  potato  fragments  in  the  vicinity  of  the  shotgun

20 wound.   He  testified  at  trial  that  the  wounds  on  the  victim's

21 hands indicated that her hands were in front of the barrel of

22 the weapon, but not necessarily grabbing it, as it was fired.

23 He concluded that the victim died from a shotgun wound to her

24 chest.   However,  he  also  stated  that  she  had  been  beaten  and

25 strangled prior to being shot, but he did not know if the

3

1  strangulation rendered her unconscious. When questioned

2  regarding the possibility of the victim having committed

3  suicide, Dr. Nine stated: "I don't believe there is any way

4  she could [have] done this [by] herself."

5  {7}   Shortly after the police responded to the incident,

6  Defendant was transported to police headquarters for

7  questioning; he was not yet under formal arrest. Photographs

8  of Defendant, taken at the police station, showed bloodstains

9  on his clothing and a cut on his right hand. There was also

10  blood on Defendant's boot. While awaiting questioning,

11  Defendant stated, "I can't believe she did that." Defendant

12  waived his rights under Miranda v. Arizona, 384 U.S. 436, 479

13  (1966), and consented to giving a videotaped statement to

14  police. He stated that the victim had a long history of drug

15  abuse. He also stated that she had threatened to commit

16  suicide previously and that she had pointed the shotgun at

17  Defendant's friend on a prior occasion. When initially

18  questioned by police, Defendant reiterated his account that the

19  victim had committed suicide following an argument with

20  Defendant. However, when confronted with physical evidence

21  that was inconsistent with suicide, Defendant varied his story,

22  stating that he and the victim had struggled over the gun in

23  the bedroom and that it had accidentally discharged.

24  {8}   At some point after the interview, the police obtained a

25  search warrant and "processed the scene." Defendant was

4

1  formally arrested, indicted, and charged with first degree

2  murder and tampering with evidence.   After a jury trial,

3  Defendant was convicted of second degree murder and tampering

4  with evidence.

5  **Plain Error**

6  {9}   Defendant argues that plain error occurred due to his

7  counsel's failure to file a motion to suppress evidence because

8  police officers searched his residence without a warrant.   We

9  may take notice of plain errors affecting substantial rights

10 even though a defendant did not object to the errors at trial.

11 State v. Gutierrez, 2003-NMCA-077, ¶ 19, 133 N.M. 797, 70 P.3d

12 787.   The plain error doctrine is not as strict as the doctrine

13 of fundamental error in its application.   State v. Paiz, 1999-

14 NMCA-104, ¶ 28, 127 N.M. 776, 987 P.2d 1163.   Therefore, "we

15 need not determine that there has been a miscarriage of justice

16 or a conviction in which the defendant's guilt is so doubtful

17 that it would shock the conscience of the court to allow it to

18 stand."   State v. Lucero, 116 N.M. 450, 453, 863 P.2d 1071,

19 1074 (1993).   Nevertheless, because the plain error rule is an

20 exception to the general rule that parties must raise timely

21 objection to improprieties at trial, plain error is to be used

22 sparingly.   Paiz, 1999-NMCA-104, ¶ 28.   The plain error rule

23 only applies to errors in evidentiary matters.   Gutierrez,

24 2003-NMCA-077, ¶ 19.   We apply the rule only if we have "grave

25 doubts about the validity of the verdict, due to an error that

5

1 infects the fairness or integrity of the judicial proceeding."

2 Id.

3 {10}  Defendant relies on the United States Supreme Court's

4 holdings in Flippo v. West Virginia, 528 U.S. 11, 14 (1999)

5 (per curiam), and Mincey v. Arizona, 437 U.S. 385, 390 (1978),

6 in arguing that the officers' failure to secure a search

7 warrant until December 4, 2001 and his counsel's failure to

8 file a motion to suppress evidence affected his substantial

9 rights so as to cause plain error.  As Defendant acknowledges,

10 Flippo dealt with the denial of the defendant's motion to

11 suppress based on a "murder scene exception" to the Fourth

12 Amendment.  Flippo, 528 U.S. at 12-14.  The Court reversed the

13 lower court, and relying on Mincey, found that there was no

14 murder scene exception and that there were no exigent

15 circumstances present.   Id.  The defendants in Flippo and

16 Mincey did not argue that plain error occurred or that their

17 counsel was ineffective for failing to file a motion to

18 suppress, because counsel in both cases filed pretrial motions

19 to suppress.  See Flippo, 528 U.S. at 12; Mincey, 437 U.S. at

20 389.  Therefore, the Supreme Court did not have to perform the

21 completely different analysis necessary to determine whether

22 plain error occurred when the evidence was admitted by the

23 trial court.

24 {11}  Because plain error does not occur in a vacuum, we

25 interpret Defendant's argument to mean that the trial court

6

1   committed plain error in failing to suppress evidence sua
2   sponte.   No New Mexico case has directly addressed this issue.
3   However, in analogous circumstances, the Tenth Circuit in
4   United States v. Meraz-Peru, 24 F.3d 1197 (10th Cir. 1994),
5   used an approach we consider persuasive.   The defendant in
6   Meraz-Peru claimed that his conviction for possession of
7   marijuana should be reversed on appeal because he was stopped
8   without reasonable suspicion.   Id. at 1198.   He never filed a
9   motion to suppress the evidence at his trial, and the court
10  analyzed the issue for plain error.   Id.   In affirming the
11  defendant's conviction, it stated that "[a] reliable appellate
12  determination concerning the [merits of a motion to suppress]
13  is not possible in the absence of factual findings." Id.   It
14  reasoned that when "the error defendant asserts on appeal
15  depends upon a factual finding the defendant neglected to ask
16  the district court to make, the error cannot be 'clear' or
17  'obvious' unless the desired factual finding is the only one
18  rationally supported by the record below."   Id. (internal
19  quotation marks and citation omitted).
20  {12}  Similarly, in this case, the factual finding that the
21  police unconstitutionally searched Defendant's home is not the
22  only one rationally supported by the record.   On the contrary,
23  the facts in the record indicate that Defendant called the
24  police reporting the alleged suicide and that he may have
25  consented to their presence in his home.   During his taped

7

1  statement to the police, Defendant stated "I called . . . first

2  and said [the victim] shot herself. . . .  I called the police

3  and you were there."  Agent Ortiz stated at trial that he was

4  suspicious and that he knew they were "going to need a search

5  warrant."   During   the   cross-examination   of   Agent   Ortiz,

6  Defendant's counsel stated:  "But prior to that search warrant

7  [Defendant] had given consent to search his house, correct?"

8  Agent Ortiz responded in the affirmative.  The record does not

9  otherwise give us an indication of the validity of the search

10 warrant.    Therefore,   because   a   finding   that   the   police

11 illegally   searched   Defendant's   home   is   not   the   only   one

12 rationally supported by the record, there was no plain error.

13 **Ineffective Assistance of Counsel**

14 {13}  Defendant additionally argues that his trial counsel was

15 ineffective because no reasonable strategy existed for his

16 counsel's failure to file a motion to suppress evidence.   To

17 prevail on this argument, Defendant has the burden to establish

18 a prima facie claim of ineffective assistance.   State v.

19 Roybal,  2002-NMSC-027,  ¶  19,  132  N.M.  657,  54  P.3d  61.

20 Defendant may only establish a prima facie claim by showing

21 that his counsel's performance fell below the performance of a

22 reasonably competent attorney and that his counsel's deficient

23 performance prejudiced Defendant.   Patterson v. LeMaster, 2001-

24 NMSC-013, ¶ 17, 130 N.M. 179, 21 P.3d 1032.  Within the context

25 of a failure to file a motion to suppress evidence, a defendant

8

1   must establish that the facts support the motion and that a

2   reasonably competent attorney could not have decided that the

3   motion was unwarranted.  Id. ¶ 19.  To determine whether the

4   facts support the motion, we evaluate the facts present in the

5   record.  See Roybal, 2002-NMSC-027, ¶ 19 (stating that "[i]f

6   facts necessary to a full determination are not part of the

7   record, an ineffective assistance claim is more properly

8   brought through a habeas corpus petition"); see also State v.

9   Wilson, 117 N.M. 11, 18, 868 P.2d 656, 663 (Ct. App. 1993).

10  {14}  Similar to our analysis of Defendant's plain error claim,

11  the record is devoid of facts from which we could determine the

12  effectiveness of Defendant's counsel with regard to whether

13  Defendant consented to a search or when a search warrant was

14  required.  Defendant argues that the State merely claimed

15  "perfunctorily at trial that [Defendant] consented to the

16  warrantless search of his residence."  Our review of the record

17  indicates that the issue regarding consent was simply never

18  raised.  We agree with Defendant that the State has the burden

19  to show that the search of Defendant's home fell under an

20  exception to the warrant requirement imposed by the Fourth

21  Amendment.  See State v. Mann, 103 N.M. 660, 663, 712 P.2d 6,

22  9 (Ct. App. 1985).  However, the State's burden does not arise

23  until Defendant puts facts into issue questioning the validity

24  of the search.  Id.

25  {15}  Flippo does not require us to conclude that counsel's

9

1   failure to file a motion to suppress was per se unreasonable as

2   Defendant argues.   See Flippo, 528 U.S. at 13.   As we

3   previously stated, the defendant in Flippo filed a motion to

4   suppress evidence.   Id.   Defendant appears to be arguing the

5   merits of a motion to suppress evidence he never made.

6   Instead, Defendant must first point to facts in the record that

7   indicate his counsel's failure to file the motion makes this

8   one of those "rare" cases of prima facie ineffective assistance

9   of counsel.   Cf. State v. Baca, 1997-NMSC-059, ¶ 25, 124 N.M.

10  333, 950 P.2d 776.

11  {16}  This case is also distinguishable from Patterson, upon

12  which Defendant relies for the proposition that a reasonably

13  competent attorney would not have decided that the motion was

14  unwarranted.   In Patterson, the defendant argued that his

15  counsel was ineffective for failing to file a motion to

16  suppress evidence obtained during a "showup" identification.

17  Patterson, 2001-NMSC-013, ¶ 15.   Our Supreme Court, in

18  reversing the defendant's conviction, relied on facts contained

19  in the record which supported the motion to suppress. Id. ¶ 26

20  ("It is likely that there was factual support for a motion to

21  suppress the identifications.").   The Court stated that the

22  record indicated that the showup identification was highly

23  suggestive and likely "lacked the indicia of reliability

24  necessary to outweigh the suggestiveness of that procedure."

25  Id.  The Court went on to state that there were not any facts

10

1 in the record "which might have led a reasonably competent

2 attorney not to file a motion to suppress." Id. ¶ 27.

3 {17} As we have discussed, the record in this case indicates

4 that Defendant's trial counsel believed Defendant had consented

5 to the entry of police into his home.   It also implies that

6 Agent Ortiz was immediately suspicious and at some point

7 realized that a search warrant would be needed.   However,

8 except to the extent that Defendant apparently called the

9 police to report the suicide and let them in when they arrived,

10 we cannot determine from the record the extent of Defendant's

11 consent or the time the police needed to obtain a warrant.

12 See, e.g., State v. Duarte, 1996-NMCA-038, ¶ 25, 121 N.M. 553,

13 915 P.2d 309 (stating that a failure to file a non-meritorious

14 motion is not ineffective assistance); State v. Baca, 115 N.M.

15 536, 544, 854 P.2d 363, 371 (Ct. App. 1993) (stating that trial

16 counsel's strategy and tactics will not be second-guessed on

17 appeal).

18 {18} Moreover, even if Defendant could show that his counsel's

19 performance fell below that of a reasonably competent attorney,

20 he has also not shown that his counsel's failure to file the

21 motion prejudiced his defense such that "there was a reasonable

22 probability that the outcome of the trial would have been

23 different." State v. Reyes, 2002-NMSC-024, ¶ 48, 132 N.M. 576,

24 52 P.3d 948.   Defendant argues that he was prejudiced because

25 (1) he was not inclined to enter a plea, (2) the evidence was

1    not strong, and (3) "the motion to suppress 'was crucial

2    because it could have excluded key evidence.'"    A warrant was

3    obtained to search Defendant's home, and Defendant fails to

4    state with any specificity which evidence, if any, police

5    collected prior to obtaining the warrant.    Given this lack of

6    specificity, Defendant's allegation of prejudice amounts to a

7    mere assertion.    See In re Ernesto M., Jr., 1996-NMCA-039, ¶

8    10, 121 N.M. 562, 915 P.2d 318 (stating that "[a]n assertion of

9    prejudice is not a showing of prejudice").    We reject

10   Defendant's claim of ineffective assistance of counsel.

11   **Hearsay Issue**

12   {19}  Defendant additionally argues that the trial court erred

13   in allowing Officer Perea to testify to a statement made by the

14   victim.    Officer Perea testified that he was dispatched on a

15   domestic violence call to Defendant's residence on October 14,

16   2001, nearly two months prior to the incident at issue.

17   Because it was Defendant's home and Defendant indicated he

18   wanted the victim to leave, Officer Perea escorted the victim

19   off the premises.    As she was leaving, the victim stated, "next

20   time you guys see me you're going to find me dead."    The State

21   responded to Defendant's hearsay objection by arguing that the

22   statement addressed the victim's state of mind and was allowed

23   under Rule 11-803(C) NMRA.

24   {20}  Defendant argues for the first time in his reply brief

25   that we must address the applicability of the United States

12

Supreme Court's recent holding in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), with regard to this issue.  Essentially, Defendant argues that the victim's statement to Officer Perea was "testimonial" under <u>Crawford</u> and therefore must be barred because its admission violated Defendant's Sixth Amendment right to "confront and cross examine the witness."  However, at trial, Defendant did not base his objection to the testimony on constitutional grounds, but only objected to the testimony at issue on hearsay grounds.  The question of whether a defendant was denied the right to confrontation "may not be raised for the first time on appeal."  <u>State v. Lucero</u>, 104 N.M. 587, 590-91, 725 P.2d 266, 269-70 (Ct. App. 1986) (refusing to reach confrontation clause issue founded on general hearsay objection and argument that the statement at issue did not fall within any exception to the hearsay rule).  An objection raising the question must be "sufficiently specific to alert the trial court to the claimed constitutional errors."  <u>Id.</u> at 591, 725 P.2d at 270.  Like <u>Lucero</u>, Defendant's hearsay objection was too broad to raise a confrontation clause issue.  <u>See id.</u>  The district court was only required to rule on the objection Defendant made:  that the statement was not admissible under the Rule 11-803(C) hearsay exception.  <u>See Lucero</u>, 104 N.M. at 591, 725 P.2d at 270.

{21}  As to the issue of whether the district court correctly ruled that the statement was admissible under Rule 11-803(C),

13

1  we review the admission of hearsay testimony under an exception

2  to the hearsay rule for abuse of discretion.  <u>State v.</u>

3  <u>McClaugherty</u>, 2003-NMSC-006, ¶ 17, 133 N.M. 459, 64 P.3d 486;

4  <u>State v. Mora</u>, 1997-NMSC-060, ¶ 51, 124 N.M. 346, 950 P.2d 789.

5  A trial court abuses its discretion when its "ruling is clearly

6  against the logic and effect of the facts and circumstances of

7  the case."  <u>State v. Simonson</u>, 100 N.M. 297, 301, 669 P.2d

8  1092, 1096 (1983).

9  (22)  The State offered the testimony as a hearsay exception

10 under Rule 11-803(C).  Rule 11-803(C) states:

11      **Then existing mental, emotional or physical**
12      **condition.**  A statement of the declarant's then
13      existing state of mind, emotion, sensation or
14      physical condition (such as intent, plan, motive,
15      design, mental feeling, pain and bodily health), but
16      not including a statement of memory or belief to
17      prove the fact remembered or believed unless it
18      relates to the execution, revocation, identification
19      or terms of declarant's will.

20 (23)  Rule 11-803(C) is applicable in situations in which a

21 defendant puts an alleged victim's state of mind at issue by

22 arguing self-defense or suicide.  <u>State v. Baca</u>, 120 N.M. 383,

23 389, 902 P.2d 65, 71 (1995); <u>see also</u> <u>State v. Swavola</u>, 114

24 N.M. 472, 478, 840 P.2d 1238, 1244 (Ct. App. 1992) (stating

25 that an utterance by the victim is relevant to the victim's

26 state of mind under Rule 11-803(C) when the defendant argues

27 self-defense and the statement tends to reduce the likelihood

28 that the victim was the initial aggressor).  Defendant took

29 such an approach in this case.  His statements to police raised

14

1  issues of suicide, accidental shooting, and self-defense. He

2  requested and received jury instructions for self-defense and

3  second degree murder. The statement "the next time you guys

4  see me you're going to find me dead" was offered to show that

5  the victim feared Defendant and was unlikely to attack him or

6  commit suicide. Yet, due to its ambiguity, the statement

7  arguably helped Defendant as much as it did the State because

8  the jury could have just as easily interpreted the statement to

9  mean the victim intended to commit suicide. Despite its

10  ambiguity, the statement was relevant to the issues of suicide

11  and self-defense, and the court did not abuse its discretion in

12  admitting it.

13  {24} This case is not like Baca. In that case, a young victim

14  had made the statement that she feared her father. Baca, 120

15  N.M. at 389, 902 P.2d at 71. Our Supreme Court held that the

16  statement was not admissible under Rule 11-803(C) because it

17  was not offered to show the victim's state of mind and was

18  therefore irrelevant and prejudicial. Baca, 120 N.M. at 389,

19  902 P.2d at 71. The Court expressed concern that the statement

20  created a substantial risk that the jury could consider the

21  victim's fear as "somehow reflecting on [the] defendant's state

22  of mind rather than the victim's." Id. at 389-90, 902 P.2d at

23  71-72 (internal quotation marks and citation omitted). The

24  defendant in Baca did not raise the issue of self-defense.

25  {25} Defendant, in his reply brief, argues that there is a

15

1  reasonable probability that he was prejudiced by the statement

2  because the State used it to headline its closing argument.

3  However, we cannot say that the trial court abused its

4  discretion in allowing the statement given the admissibility of

5  the statement under Rule 11-803(C) and the wide latitude

6  afforded prosecutors and defense counsel during closing

7  argument. See State v. Venegas, 96 N.M. 61, 63, 628 P.2d 306,

8  308 (1981).

9  {26} Based on State v. Woodward, 121 N.M. 1, 908 P.2d 231

10  (1995), the dissent would hold that the statement is best

11  construed as the victim's belief that Defendant was going to

12  kill her and is therefore inadmissible hearsay. In Woodward,

13  an appeal of a conviction of first degree murder and other

14  charges, a psychologist testified that the victim had told him

15  that the defendant "is going to kill me." Id. at 8-9, 908 P.2d

16  238-39. Our Supreme Court, relying on United States v. Joe, 8

17  F.3d 1488 (10th Cir. 1993), distinguished a statement that a

18  victim was afraid from a statement that the defendant would

19  kill the victim. Woodward, 121 N.M. at 9, 908 P.2d at 239. It

20  held that the former was admissible as a "statement of then-

21  existing mental, emotional, or physical condition," but that

22  the latter was inadmissible because it was a "statement of

23  memory or belief." Id. (internal quotation marks and citation

24  omitted). However, Defendant did not raise this distinction in

25  the trial court and does not argue it on appeal. We therefore

16

do not address it.   See State ex rel. Human Servs. Dep't v. Staples, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982) (stating that appellate courts risk "overlooking important facts or legal considerations when they take it upon themselves to raise, argue, and decide legal questions overlooked by the lawyers who tailor the case to fit within their legal theories" in cautioning this Court against ignoring the arguments presented and searching for alternative grounds for a decision) (internal quotation marks and citation omitted); State v. Ferguson, 111 N.M. 191, 196, 803 P.2d 676, 681 (Ct. App. 1990) ("Courts should not take it upon themselves to raise, argue, and decide legal issues overlooked by the lawyers."). In addition, we note that there was no issue in Woodward as to self-defense or suicide.

**Agent Ortiz's Opinion Testimony**

{27}  At trial, Agent Ortiz was accepted as an expert in blood stain pattern analysis and crime scene reconstruction without objection.   At the beginning of his testimony, Agent Ortiz stated that "Crime Scene Reconstruction is to evaluate the evidence at the scene.   Gather physical evidence and you evaluate it to determine to arrive at a conclusion as to what occurred, what happened at the scene."   He also testified that blood splatter analysis will "assist you in supporting or refuting any statements by witnesses or defendants."   He stated that the evidence did not support Defendant's assertion that

17

1  the victim walked down the hallway to the bedroom because there

2  were no carpet fibers on the bottom of her bare feet.  On the

3  contrary, Agent Ortiz stated that the evidence supported the

4  conclusion that the victim was carried into the bedroom.  He

5  also stated that there were pieces of duct tape and potato on

6  the victim, indicating that those substances were covering the

7  barrel of the shotgun.  Agent Ortiz was also able to track the

8  trajectory of the flight of the victim's thumb and opined that

9  she was propped up on the bed when she was shot.

10  {28}  Agent Ortiz concluded that the victim could not have

11  committed  suicide  because  the  lacerations  on  her  hands

12  indicated that they were near the barrel when the shotgun was

13  fired, and therefore, she could not have pulled the trigger.

14  He opined that the covering of the weapon with duct tape and a

15  towel, in addition to the presence of the potato, were all

16  consistent  with  an  effort  to  prevent  gunshot  residue  from

17  depositing on the person who fired the weapon.  He stated that

18  Defendant's claim that the victim committed suicide was not

19  consistent  with  the  physical  evidence.   Defendant  did  not

20  object to these statements.  Agent Ortiz then gave a synopsis

21  as to the manner in which he believed the crime occurred based

22  on the evidence.  Defendant objected and the court asked the

23  prosecutor to "move along."  Agent Ortiz opined that Defendant

24  fired the shotgun and used the potato as a silencer and then

25  called the police because of the loud explosion.  He stated

18

1  that "physical evidence does not lie" and that the evidence

2  indicated the victim was killed deliberately.

3  {29}  Defendant argues that the trial court erred in overruling

4  his objections to Agent Ortiz's testimony.  We review the trial

5  court's admission of Agent Ortiz's testimony for abuse of

6  discretion and we will not disturb its evidentiary ruling

7  absent a clear abuse of that discretion.  State v. Stanley,

8  2001-NMSC-037, ¶ 5, 131 N.M. 368, 37 P.3d 85.

9  {30}  Defendant relies on Lucero in support of his argument that

10  the trial court erred in admitting the testimony because Agent

11  Ortiz "improperly commented directly on the credibility of

12  [Defendant]."  Lucero is distinguishable from this case.  The

13  expert witness in Lucero was a psychologist who examined one of

14  the complaining witnesses.  Lucero, 116 N.M. at 451, 863 P.2d

15  at 1072.  The expert testified that the complaining witness

16  exhibited symptoms of post traumatic stress syndrome caused by

17  sexual abuse.  Id. at 451-52, 863 P.2d at 1072-73.  The expert

18  also commented directly on the credibility of the complaining

19  witness in stating that the complaining witness was consistent

20  both in identifying the defendant as the abuser and in

21  referring to the rooms in which the alleged abuse occurred.

22  Id. at 452, 863 P.2d at 1073.  The expert also inappropriately

23  commented on the demeanor of the complaining witness, which the

24  expert claimed changed when the complaining witness talked

25  about the alleged sexual abuse she had endured.  Id.  The

19

1  expert testified that "if the complainant were not telling the

2  truth, she probably would have reacted differently than she

3  did." Id.

4  {31} Our Supreme Court held that the trial court committed

5  plain error in admitting the testimony and stated that an

6  expert commenting on the credibility of the alleged victim of

7  sexual abuse was improper. Id. at 455, 863 P.2d at 1076. The

8  Court, relying on State v. Alberico, 116 N.M. 156, 861 P.2d 192

9  (1993), stated that the expert's testimony was improper because

10 it went outside the bounds of admissible testimony concerning

11 post traumatic stress disorder, which it stated was identical

12 to post traumatic stress syndrome. Lucero, 116 N.M. at 454,

13 863 P.2d at 1075. It reasoned that "[w]hile PTSD testimony may

14 be offered to show that the victim suffers from symptoms that

15 are consistent with sexual abuse, it may not be offered to

16 establish that the alleged victim is telling the truth; that is

17 for the jury to decide." Id. (internal quotation marks and

18 citation omitted).

19 {32} In this case, Agent Ortiz, as a qualified crime scene

20 reconstructionist, gave his opinion as to the credibility of

21 Defendant's version of events. He did not directly bolster the

22 testimony of any of the State's other witnesses. We agree with

23 the State that State v. Landgraf, 1996-NMCA-024, 121 N.M. 445,

24 913 P.2d 252, is directly on point. The defendant in Landgraf

25 had been charged with multiple crimes for causing an automobile

20

crash in which three people died. Id. ¶ 1. The prosecutor offered the testimony of police officers who stated that the defendant's "complex motor reactions demonstrated deliberation." Id. ¶ 20. We stated that the defendant had misconstrued Alberico and acknowledged that our Supreme Court had "recognized and acknowledged the continuing validity of its prior decisions that expert testimony is admissible even if it touches upon an ultimate issue to be decided by the trier of fact." Id. (internal quotation marks and citation omitted). We further stated that the jury is "free to disregard any or all such opinion testimony" and had been so instructed. Id.

{33} Agent Ortiz's testimony was similar to that of the police officer in Landgraf. His testimony touched upon the ultimate issue to be decided by the trier of fact, whether Defendant was being truthful in his assertions that the victim committed suicide or attacked him. The jury was instructed that it could entirely disregard the testimony of any or all expert witnesses. Therefore, we cannot characterize the trial court's admission of Officer Ortiz's testimony as "clearly untenable or not justified by reason." See Stanley, 2001-NMSC-037, ¶ 5 (internal quotation marks and citation omitted).

{34} Defendant additionally asserts that Officer Perea's testimony also inappropriately interpreted the evidence to implicate Defendant. We do not reach this issue because Defendant did not brief it. State v. Desnoyers, 2002-NMSC-031,

21

1  ¶ 11, 132 N.M. 756, 55 P.3d 968 (stating that issues not argued

2  and supported by authority deemed abandoned).   Similarly,

3  Defendant argues that his "constitutional rights to a fair

4  trial and a jury trial under the Sixth Amendment to the U.S.

5  Constitution and Article II, § 14 of the New Mexico

6  Constitution were violated" because of the admission of Agent

7  Ortiz's statements.   However, Defendant cites to no authority

8  and also fails to brief the manner in which either constitution

9  was implicated.   See <u>Desnoyers</u>, 2002-NMSC-031, ¶ 11.   We find

10  no error in the trial court's admission of the testimony.

11  <u>**Prosecutor's Assertions During Opening Statement**</u>

12  {35}   Defendant additionally argues that assertions made by the

13  prosecutor during opening statement constitute fundamental

14  error.   At the end of his opening statement, the prosecutor

15  asserted:

16      Just as you have taken an oath and have raised your
17      hand to fairly and truly judge this case, on behalf
18      of the people of the State of New Mexico, I promise
19      you that Ms. Garcia and myself will conduct our case
20      as fairly and as honestly and as truthfully as
21      possible.

22  {36}   Because Defendant did not object to this statement, we

23  only review for fundamental error.   <u>State v. Gonzales</u>, 113 N.M.

24  221, 229, 824 P.2d 1023, 1031 (1992); <u>State v. Diaz</u>, 100 N.M.

25  210, 212, 668 P.2d 326, 328 (Ct. App. 1983).   The doctrine of

26  "fundamental error applies only if there has been a miscarriage

27  of justice, if the question of guilt is so doubtful that it

28  would shock the conscience to permit the conviction to stand,

22

or if substantial justice has not been done." State v. Dartez, 1998-NMCA-009, ¶ 21, 124 N.M. 455, 952 P.2d 450 (internal quotation marks and citation omitted).  In the context of analyzing a prosecutor's alleged improper statements, "fundamental error arises when the prosecutor engages in misconduct that compromises the defendant's right to a fair trial." State v. Rojo, 1999-NMSC-001, ¶ 55, 126 N.M. 438, 971 P.2d 829.

{37} Defendant's reliance on Diaz and Baca is also misplaced with regard to this issue.  We agree with Defendant that it is improper for a prosecutor to "precondemn a defendant on the basis of the authority he represents." Diaz, 100 N.M. at 213, 668 P.2d at 329; Baca, 120 N.M. at 392, 902 P.2d at 75. However, the prosecutor's conduct in this case did not rise to the same odious level as the cases upon which Defendant relies.

{38} In Diaz, the prosecutor stated:

> The taxpayers pay me, pay the judge, even pay Mr. Lane, and they're gonna pay you for being here two days.
>
> Please remember ladies and gentlemen, that I represent the State, and just like [the defendant] is represented by Mr. Lane, I represent you and all the other people in the Sixth Judicial District which covers three counties.  You are my clients. I'm here to protect your rights.  I'm here to protect the security of your homes, your places of business.  The people of New Mexico come in here and presented this case to you * * *.
>
> When you start putting judges on trial, Supreme Court Justices, prosecutors who represent the people * * *.

23

1  Just remember, the style of this case is State of
2  New Mexico versus [the defendant] * * *.  And the
3  people of this district ask you to find him guilty
4  of both counts.

5  _Diaz_, 100 N.M. at 213, 668 P.2d at 329.  In holding that error

6  occurred requiring reversal, we stated that the prosecutor's

7  improper statements were "substantial" and that he had made

8  "overextensive references to the authority he represents." _Id._

9  at 213, 215, 668 P.2d at 329, 331.  In addition, we stated that

10 it was the combined effects of these comments in addition to

11 the prosecutor's other pronounced and persistent misconduct

12 which likely had "a probable cumulative effect upon the jury

13 which cannot be disregarded as inconsequential." _Id._ at 215,

14 668 P.2d at 331 (internal quotation marks and citation

15 omitted).

16 {39}  In _Baca_, the prosecutor improperly told the jury that he

17 had a higher ethical duty than defense counsel because he, as

18 a prosecutor, was "bound by law to seek the truth," whereas the

19 defendant's counsel, as a criminal defense attorney, was not.

20 _Baca_ 120 N.M. at 392, 902 P.2d at 74.  Our Supreme Court, in

21 reversing the defendant's convictions based on cumulative

22 error, admonished the state to avoid making the same improper

23 statements on remand.  _Id._  However, it did not factor these

24 comments into its cumulative error determination and expressly

25 stated that they did not amount to fundamental error.  _Id._

26 {40}  In this case, the prosecutor did not engage in the

27 extensive and egregious misconduct admonished in _Diaz_ and _Baca_.

24

He merely stated that he promised to present his case "honestly" and as "truthfully" as possible. While arguably improper, the prosecutor's statements during opening statement were not fundamental error.

**Prosecutor's Statements During Closing Argument**

{41} During the State's rebuttal closing argument, the prosecutor personally admonished Defendant, stating that Defendant "continues to disgrace and deface her memory. Shame on you, Gilbert Torres! And I hope you feel my outrage. I hope that as a society . . . ." Defense counsel objected, and the trial court told the prosecutor to "tone it down." The prosecutor then stated:

> And as a society we should feel outraged. We are a nation of law, not of men. The true test of our greatness is how well we treat the least of our citizens. The true test of our greatness is how we uphold the principle that everybody's entitled to life, liberty and the pursuit of happiness.

Defendant argues, relying on Diaz, 100 N.M. at 214, 668 P.2d at 330, Ferguson, 111 N.M. at 194, 803 P.2d at 679, and State v. Vallejos, 86 N.M. 39, 42, 519 P.2d 135, 138 (Ct. App. 1974), that the trial court erred in overruling Defendant's objection to the prosecutor's statements. We disagree.

{42} Because Defendant objected to the statements, we review for abuse of discretion. State v. Clark, 1999-NMSC-035, ¶ 52, 128 N.M. 119, 990 P.2d 793. Our Supreme Court has stated:

> The prosecution is allowed reasonable latitude in closing argument. The district court has wide discretion to control closing argument, and there is

25

1  no error absent an abuse of discretion or prejudice
2  to defendant. . . . The question on appeal is
3  whether the argument served to deprive defendant of
4  a fair trial.

5  State v. Chamberlain, 112 N.M. 723, 729, 819 P.2d 673, 679

6  (1991) (citations omitted). The defendant in Ferguson objected

7  to the prosecutor's statement of "I think you should return

8  . . . a guilty verdict, for a crime here. Yes." Ferguson, 111

9  N.M. at 195, 803 P.2d at 680. The defendant immediately moved

10  for a mistrial arguing that the words "I think" in reference to

11  the verdict the jury was to give was an improper injection of

12  personal opinion into the case by the prosecutor.   Id.   In

13  upholding the trial court's grant of the motion for mistrial,

14  we stated that a key component of our reasoning was that the

15  standard of review was deferential to the trial court.   Id.

16  (stating that deferring to the trial court in these situations

17  makes sense because "[t]he trial court judge was present, and

18  therefore she was in a better position to resolve this question

19  than we are"). We acknowledged that the trial court could have

20  reasonably decided either way on the issue and therefore

21  affirmed its ruling.   Id. at 196, 803 P.2d at 681.

22  {43} In this case, Defendant objected to the prosecutor's

23  statement and the trial court expressed its concern.  Defendant

24  did not move for a mistrial or request any curative instruction

25  to the jury.  The trial court did not abuse its discretion by

26  not taking further action.

27  {44} This case is also distinguishable from Diaz and Vallejos.

26

1  In both of those cases, the prosecutors made multiple improper

2  comments, and we based our holdings on cumulative error. <u>Diaz</u>,

3  100 N.M. at 215, 668 P.2d at 331; <u>Vallejos</u>, 86 N.M. at 42, 519

4  P.2d at 138.   Moreover, in this case, the State presented

5  evidence that Defendant tried to cover up the incident,

6  repeatedly attempted to portray the victim in a negative light

7  by referring to her drug use, and changed his story at least

8  twice when questioned about the shooting by police.   It would

9  not have been an abuse of discretion for the trial court to

10  have ruled that the prosecutor's statements that Defendant

11  continued to disgrace the victim's memory were a fair comment

12  on the evidence.   See <u>State v. Lamure</u>, 115 N.M. 61, 67, 846

13  P.2d 1070, 1076 (Ct. App. 1992) ("Comments on the evidence are

14  not error or fundamental error.").   Given the facts of this

15  case and our deferential standard of review, the trial court

16  did not abuse its discretion in allowing counsel's statements

17  during closing argument.

18  **Cumulative Error**

19  {45}  Finally, Defendant's claim of cumulative error also fails

20  because the trial court did not commit the many errors

21  Defendant claims were cumulative.   <u>State v. Perea</u>, 2001-NMCA-

22  002, ¶ 26, 130 N.M. 46, 16 P.3d 1105.

23  **Conclusion**

24  {46}  For the foregoing reasons, we affirm Defendant's

25  convictions for second degree murder and tampering with

27

1 | evidence.

2 | {47}   **IT IS SO ORDERED.**


3
4                                         _James J. Wechsler_
5 | I CONCUR:                            JAMES J. WECHSLER, Judge


6 | _Lynn Pickard_
7 | LYNN PICKARD, Judge


8 | MICHAEL E. VIGIL, Judge (concurring in part and dissenting
9 | in part).

28

1  VIGIL, Judge (concurring in part and dissenting in part).

2  {48}   I concur with the majority opinion in all respects except

3  its conclusion that the victim's hear say statement that,

4  "next time you guys see me you're going to find me dead" was

5  admissible under Rule 11-803(C) as a state of mind exception

6  to the hearsay rule.   I conclude that the statement was not

7  admissible into evidence under Rule 11-803(C) and that its

8  admission into evidence constituted reversible error.

9  {49}   Police Officer Joshua Perea was the second officer to

10  arrive at Defendant's home on December 3, 2001.  He was also

11  the State's second witness.   Before Officer Perea was asked

12  about the events of December 3, 2001, he testified about an

13  incident which occurred on October 14, 2001, nearly two months

14  before.   Officer Perea testified he was back-up on a domestic

15  violence call to Defendant's home involving Defendant and the

16  victim.   "[W]e walked into the house and the house was kind of

17  [in] disarray.  Looked like a fight had taken place."  Officer

18  Perea related that Defendant and the victim had both been

19  drinking and Defendant was stating that he wanted the victim

20  out of the house, that he was tired of her, and did not want

21  a relationship with her anymore.  The following then occurred:

22
23
          [PROSECUTOR]:  Uh, did you get an opportunity
      to speak with [victim] that day in October?

24
25
26
27
          OFFICER PEREA:  I don't recall speaking with
      her.   I was there listening as she was making
      comments on who did.  I know we did give her some
      uh, information about places that she could stay to

29

1  get out of there. Anything from a hotel to a
2  domestic shelter.

3  [PROSECUTOR]: And is there anything that she
4  directly said that evening.

5  [DEFENSE COUNSEL]: Objection your Honor,
6  hearsay.

7  [PROSECUTOR]: Goes to victim's state of mind.

8  JUDGE: Overruled, go ahead.

9  [PROSECUTOR]: Okay and can you tell us what
10 was said that evening?

11 OFFICER PEREA: After they were done loading
12 the car with the stuff, we were all getting ready to
13 leave and she was getting off from the couch, just
14 before she got up she made a statement uh, next time
15 you guys see me you're going to find me dead.

16 [PROSECUTOR]: And how did she appear to you
17 that evening?

18 OFFICER PEREA: She seemed kind of groggy, like
19 she wasn't really upset, she wasn't hyperactive like
20 I honestly she may have possibly be[en] under the
21 influence of something, but I wasn't completely
22 sure.

23 [PROSECUTOR]: Do you know if she smelled like
24 alcohol that evening or?

25 OFFICER PEREA: Yes she had been drinking.

26 [PROSECUTOR]: And did you ask anything of her
27 son in response?

28 OFFICER PEREA: Her son was going off I believe
29 the whole time. He made a comment, come on Gilbert
30 tell them how you are threatening to get your hells
31 angels friends to kill my mom or something like
32 that.

33 [DEFENSE COUNSEL]: Judge.

34 JUDGE: Sustained.

30

1
2      [DEFENSE COUNSEL]:   I and I move that that be stricken and that the jury disregard that statement.

3
4      JUDGE:   It will be stricken and the jury will disregard it.

5
6      [PROSECUTOR]:   Any thing else you did in response to the call in October of 2001?

7
8      OFFICER PEREA:   Just made sure that she left the residence.

9
10      [PROSECUTOR]:   And did Gilbert Torres ask her to leave that night?

11      OFFICER PEREA:   Yes.

12 It was in the foregoing context during the State's case in

13 chief before any statements of Defendant were admitted into

14 evidence that the victim's hearsay statement, "next time you

15 guys see me you're going to find me dead" was admitted as

16 substantive evidence.

17 {50}   The admission or exclusion of hearsay evidence lies

18 within the discretion of the trial court.   State v. Balderama,

19 2004-NMSC-008, ¶ 46, 135 N.M. 329, 88 P.3d 845 ("We review the

20 trial court's admission of hearsay statements for an abuse of

21 discretion.").   I conclude that admission of the evidence was

22 erroneous and therefore an abuse of discretion.   See State v.

23 Brown, 1998-NMSC-037, ¶ 39, 126 N.M. 338, 969 P.2d 313

24 (stating an abuse of discretion in admitting evidence may

25 occur when its admission is "obviously erroneous." (internal

26 quotation marks and citation omitted)).

{51}   The evidence was admitted under Rule 11-803(C), which provides that certain evidence is not excluded by the hearsay rule which includes:

> C.   Then Existing Mental, Emotional or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.

Id.

{52}   This rule allows a declarant's out of court statement of her then-existing state of mind or emotion to be admitted into evidence.   However, as the majority agrees, the victim's statement is ambiguous.   At best, it is only a declaration ("next time you see me I'll be dead").   In context, the victim might have been asserting to Officer Perea that the next time he saw her she would be dead because Defendant's "hells angels friends" were going to kill her.   The statement is not an expression of a state of mind or emotion (such as "I am afraid").   The statement was therefore not admissible.   Rule 11-802 NMRA ("Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court or by statute.").

{53}   The hearsay statement was inadmissible for the additional reason that it was irrelevant.   "For an extrajudicial statement of a declarant's state of mind to be admissible, the

1  state of mind must be relevant." <u>Baca</u>, 120 N.M. at 389, 902

2  P.2d at 71.  The state of mind evidence must prove or negate

3  action or inaction of the declarant that is relevant to the

4  case.  While the victim's state of mind may be relevant in

5  issues of "(1) self defense (rebutted by extrajudicial

6  declarations of the victim's passive state of mind), (2)

7  suicide (rebutted by statements inconsistent with a suicidal

8  bent), and (3) accident (rebutted by victim's fear of placing

9  self in way of such harm)." <u>Id</u>.  The majority suggests that

10  the victim's statement was relevant because it related to a

11  claim of suicide and self defense.  I disagree.

12  {54}  The State alleged that Defendant killed the victim with

13  a deliberate intent, and charged him with first degree murder.

14  To prove its case of first degree murder the State introduced

15  two recorded statements Defendant gave to the police.

16  Initially, Defendant contended that he and the victim had

17  argued, victim cut her leg on broken pottery, and she went

18  into the bedroom.  Defendant first claimed he heard the

19  shotgun blast come from the bedroom as he sat at his computer.

20  He told the officers about her problems with drugs and the law

21  and claimed she had threatened suicide before.  When Defendant

22  was confronted with the physical evidence that was

23  inconsistent with a suicide, and the officers told him they

24  did not believe him, his story changed and he gave a second

25  statement.  He now said that while they were arguing the

33

victim pulled the shotgun and she was shot accidentally when he tried to take it away from her.  He denied any knowledge of the duct tape, blue towel, or potato, but subsequently admitted he put the towel on the gun trigger, claiming he did so to keep the victim from firing the shotgun.  The State introduced these statements into evidence during its case in chief _after_ Officer Perea testified as part of its effort to prove first degree murder.  Defendant did not testify.  However, Defendant introduced evidence of an incident in which the victim allegedly pulled the shotgun on another person to corroborate the self defense claim his attorney later made in closing argument.  Under the circumstances, the victim's statement "next time you see me I'll be dead" did not tend to prove or disprove whether she killed herself.  Furthermore, because of its inherent ambiguity, it did not tend to prove or disprove whether the victim attacked defendant two months later, or whether she was accidentally killed.  Cf. _Swavola_, 114 N.M. at 478, 840 P.2d at 1244 (stating that the victim's statement that he desired to reconcile with Defendant was relevant where self defense asserted because it reduced the likelihood he was the first aggressor).

{55}    The statement is most easily construed as a belief by the victim that Defendant was going to kill her.  "In general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts

34

1  rather than solely to show state of mind, the evidence must be

2  excluded." Baca, 120 N.M. at 389, 902 at 72 (quoting United

3  States v. Brown, 490 F.2d 758, 763 n.10 (D.C. Cir. 1973). The

4  rule itself excludes the admission of "a statement of memory

5  or belief to prove the fact remembered or believed." Rule 11-

6  803(C). In Woodward, 121 N.M. at 1, 908 P.2d at 231 the

7  defendant was convicted of killing his estranged wife. Over

8  his objection the victim's statement to a psychologist "[he]

9  is going to kill me" was admitted into evidence. Id. at 8-9;

10  908 P.2d at 238-39. The Supreme Court held this was a

11  "statement of memory or belief" rather than a statement of

12  then-existing mental, emotional, or physical condition, and

13  inadmissible. Id. at 9, 908 P.2d at 239. Woodward explains

14  that while Rule 11-803(C) allows the admission of a

15  declarant's then existing mental or emotional condition, the

16  reason why the declarant has the state of mind is not

17  admissible. The example given by the Supreme Court is from

18  Joe, 8 F.3d at 1492-93, in which the defendant was convicted

19  of killing his estranged wife. Eight days before the murder,

20  she saw a doctor who treated her for rape. During the

21  treatment, she told the doctor she was afraid because the

22  defendant had threatened to kill her. Id. at 1491. Our

23  Supreme Court approved the Joe holding that the first part of

24  the statement that she was afraid was admissible as statement

25  of then-existing mental, emotional, or physical condition but

35

the statement that the defendant would kill her was a prohibited "statement of memory or belief." <u>Id.</u> at 1493; <u>Woodward</u>, 121 N.M. at 9, 908 P.2d at 239. <u>See also</u> <u>Baca</u>, 120 N.M. at 389, 902 P.2d at 71 (stating that while Rule 803(C) "allows hearsay statements that show the declarant's then existing mental condition, the rule does not permit evidence explaining why the declarant held a particular state of mind." (citing <u>United States v. Liu</u>, 960 F.2d 449, 452, (5th Cir. 1992) (a witness could properly testify that the declarant (the defendant) "was scared" and that he had a fear of getting killed, but not why)).

{56}    I also conclude that the erroneous admission of the victim's hearsay statement was not harmless error. <u>See</u> <u>State v. McClaugherty</u>, 2003-NMSC-006, ¶ 32, 133 N.M. 459, 64 P.3d 486; <u>State v. Morales</u>, 2002-NMCA-052, ¶ 24, 132 N.M. 146, 45 P.3d 406. In <u>Baca</u>, the defendant's three-year-old daughter was found with defendant's dead wife. The State presented evidence that the defendant killed his wife then drove his dead wife and daughter to a remote area, where he ran over them. 120 N.M. at 386, 902 P.2d at 68. The daughter saw a social worker who was allowed to testify that the daughter made a nonverbal statement by nodding her head "yes" that she was afraid of her father when he asked her if she was afraid of him. <u>Id.</u> at 387, 902 P.2d at 69. Our Supreme Court held that admission of the hearsay statement was not only improper,

36

but prejudicial, because of the danger that the jury would consider the statement as reflecting on the defendant's state of mind as a true indication of his intentions, actions, or culpability, rather than the victim's.  Id. at 389-90, 902 P.2d at 71-72.  Where there is a strong likelihood that the jury will make such an inference, "injurious prejudice" is "particularly evident."  Id. (quoting Brown, 470 F.2d at 766). The prosecutor's opening words in closing argument were: "[Victim's] prophesy came true: 'The next time you see me you are going to find me dead.'  She told Officer Josh Perea of the Los Lunas Police Department.  And sure enough, the next time Josh Perea saw [Victim], he saw her dead."  The prosecutor then highlighted the physical evidence which it argued demonstrated a first degree murder and Defendant's inconsistent statements about what occurred, while referring to the hearsay statement again.  The inadmissible evidence was therefore used to demonstrate that Defendant killed the victim and to show his state of mind, not the victim's.  This was not harmless error.  Baca, 120 N.M. at 390, 902 P.2d at 72 (holding that the use of a hearsay statement was an attempt to demonstrate something other than the victim's state of mind and that it was unfairly prejudicial).  In light of the foregoing conclusions, I need not address whether, or to what extent, Crawford applies.

1   {57}   I would reverse Defendant's conviction and remand for a

2   new trial excluding the victim's hearsay statement.  Since the

3   majority disagrees, I dissent.

4
5
                    MICHAEL E. VIGIL, Judge

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

        Plaintiff-Respondent,

vs.

Ct. App. No. 24,103
S. Ct. No. _____

GILBERT TORRES, JR.,

        Defendant-Petitioner.

## RESPONSE TO DEFENDANT'S PETITION FOR WRIT OF CERTIORARI TO THE NEW MEXICO COURT OF APPEALS

PATRICIA A. MADRID
Attorney General for the
State of New Mexico

M. ANNE KELLY
Assistant Attorney General
Attorneys for Plaintiff-Respondent
111 Lomas Blvd. NW, Suite 300
Albuquerque, NM 87102
(505) 222-9000

SUPREME COURT OF NEW MEXICO
FILED
MAY 1 3 2005

*Kathleen Jo Gibson*


EXHIBIT
K

## INTRODUCTION AND SUMMARY OF FACTS

Defendant seeks a writ of certiorari pursuant to Rule 12-502, NMRA 2005. The State responds that there is no basis to grant this writ. The Defendant has not shown that the Court of Appeals' opinion is contrary to any precedent from the New Mexico appellate courts, that it involves a significant question of law under either the state or federal constitution, or that it involves an issue of substantial public interest. See Rule 12-502(C)(4), NMRA 2005; NMSA 1978 § 34-5-14. For most of the petition, Defendant cites only the cases relied upon by the Court of Appeals in their opinion, stating without argument or authority that the opinion conflicts with those cases. This is not sufficient. The issues raised are trial evidentiary issues, and no significant issue of constitutional law or public interest is presented.

Defendant was convicted of second-degree murder and tampering with evidence. The evidence showed that he killed his estranged wife, Pamela Pace, with a single shotgun blast and then attempted to make the scene look like a suicide. The Defendant had wrapped a potato over the shotgun, with a blue rag and some duct tape, and the potato shards were found in Ms. Pace's wounds and in the room where she was killed. Part of one of Ms. Pace's fingers was also shot off, indicating that her hands were in front of the gun when it was fired. There was also evidence that Ms. Pace had been strangled before being shot. The pathologist and crime scene investigator opined that Ms. Pace could not have shot herself, due to this, and other, physical evidence. Neighbors also saw Defendant leave the house and throw something over the fence into a vacant yard – the officers recovered part of the blue rag and duct tape. Defendant called the officers to his house, claiming that the victim had "finally done it" (i.e. committed suicide), but later in a statement to police admitted that he had shot her but claimed he did so in self-defense and/or as an accident.

1

The majority opinion of the Court of Appeals correctly affirmed the convictions. Judge Vigil dissented only on the holding as to Issue I regarding admission of the victim's statement.

## I.   THE MAJORITY OF THE COURT OF APPEALS DID NOT ERR IN FINDING THAT THE VICTIM'S STATEMENT WAS ADMISSIBLE AT TRIAL

At trial, one of the officers was allowed to testify about a statement made by Ms. Pace. Some two months before her murder, the officer responded to a domestic violence call in which the Defendant wanted the victim to leave. As she was leaving with the officer, she stated, "next time you guys see me you're going to find me dead." The court admitted this statement under the state of mind hearsay exception in Rule 11-803(C).

The Court of Appeals found that the trial court did not abuse its discretion in admitting the statement. (Op. at ¶¶ 19-26). The Court of Appeals applied the applicable law of State v. Baca, 120 N.M. 383, 902 P.2d 65 (1995), and Defendant-Petitioner has not indicated that this issue involves a significant issue of constitutional law or public interest.

The state of mind hearsay exception applies when the state of mind of the declarant is relevant; i.e. that it "tends to make the existence of any fact of consequence to the determination of the action more probable than it would be without the evidence." Baca, 120 N.M. at 389, 902 P.2d at 73; Rule 11-401, NMRA 2004. And, as this Court held in Baca, the admissibility of the out-of-court statement depends upon whether it is consequential to the determination of the declarant's conduct. In Baca, the Court considered a statement made by a young witness that she feared her father. That statement ran afoul of the hearsay exception because it was offered not to prove some relevant fact of the young girl's state of mind, but only that she feared her father and that he must therefore have killed her mother. As such, the statement was probative only because

it reflected on the defendant's state of mind, not the victim's, and thus encouraged the jury to reach an improper inference. Id. at 389-390, 902 P.2d at 71-72.

However, this Court in Baca also specifically noted that the state of mind of the victim of a crime is a fact in consequence where there are issues of self-defense, suicide, or accident. That is, a claim of suicide can be rebutted by statement that are "inconsistent with a suicidal bent", and claims of accident can be "rebutted by victim's fear of placing self in way of such harm." Id. Here, Defendant's statements to police raised the issues of suicide accidental shooting, and self-defense. His attorneys defended him on the same issues at trial and received the applicable self-defense instructions. See UJI 14-5183, NMRA 2004. Defendant told the police in his second statement that he took the gun from the victim to avoid being shot himself because "she had it on me" and he believed that she intended to use the gun on him. Statements as to the victim's fear of the Defendant are thus relevant, as they tend to disprove the claim of self-defense. See e.g., State v. Swavola, 114 N.M. 472, 478, 840 P.2d 1238, 1244 (Ct. App. 1992) (victim's hearsay testimony that he wanted to reconcile with his wife was admissible under the state of mind hearsay exception because it was relevant to defendant's claim of self-defense as it reduced the likelihood that the victim was the first aggressor); United States v. Brown, 490 F.2d 758, 767 (D.C. Cir. 1973) (claim of self-defense can be rebutted by victim's expressions of fear because such fear renders it unlikely that the victim was the first aggressor). The victim's statement that the police would next see her dead, and the contextual inference from that statement that she expected more violence from Defendant, tends to refute the assumption that she was suicidal or that the Defendant acted in self-defense. The Defendant's only witnesses, Mark Vandi and Marvin Gracie, testified about the victim's violent and irrational behavior toward the Defendant to bolster the defense that the shooting was accidental and instigated by the victim's use of the

3

gun. Thus, the victim's fear of Defendant hurting her was a relevant fact, not because it proved that Defendant would in fact hurt her in the future, but because it tended to refute the notion that she was likely to commit suicide or instigate violence against the Defendant.

The Defendant put the victim's state of mind at issue and a statement that tended to prove her state of mind was relevant. The statement was probative because it showed the victim's state of mind shortly before her death, and because it tended to refute the Defendant's witnesses. Under these circumstances, the court did not abuse its discretion in admitting it. See Rule 11-403, NMRA 2004.

Moreover, even if found to be error under, the error in admitting the statement was harmless. Reversal is not warranted if the error is not prejudicial. See e.g., State v. Stampley, 1999-NMSC-027, ¶ 38, 127 N.M. 426, 982 P.2d 477. Here, there was overwhelming evidence that the Defendant shot the victim and that the shooting was not suicide, accidental, or in self-defense. There was no dispute that the victim was shot at close range with a shotgun and that she had been partially strangled before her death. Defendant and the victim were the only two persons at the house and the house showed evidence of a violent altercation contemporaneous with the victim's death. Both a crime scene investigator and the pathologist opined that suicide was impossible due to the position the victim's hands would have had to be in to receive the severe injuries from the shotgun blast. The presence of the potato, apparently used as a silencer, and the blue towel on the gun, bolstered the conclusion that the gun was prepared to avoid undue noise and gun residue. Defendant changed his statement to police, and was unable to explain the presence of the potato at the end of the gun, despite irrefutable evidence that it was there. As such, faced with the wealth of inculpatory evidence, the comment made by the victim two

months before her death is miniscule in comparison to the admissible evidence and could not have reasonably contributed to Defendant's conviction.

There was also no substantial conflicting evidence to discredit the State's testimony. The only evidence offered by the Defendant were two witnesses who testified as to some fights between the victim and Defendant, to bolster the theory that the shooting was accidentally caused by Defendant in an effort to get the gun away from the victim. The Defendant's actions after the shooting, including his calm demeanor with the officers, his ready story of suicide and the victim's problems, as well as his throwing the blue towel over the fence, all served to discredit any theory of an accidental shooting. This case is not a close call on harmless error as there is no reasonable possibility that the victim's statement contributed to the conviction. See Clark v. State, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991). Moreover, the Defendant could have argued that the statement in fact could be interpreted to mean that the victim was suicidal.

Judge Vigil's dissent indicates his disagreement with the Court of Appeals' analysis, but does not establish that the district court actually abused its discretion in admitting the statement under that exception. The statement was somewhat ambiguous, but the trial court's determination that it was relevant to the issues of suicide and/or accidental shooting was not outside the court's discretion. Defendant put the victim's state of mind at issue with his statements to the police and there was rational reason to include the victim's statement at trial.

## II.   THE COURT OF APPEALS DID NOT ERR IN FINDING THAT THE PROSECUTOR'S CLOSING ARGUMENT WAS ALLOWABLE

In closing, the prosecutor stated that the Defendant "continues to disgrace and defame [the victim's] memory. Shame on you, Gilbert Torres! And I hope you feel my outrage ...." After an objection and resulting admonition from the trial court to "tone it down", the prosecutor

continued in a more impersonal vein. The Court of Appeals correctly found that this statement was not outside the reasonable latitude offered to prosecutors during argument, was not overly egregious, and in fact was a fair comment on the evidence because the Defendant had tried to cover up the incident, and then tried to portray the victim in a negative light to the police by detailing her drug use. (Op. ¶¶ 41-44). Defendant-Petitioner has not demonstrated that this finding is worthy of this Court's certiorari review.

### III.   THE COURT OF APPPEALS DID NOT ERR IN FINDING THAT THE OPINION TESTIMONY WAS ADMISSIBLE

Admission of expert testimony is within the sound discretion of the trial court and will not be overturned absent a clear abuse of that discretion. State v. Gilbert, 100 N.M. 392, 400, 671 P.2d 640, 648 (1983), cert. denied, 465 U.S. 1073 (1984).

At the beginning of Agent Ortiz's testimony the prosecutor detailed Ortiz's specialized education and experience in the areas of blood splatter and analysis and crime scene reconstruction. Ortiz testified that:

> Crime Scene Reconstruction is to evaluate the evidence at the scene. Gather physical evidence and you evaluate it to determine to arrive at a conclusion as to what occurred, what happened at the scene.

He also testified that blood splatter analysis can tell you many things including the origin of the blood stain, the direction of the blood, the distance from impact, the type of force used, the velocity, the number of gunshots, and relative positions and movements of the parties. He stated that, "It will also assist you in supporting or refuting any statements by witnesses or defendants." He went through all the physical evidence at the house in painstaking detail and opined that the shooting could not have happened the way the Defendant described it. No objection was made to

6

the majority of this testimony, and defense counsel had no objection to the prosecutor's proffer of Ortiz as an expert in blood splatter analysis and crime scene reconstruction.

The Court of Appeals correctly found State v. Landgraf, 1996-NMCA-024, 121 N.M. 445, 913 P.2d 252, to be directly on point for the proposition that an expert witness can touch upon the ultimate issue to be decided. The jury was instructed that it could entirely disregard any and all opinion evidence. (Op. ¶¶ 32-33). Ortiz's testimony was within the bounds of acceptable expert testimony in New Mexico, and Defendant-Petitioner has not demonstrated that this issue is worthy of this Court's discretionary review.

## IV. THE COURT OF APPEALS DID NOT ERR IN FINDING NO FUNDAMENTAL ERROR DURING THE PROSECUTOR'S OPENING STATEMENT

At the conclusion of his opening statement, the prosecutor said, "Just as you have taken an oath and have raised your hand to fairly and truly judge this case, on behalf of the people of the State of New Mexico, I promise you that Ms. Garcia and myself will conduct this case as fairly and as honestly and as truthfully as possible. Thank you." No objection was made to this argument. Therefore, the prosecutor's remarks can be reviewed only for fundamental error. "Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error." State v. Gonzales, 113 N.M. 221, 229, 824 P.2d 1023, 1031 (1992). The Court of Appeals correctly found that this was not fundamental error as it did not precondemn the Defendant, or rely on the prosecutor's authority to unduly sway the jury, specifically distinguishing the more "odious" conduct of the prosecutor in State v. Diaz, 100 N.M. 210, 668 P.2d 326 (Ct. App. 1983). (Op. ¶¶ 37-38). The Defendant-Petitioner has not demonstrated why this finding is worthy of this Court's discretionary review.

**V.    THE COURT OF APPEALS DID NOT ERR IN NOT FINDING PLAIN ERROR OR INEFFECTIVE ASSISTANCE OF COUNSEL FOR DEFENSE COUNSEL'S FAILURE TO FILE A MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM DEFENDANT'S HOUSE**

Defendant called the police to his house on a 911 call, and invited them in. Shortly thereafter, the Defendant was transported to the police station where he gave a voluntary statement. At some point, the officers obtained a search warrant and removed the evidence from Defendant's house. No issue as to the propriety or timing of that warrant was ever raised or litigated below. During the trial, defense counsel made references to the fact that Defendant consented to the officers' entry.

For the first time on appeal, Defendant contended that his trial counsel's failure to file a motion to suppress the evidence was plain error and/or ineffective assistance of counsel. The Court of Appeals correctly found that plain error did not apply because the factual finding that the police unconstitutionally searched Defendant's home was not the only finding rationally supported on the record because the evidence also supported the inference that Defendant consented. (Op. ¶¶ 9-12).

The Court also correctly found that ineffective assistance of counsel could not be found on this record. The record is "devoid of facts" (Op. ¶ 14) from which counsel's effectiveness could be determined. The issue was simply never raised in any context, and the facts underlying the claim were not developed in the trial record. Defendant could also not show prejudice because there was no showing that the motion would have been granted – again the record is devoid of necessary facts to make that determination. It was not clear on this record as to what evidence, if any, would have been suppressible. (Op. ¶ 18). Defendant has not shown why this part of the opinion is worthy of this Court's discretionary review.

8

## VI.   THE COURT OF APPEALS DID NOT ERR IN FINDING NO CUMULATIVE ERROR

The Court of Appeals correctly found that the cumulative error doctrine is not available if there were no irregularities at trial or if the record as a whole demonstrates that the Defendant received a fair trial, relying on State v. Perea, 2001-NMCA-002, ¶ 26, 130 N.M. 46, 16 P.3d 1105.   (Op. ¶ 45).   Defendant-Petitioner has presented no compelling reason to revisit this conclusion.

## CONCLUSION AND RELIEF SOUGHT

The Defendant-Petitioner has not adequately identified any issues that meet this the criteria for this Court to grant a writ of certiorari.   For all these reasons the State respectfully requests this Court to deny the Defendant-Petitioner's petition for writ of certiorari to the New Mexico Court of Appeals.

Respectfully submitted,

PATRICIA A. MADRID
Attorney General

M. ANNE KELLY
Assistant Attorney General
Attorneys for Plaintiff-Respondent
111 Lomas NW, Suite 300
Albuquerque, NM  87102
(505) 222-9000

9

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct
copy of the foregoing was served by
first class mail on
Todd Hotchkiss
Frechette & Associates, P.C.
P.O. Box 26807
Albuquerque, NM  87125
on this 13th day of May, 2005.

Assistant Attorney General

THE SUPREME COURT OF THE STATE OF NEW MEXICO
May 20, 2005

NO. 29,194

**STATE OF NEW MEXICO,**

    Plaintiff–Respondent,

v.

**GILBERT TORRES, JR.,**

    Defendant–Petitioner.

ORDER

    This matter coming on for consideration by the court upon petition for writ of certiorari, and the Court having considered said petition and response, and being sufficiently advised, Chief Justice Richard C. Bosson, Justice Pamela B. Minzner, Justice Patricio M. Serna, Justice Petra Jimenez Maes, and Justice Edward L. Chávez concurring;

    NOW, THEREFORE, IT IS ORDERED that the petition for writ of certiorari is denied in Court of Appeal number 24103.

    IT IS SO ORDERED.

                  WITNESS, The Hon. Richard C. Bosson, Chief Justice of the Supreme Court of the State of New Mexico, and the seal of said Court this 20th day of May, 2005.

( S E A L )

*Madeline Garcia*

Madeline Garcia, Chief Deputy Clerk

ATTEST: A TRUE COPY

*Madeline Garcia*

Clerk of the Supreme Court
of the State of New Mexico



EXHIBIT

L

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. 24103

STATE OF NEW MEXICO,

      **Plaintiff-Appellee,**

vs.

      Valencia County
      CR-01-483

GILBERT TORRES, JR.,

      **Defendant-Appellant.**

**MANDATE TO DISTRICT COURT CLERK**
(Applicable items are indicated by an "X" below.)

1. _x__ Attached is a true and correct copy of the original decision entered in the above-entitled cause.

2. _x__ This decision being now final, the cause is remanded to you for any further proceedings consistent with said decision.

3.____ Writ of Certiorari having been issued by the New Mexico Supreme Court and their decision being final, this cause is remanded to you for any further proceedings consistent with said Supreme Court decision/order attached hereto.

4. _x__ You are directed to issue any commitment necessary for the execution of your judgment and sentence.

5. ____ District Court Clerk's Record returned herewith:
    ____ tapes; ____transcript; ____depositions; ____ other

6. ____ Exhibits filed herein shall be:
    _____picked up at this Clerk's Office forthwith.
    _____ returned by this Clerk's Office

7. ____ Costs bill is assessed as follows:

8. ____ Attorney fees on appeal are granted as follows:

    By direction of and in the name of the Chief Judge of the Court of Appeals, this 21 day of  July  2005.
(SEAL)

                                *Patemu R Wallace*
               Clerk of the Court of Appeals of the
               State of New Mexico

cc: Counsel w/out attachments

ATTEST:
A true copy.
Clerk of the Court of Appeals
of the State of New Mexico
By
N. Gonzales

**EXHIBIT**
M