IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

      Respondent,

v.                         No.

GILBERT E. TORRES, JR.,

      Petitioner.

## RULE 12-501, N.M.R.A. 2010
## PETITION FOR WRIT OF CERTIORARI
## TO THE THIRTEEN JUDICIAL DISTRICT COURT
## OF THE STATE OF NEW MEXICO

DECIDED BY THE THIRTEENTH JUDICIAL DISTRICT COURT
OF VALENCIA COUNTY
HONORABLE John W. Pope, Presiding
No. D-1314-CR-2001-483

Respectfully submitted,

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for Petitioner
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558



# TABLE OF CONTENTS

*Page No.*

TABLE OF AUTHORITIES.........................   iii

DESCRIPTION OF DISTRICT COURT PROCEEDINGS....   1

SUMMARY OF EVIDENCE AT EVIDENTIARY HEARINGS..   1

DISTRICT COURT'S FINDINGS....................   5

ARGUMENT.....................................   6

    I.   Trial Counsel Rendered Ineffective
        Assistance of Counsel by Not Filing
        A Motion to Suppress Evidence and
        Fruit of the Poisoned Tree Under the
        Fourth and Sixth Amendments and
        Article II, §§ 10 and 14 of the
        New Mexico Constitution............   6

    A.   The District Court Erred by Not
        Applying Binding Precedent from the
        United States Supreme Court that
        Calling Police was Not Consent, and
        Cited No Factual Basis or Legal
        Precedent for Petitioner's Reporting
        His Ex-Wife's Suicide was Consent
        For the State's Nighttime
        Warrantless Searching of His Home...   7

i

B.   **The District Court Erred by Finding the Community Caretaker Exception to the Warrant Requirement Allowed the State's Nighttime Warrantless Searching Of Petitioner's Residence When the Initially Arriving Officer Determined Petitioner's Ex-Wife was Deceased, Petitioner was Removed From the Residence, No Emergency Circumstances Continued to Exist, And Suicide was Not a Crime in The State of New Mexico**............    8

**REQUEST FOR RELIEF**...........................   10

ii

## TABLE OF AUTHORITIES

*Page No.*

### Cases

Flippo v. West Virginia, 528 U.S. 11 (1999)..   3,4,7,9

Michigan v. Tyler, 436 U.S. 499 (1978).......   8

Mincey v. Arizona, 437 U.S. 385 (1978)....... 3,4,7,8,9

Minnesota v. Dickerson, 508 U.S. 366 (1993)..   10

Thompson v. Louisiana, 469 U.S. 17,
      *reh'g denied*, (1984)...................   3,4,7

Patterson v. LeMaster, 2001-NMSC-013,
      130 N.M. 179, 21 P.3d 1032.............   6

State v. Anderson, 107 N.M. 165,
      754 P.2d 542 (Ct. App. 1988)...........   7

State v. Arellano, 91 N.M. 195, 572 P.2d 223
      (Ct. App. 1977)........................   8

State v. Balenquah, 2009-NMCA-055,
      146 N.M. 267, 208 P.3d 912.............   10

State v. Cooper, 1998-NMCA-180,
      126 N.M. 500, 972 P.2d 1...............   6

State v. Jackson, 2009-NMCA-068, 146 N.M. 563,
      212 P.3d 1118, *cert. granted*, (2009) ...   8

State v. Moran, 2008-NMCA-160,
      145 N.M. 297, 197 P.3d 1079............   10

State v. Pierce, 2003-NMCA-117, 134 N.M. 388,
      77 P.3d 292............................   7

iii

State v. Ryon, 2005-NMSC-005,
    137 N.M. 174, 108 P.3d 1032............ 5,6,7,8,9

State v. Torres, 2005-NMCA-070,
    137 N.M. 607, 113 P.3d 877............. 1,3

State v. Torres, 2005-NMCERT-005,
    137 N.M. 522, 113 P.3d 345............. 1

State v. Valdez, 111 N.M. 438,
    806 P.2d 578 (Ct. App. 1990)........... 10

State v. Warsaw, 1998-NMCA-044,
    125 N.M. 8, 956 P.2d 139............... 10

### New Mexico Statutes and Court Rules

N.M.S.A. 1978, § 24-11-5................... 7

Rule 5-802, N.M.R.A. 2006................. 1

Rule 12-501 N.M.R.A. 2010................. 10

### United States Constitution

Fourth Amend................................ 6

Sixth Amend................................. 6

### New Mexico Constitution

Art.II, §10................................. 6

Art.II, §14................................. 6

iv

## DESCRIPTION OF DISTRICT COURT PROCEEDINGS

A Valencia County jury found Petitioner guilty of second degree murder and tampering with evidence. The New Mexico Court of Appeals affirmed in State v. Torres, 2005-NMCA-070, 137 N.M. 607, 113 P.3d 877. This Court denied the petition for a writ of certiorari in State v. Torres, 2005-NMCERT-005, 137 N.M. 522, 113 P.3d 345.

Petitioner filed a Rule 5-802 petition for a writ of habeas corpus. Respondent responded. Evidentiary hearings were held on October 6 and December 7, 2009. The district court filed the May 27, 2010 Order Denying Petition for Writ of Habeas Corpus ("Order").

## SUMMARY OF EVIDENCE AT EVIDENTIARY HEARINGS

On December 3, 2001, Petitioner telephoned the Los Lunas Police Department (LLPD) "alleging the suicide of his ex-wife." (Order at 1) LLPD Officer Wroten arrived at Petitioner's residence, went to the back bedroom, found the woman deceased, did not seize any evidence, and knew Petitioner was the only other person there.

LLPD Officer Perea arrived after Wroten exited the residence, walked to the back bedroom, did not seize any

1

evidence, secured the scene, and requested LLPD Detective James Harris go to the scene.  Harris arrived, Perea took Harris to see the dead body, exited, and spoke with Wroten.  The LLPD officers then removed Petitioner, without arrest, from the scene to LLPD by 7:30 p.m.

Wroten, Perea, and Harris knew of no consent from Petitioner to search his residence, and did not seek a search warrant because probable cause did not exist.

LLPD requested the assistance of the New Mexico State Police (NMSP) Crime Scene Team.

All witnesses agreed suicide is not a crime.

NMSP Crime Scene Team agent Shane Arthur arrived at 9:01 p.m., Mike Applegate at 9:22 p.m., Ramon Casaus at 11:00 p.m., and Art Ortiz at 11:30 p.m.

Applegate testified all NMSP agents collected and evaluated evidence in the residence for hours.  The suicide investigation in Petitioner's residence by midnight turned into a homicide investigation.  Harris, the affiant, testified, after Petitioner left his residence, LLPD and NMSP were "developing probable cause" because the State lacked probable cause.

2

The NMSP agents, despite acknowledged training, admittedly had no knowledge of the holdings of <u>Flippo v. West Virginia</u>, 528 U.S. 11, 13 (1999)(per curiam); <u>Thompson v. Louisiana</u>, 469 U.S. 17, *reh'g denied*, (1984); or <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978).

There was no evidence any NMSP agent requested or witnessed Petitioner consent to overnight searches of his house.   Arthur believed LLPD Lt. Nuanes had acquired written consent from Petitioner.   Nuanes did not.

Ortiz believed Petitioner consented by reporting his ex-wife's suicide.   Ortiz also thought Applegate secured oral consent from Petitioner.   Applegate did not.   The consent about which Ortiz responded at trial was the mistaken consent. <u>State v. Torres</u>, 2005-NMCA-070, ¶12. Ortiz also mistakenly thought LLPD had received consent from Petitioner to search his residence.

NMSP agents first contacted Petitioner at LLPD after 12:30 a.m. on December 4 when Harris, Arthur, Ortiz and Casaus questioned him about what LLPD and NMSP reviewed and evaluated inside Petitioner's residence.   Then Petitioner was arrested for tampering with evidence.

3

The warrantless searches of the residence stopped at 3:00 a.m. when officers developed probable cause.

During Petitioner's second statement after 3:30 p.m., Applegate presented him "with the facts" from the warrantless searches of his residence.

The Affidavit for Search Warrant, filed at 8:48 a.m. on December 4, 2001, failed to assert Petitioner consented to the searching of his residence. The Affidavit at 2 alleged, "Upon further investigation of the crime scene, by officers, they learned that a domestic dispute occurred between the victim and TORRES."

Petitioner's counsel Campbell never found any evidence Petitioner consented to search his residence.

Campbell considered filing a motion to suppress, but believed Petitioner consented by reporting the suicide. This was the consent about which he asked Ortiz at trial.

Campbell admitted he unreasonably did not file a motion to suppress when he had no knowledge of Mincey, Thompson and Flippo. Consequently, Campbell made the tactical decision to focus exclusively on preparing for trial and not contest the admission of all of the

4

physical evidence and Petitioner's two statements to LLPD and NMSP. Campbell admitted a successful motion to suppress physical evidence and fruits of the illegal evidence, would have caused the case not to go to trial.

## DISTRICT COURT'S FINDINGS

The officers entered Petitioner's residence in furtherance of their duties under the community caretaker exception to the warrant requirement and searched for evidence of the alleged suicide under <u>State v. Ryon</u>, 2005-NMSC-005, 137 N.M. 174, 108 P.3d 1032. (Order at 2) As such, "they did not have to completely abandon their investigative function." (Order at 2)

"The officers' presence on the Petitioner's premises ... was consensual. Any investigative functions undertaken while on the premises was incidental to the consent given when the Petitioner called to report a suicide." (Order at 2) The lack of a motion to suppress evidence "does not amount to ineffective assistance of counsel" and was "not prejudice" because of "a high probability that the motion would have failed." (<u>Id</u>. at 2)

5

**ARGUMENT**

I. **Trial Counsel Rendered Ineffective Assistance Of Counsel by Not Filing a Motion to Suppress Evidence and Fruit of Poisoned Tree Under The Fourth and Sixth Amendments and Article II, §§ 10 and 14 of the New Mexico Constitution.**

"Warrantless searches and seizures inside a home are presumptively unreasonable, with "only a few specific, narrowly defined exceptions." Ryon, 2005-NMSC-005, ¶23.

For ineffective assistance of counsel, counsel must not exercise the skill of a reasonably competent attorney, which prejudiced Petitioner's case. State v. Cooper, 1998-NMCA-180, ¶11, 126 N.M. 500, 972 P.2d 1.

"There was no strategic reason for a reasonably competent attorney who was aware of the facts of this case and the governing case law not to try to suppress". Patterson v. LeMaster, 2001-NMSC-013, ¶27, 130 N.M. 179, 21 P.3d 1032. Petitioner was prejudiced when the motion "was crucial because it could have excluded key evidence", undermining confidence in the verdict. Id. ¶¶28-33.

6

**A.   The District Court Erred by Not Applying Binding Precedent from the United States Supreme Court that Calling Police was Not Consent, and Cited No Factual Basis or Legal Precedent for Petitioner's Reporting His Ex-Wife's Suicide was Consent for the State's Nighttime Warrantless Searching of His Home.**

Under <u>Mincey</u>, <u>Thompson</u>, and <u>Flippo</u>, and <u>Ryon</u>, Petitioner's report to police of his ex-wife's suicide in his residence and Wroten briefly being in the residence to check on the reported suicide, was not consent to all-night, warrantless searches and seizures in his home.

Petitioner's call to LLPD did not "evidence a diminished expectation of privacy" or constitute consent for police to search his residence. <u>Thompson</u>, 469 U.S. at 22-23; <u>Mincey</u>, 437 U.S. at 391-92.  He was obligated under N.M.S.A. 1978, § 24-11-5 to report the death.

His report of the suicide was "clear and positive testimony that consent was clear and unequivocal", conentt was "given without duress or coercion", and "in light of the presumption that disfavors the waiver of constitutional rights." <u>State v. Pierce</u>, 2003-NMCA-117, ¶20, 134 N.M. 388, 77 P.3d 292 (citing <u>State v. Anderson</u>, 107 N.M. 165, 167, 754 P.2d 542 (Ct. App. 1988)).

7

**B.  The District Court Erred by Finding the Community Caretaker Exception to the Warrant Requirement Allowed the State's Nighttime Warrantless Searching of Petitioner's Residence When the Initially Arriving Officer Determined Petitioner's Ex-Wife was Deceased, Petitioner Was Removed From the Residence, No Emergency Circumstances Continued to Exist, and Suicide Was Not a Crime in the State of New Mexico.**

The report of suicide, not a crime, was not probable cause. <u>State v. Arellano</u>, 91 N.M. 195, 196, 572 P.2d 223 (Ct. App. 1977); <u>State v. Jackson</u>, 2009-NMCA-068, ¶9, 146 N.M. 563, 212 P.3d 1117, *cert. granted*, (2009).

The emergency aid doctrine "is limited to the functions of protecting or preserving life or avoiding serious injury". <u>Id</u>. at ¶26.  "[O]nly a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge." <u>Ryon</u>, 2005-NMSC-005, ¶26.  It applies when police "reasonably believe that a person within is in need of immediate aid" or at "the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises". <u>Mincey</u>, 437 U.S. at 392 (citing to <u>Michigan v. Tyler</u>, 436 U.S.

8

499, 509-510 (1978)).   After Wroten found the body, no emergency existed. Ryon, 2005-NMSC-005, ¶¶23,24.   There was no other victim, Petitioner was removed, and no basis for a long, not prompt, search.

Thereafter, LLPD and NMSP "develop[ed] probable cause" not promptly until approximately 3:00 a.m. hardly promptly as "crime-solvers", not "community caretakers". Ryon, 2005-NMSC-005, ¶27.   The "emergency aid doctrine, established in Mincey", is for when "the intrusion upon privacy occurs while police ... are motivated by 'a desire to aid victims rather than investigate criminals.'" Id. at ¶¶25,26 n.4.   Under Ryon, 2005-NMSC-005, ¶29, the State did not meet the three-pronged objective test.

There is not a "murder scene exception" to the warrant requirement. Flippo, 528 U.S. at 12-14.

The plain view exception to the warrant requirement did not apply as officers were not "lawfully positioned when the evidence was observed, and the incriminating nature of the evidence was immediately apparent, such that the officer had probable cause to believe the

9

article seized was evidence of a crime". <u>State v. Balenquah</u>, 2009-NMCA-055, ¶26, 146 N.M. 267, 208 P.3d 912; <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993).

No "prior justification" existed for the hours-long presence of the officers. <u>State v. Warsaw</u>, 1998-NMCA-044, ¶20-21, 125 N.M. 8, 956 P.2d 139; <u>State v. Valdez</u> 111 N.M. 438, 441, 806 P.2d 578, 581 (Ct. App. 1990).

The incriminating nature of the evidence was not immediately apparent when no LLPD officer seized any evidence during their presence before NMSP arrived, and they did not have probable cause. <u>State v. Moran</u>, 2008-NMCA-160, ¶12, 145 N.M. 297, 197 P.3d 1079.

## REQUEST FOR RELIEF

Petitioner requests this Court grant this Rule 12-501, N.M.R.A. 2010, petition and reverse the Order.

Respectfully submitted,

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for Petitioner
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558

10

THIRTEENTH JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF VALENCIA



FILED IN MY OFFICE
DISTRICT COURT CLERK

05 APR 17 AM 8: 54

GERI LYN SANCHEZ

BY_____ _____DEPUTY

GILBERT TORRES, JR.,

       Petitioner,

v.                         No. D-1314-CR-2001-483

JOE ROMERO, Warden,
Central New Mexico Correctional Facility,

       Respondent.

## PETITION FOR WRIT OF HABEAS CORPUS

The Petitioner, GILBERT TORRES, JR., by and through his attorney, Todd Hotchkiss of Frechette & Associates, P.C., hereby files this petition for a writ of habeas corpus pursuant to Rule 5-802(D)(1), N.M.R.A. 2006.

This petition seeks to vacate, set aside, or correct an illegal sentence and order of confinement for second-degree murder and tampering with evidence on the grounds that MR. TORRES was denied his state and federal constitutional rights to adequate and effective assistance of counsel, due process of law, protections against unlawful searches and seizures, and a fair trial. MR. TORRES seeks to set aside his convictions and sentence and to obtain a new trial on all of the charges contained in the original indictment which resulted in a conviction.

In support of this petition, counsel states:

1

1.  **Respondent's Name and Title, and Petitioner's Place of Confinement:**  GILBERT TORRES, JR. (#58623) is imprisoned or otherwise restrained at Central New Mexico Correctional Facility, P.O. Drawer 1328, Los Lunas, New Mexico  87031 by Joe Romero, Warden of said facility, who is also Respondent in this action pursuant to Rule 5-802(B)(1) & (2).

2.  **Nature of Proceedings:**  In this matter, <u>State of New Mexico v. Gilbert Torres, Jr.</u>, Thirteenth Judicial District Court No. D-1314-CR-2001-483, MR. TORRES was convicted in February of 2003 by a jury of the second-degree murder of Ms. Pamela Pace and tampering with evidence on December 3, 2001.  The State's theory was that MR. TORRES murdered Ms. Pace in MR. TORRES' home and covered up the murder by claiming that the deceased committed suicide.  Judge John W. Pope presided over the trial, the jury found MR. TORRES not guilty of first-degree murder, guilty of second-degree murder and tampering with evidence, and Judge Pope sentenced MR. TORRES to 16½ years in prison.  The Thirteenth Judicial District Court in Valencia County is located at the Valencia County Courthouse, P.O. Box 1089, Los Lunas, New Mexico 87031.

3.  **Judgment and Sentence:**  The Judgment, Sentence and Commitment ordered MR. TORRES into the custody of the New Mexico Department of Corrections for service of MR. TORRES' sentence of 15 years for the second-degree murder conviction and 18 months

2

consecutive for the tampering with evidence conviction.

    4.  **Prior Appeal or Prior Habeas Corpus Petitions, and Exhaustion of Available Remedies:**  Pursuant to Rule 5-802(B)(4), no other prior applications, petitions, or motions for post-conviction relief have been filed as pertains to this imprisonment.  Regarding MR. TORRES' direct appeal of his conviction and sentence, MR. TORRES exhausted all other available remedies as required by Rule 5-802(B)(3) & (4):

    A.  MR. TORRES appealed to the Court of Appeals for the State of New Mexico in <u>State of New Mexico v. Gilbert Torres, Jr.</u>, No. 24,103, which resulted in a published opinion reported at 2005-NMCA-070, 137 N.M. 607, 113 P.3d 877.

    B.  The grounds upon which MR. TORRES appealed were:

> On appeal, Defendant argues that plain error occurred due to his trial counsel's failure to file a motion to suppress evidence because the police did not obtain a search warrant prior to collecting evidence from Defendant's home.  In the alternative, Defendant argues that his counsel was ineffective in failing to file the motion. Additionally, Defendant argues that the trial court erred in allowing a witness to testify to a statement made by the victim over Defendant's hearsay objection, that it erroneously admitted testimony of two police officers, and that statements made by the prosecutor during opening statements and closing arguments constituted fundamental error.

> <u>State v. Torres</u>, 2005-NMCA-070, ¶1, 137 N.M. 607, 113 P.3d 877.

    C.  The result of the appeal was that the Court of Appeals, in a April 7, 2005 decision, affirmed MR. TORRES'

convictions and sentence.

D.   On April 27, 2005, MR. TORRES filed in the Supreme Court of the State of New Mexico a petition for writ of certiorari to the Court of Appeals in No. 29,194.  The State filed a response on May 13, 2005.

E.   On May 20, 2005, the Supreme Court denied MR. TORRES' petition for writ of certiorari.  That denial is reported at 2005-NMCERT-5, 137 N.M. 522, 113 P.3d 345.

F.   The claim that trial counsel provided ineffective assistance of counsel when not objecting to a prior statement by the decedent based on the confrontation clause of the Sixth Amendment to the United States Constitution is distinctly different from challenging the admission of the statement as not being a statement of the victim's state of mind under Rule 11-803(C), N.M.R.A.

5.   **Previously Raised Claim:**  Pursuant to Rule 5-802(B)(5), one claim herein was raised on direct appeal.  Regarding the claim of ineffective assistance of counsel because trial counsel did not file a motion to suppress evidence, the Court of Appeals ruled that the record "is devoid of facts from which we could determine the effectiveness of Defendant's counsel" and "he has also not shown that his counsel's failure to file the motion prejudiced his defense". State v. Torres, 2005-NMCA-070, ¶¶ 14 & 18.  The ends of justice require consideration of this claim

because the Court of Appeals refused to address the issue on direct appeal because the record was insufficient. A sufficient record must be made on the issue and MR. TORRES should be allowed to attempt to establish prejudice at an evidentiary hearing. Kimmelman v. Morrison, 477 U.S. 365, 390-91, 106 S.Ct. 2574, 2591 (1986).

6. **Prior Counsel:** The name and address of the attorney who represented MR. TORRES at trial is Mr. Joseph M. Campbell, Esq., 4 Opal Court East, Edgewood, New Mexico 87015-9094. A defense attorney who represented MR. TORRES before trial was Ms. Trienah Meyers Gorman, present address unknown. The prosecutors at trial were Mr. John J. Bogren, Esq., 8400 Menaul Boulevard N.E., #A, Albuquerque, New Mexico 87112-2200 and Elizabeth A. Garcia, P.O. Box 27248, Albuquerque, New Mexico 87125-7248. The name and address of the attorney who represented MR. TORRES on the appeal is Todd Hotchkiss, Frechette & Associates, P.C., P.O. Box 26807, Albuquerque, New Mexico 87125. Ms. M. Anne Kelly, Assistant Attorney General, 111 Lomas Boulevard N.W., Suite 300, Albuquerque, New Mexico 87102, represented the State of New Mexico on appeal.

7. **Statement of Facts**, pursuant to Rule 5-802(B)(7):

Los Lunas Police Officer Dino Wroten, an accident reconstructionist, on December 3 was dispatched to TORRES' residence regarding a woman who committed suicide. (T.03-77,25-

5

75)   MR. TORRES had called the police informing the police of a suicide which occurred at his residence.  Wroten arrived at approximately 7:00 p.m. (T.03-77,84)

Wroten entered the residence and saw debris, broken pottery and blood stains on the floor. (T.03-77,115-22)  TORRES was inside and said, "Well, she finally did it." (T.03-77,132)

In the back bedroom laid Pamela Pace dead on a bed with a shotgun wound to her chest. (T.03-77,148)  A 12-gauge shotgun leaned against the bed with the barrel of the shotgun "peeled back like a banana". (T.03-77,156,247)  Pace had a gash to her left upper thigh from which blood flowed toward her hip rather than down. (T.03-77,259)

Los Lunas Police Department (LLPD) Sergeant Perea arrived and spoke with Wroten. (T.03-77,280)  TORRES told them Pace was his ex-wife. (T.03-77,285)  Pace and he argued leading to Pace breaking a vase, slipping on the vase cutting her thigh, and went into the bedroom and committed suicide. (T.03-77,293)

Sgt. Perea and Wroten called LLPD Detective James Harris due to their suspicions of whether Ms. Pace had committed suicide. (T.03-77,314, 549)

LLPD Sergeant Josh Perea was dispatched on October 14, 2001 to TORRES' residence on a domestic violence call from TORRES reporting  Pace. (T.03-77,426-41; T.03-78,252)  Over defense counsel's objection based on hearsay, the trial court allowed

6

Perea to testify, as a statement of Pace's state of mind under Rule 11-803(C), N.M.R.A. 2003, that Pace said, "The next time you guys see me you're going to find me dead." (T.03-77,467-72)

On December 3, Perea arrived at TORRES' residence at 6:54 p.m.  Inside was in disarray as if a "pretty good fight had taken place." (T.03-77,490)

Perea went to the bedroom where Pace was dead on the bed. (T.03-77,510)  Perea noticed the shotgun beside the bed with the barrel peeled back. (T.03-77510-40)  Pace had a large laceration to her left upper thigh, her right thumb was found under a bed stand, and in the corner were apparent pieces of potato. (T.03-77,510-40)  On the bottom part of the shotgun he saw some grey duct tape with some blue cloth fibers hanging on it. (T.03-77,542)  Perea did not initially consider the potato because he thought Ms. Pace and MR. TORRES may have been throwing food at each other. (T.03-78,45)

Police removed everyone from the house and put up crime scene tape. (T.03-78,83)

A neighbor later told Perea he saw a man exit the residence and put an item over a fence. (T.03-78,96)  Perea looked and found a blue rag or towel wrapped in duct tape. (T.03-78,101) Perea did not initially think much of those items at the time but he did tell other officers about it. (T.03-78,127)

LLPD Officer Vince Torres arrived at TORRES' residence on

7

December 3 at 6:57 p.m. and went inside. (T.03-78,294-316)
Torres took photographs of the scene. (T.03-78,350)

   **LLPD Detective James Harris** on December 3 spoke with Sgt.
Perea prior to arrival at the scene and told him to secure the
scene.  He arrived at 7:15 p.m. with the scene secured. (T.03-
81,57-85) Harris spoke with officers at the scene and then to
TORRES, who was outside. (T.03-81,96)

   TORRES said Pace committed suicide. (T.03-81,99-102)  Harris
went inside the residence, saw several pieces of pottery and
blood stains, and believed a fight had occurred. (T.03-81,107-19)

   Harris went to the back bedroom, saw Pace dead on the bed,
observed the scene, and then approached TORRES.  Harris told
TORRES he was not under arrest but that Harris wanted TORRES to
go to LLPD to speak with him later. (T.03-81,148)  Torres took
TORRES to LLPD. (T.03-78,419)  TORRES, at LLPD, said, "I can't
believe she did that." (T.03-78,485)  TORRES was not arrested,
had not been read any Miranda warnings, waited in the "pink
room", and was free to leave LLPD at that time. (T.03-78,529-32)

   This was Harris' first murder scene investigation as a
detective. (T.03-89,458) After the initial walk through, Harris
decided he needed a closer look at the scene. (T.03-89,476)
Harris went back into TORRES' home and carefully evaluated the
details of the scene. (T.03-89,483-572; T.03-90,1-200)

   After initial photos were taken of the scene by Harris and

other members of LLPD, Harris and Sgt. Perea decided, within 30 minutes of Harris' arrival, to call the New Mexico State Police (NMSP) crime scene team. (T.03-81,175; T.03-90,201-05)

Thereafter, the only people that were in the residence were the crime scene unit and Harris. (T.03-90,410-12)

**Neighbor Edgar Neil** saw TORRES exit his residence with a brown bag in his hand, approach the fence line, and throw a bag over the fence into someone else's yard. (T.03-79,48-55)

**Neighbor Tomasina Baca** heard screaming and yelling by both a woman and a man from TORRES' residence for approximately 30 minutes on December 3. (T.03-79,176)  10-15 minutes after the arguing ended, Ms. Baca also saw a man, not identified as TORRES, exit the residence and throw a brown bag over a fence. (T.03-79,245,364)  The police arrived approximately 10 minutes later. (T.03-79,287)

**Neighbor Juan Lopez** on December 3 heard a loud noise with his wife. (T.03-79,392-419)  **Lori Lopez** thought someone had busted a beer bottle in their back yard. (T.03-79,513-17)  Three to four minutes later, Mr. Lopez saw TORRES outside, throw something in Lopez's yard, and re-enter his residence. (T.03-79,420-26)  Ten minutes later the police arrived. (T.03-79,436)

LLPD searched the area and found the blue cloth with duct tape on it. (T.03-81,193)  The significance of the cloth with tape escaped Harris until later when he saw those items on the

butt of the shotgun. (T.03-81,201)

LLPD collected the shotgun from the residence. (T.03-81,208; T.03-90,314)   The weapon was processed. (T.03-81,245)   It was concluded that the barrel of the 12-gauge shotgun exploded and sent shrapnel through the wall between the bedroom and the laundry room. (T.03-81,350)   A piece of potato was found on the right side of the barrel and duct tape was on the barrel. (T.03-82,389)  The ceiling tile from above Pace's body had gun powder residue, blood, and apparent potato pulp on its surface. (T.03-81,465-90)   An arm of a chair had hair consistent with Pace's hair. (T.03-81,538)   Harris observed bruises or marks around Pace's neck. (T.03-82,195)   The cut on Pace's upper left thigh was approximately 4"-5" long. (T.03-82,201)

Mike Applegate of the NMSP crime scene team arrived at 9:22 p.m., Shane Arthur at 9:59 p.m., Ramon Casaus at 11:02 p.m., and Art Ortiz at 11:24 p.m. on December 3. (T.03-90,230)

NMSP Investigator Mike Applegate, the crime scene manager in this case, assigned Arthur to photograph, Casaus to videotape, and Ortiz to process the blood splatter in TORRES' home. (T.03-92,549-54;T.03-95,52)

Applegate arrived at TORRES' residence at 9:22 p.m. on December 3. (T.03-96,160)   After Harris' briefing, Applegate went into the house to look around "to see what you have." (T.03-96,168-74)   That first time in the house, with Detective Harris,

was "Just to get a general feel for what was happening and what type of evidence we needed to look for." (T.03-96,266)

The door to the front bedroom was busted off its hinge. (T.03-95,142)  A broken vase was found in the hallway. (T.03-95,200)  Blood stains were found in the living room. (T.03-95,240)  Duct tape was on the gun with blue fibers. (T.03-95,425) 22 blood stains were on the ceiling and west wall of the master bedroom. (T.03-95,519-42)

The initial assessment was domestic violence occurred, Pace was shot with a shotgun, and suicide was staged. (T.03-95,553-56)

The crime scene team went to LLPD to question TORRES at approximately 3:30 a.m. about the blue rag, duct tape and potato and the use of the potato as a suppressor. (T.03-96,78-92 & 444)

"We went back to the residence and began processing the scene." (T.03-96,128)  None of the evidence was collected until after a search warrant was obtained. (T.03-96,131)

Later on that evening, when processing the scene, the crack in the chair's arm was brought to his attention. (T.03-96,268)

**NMSP Sergeant Ramon Casaus** arrived at the scene to assist at approximately 11:00 p.m. on December 3. (T.03-96,531; T.03-97,419)  Casaus videotaped the scene. (T.03-96,550-53;T.03-97.457)  That videotape, Exhibit 37, went into evidence and played for the jury. (T.03-97,1)

According to Casaus, after initially investigating as a

11

suicide, "then when we found the rag, and stuff like that, we stepped out and decided to get the warrant." (T.3-97,291) The scene was not processed until after a search warrant was acquired at approximately 10:00 a.m. on December 4. (T.03-97,408)

NMSP Agent Shane Arthur, after Wroten's briefing, photographed the scene in TORRES' residence from 9:30 p.m. on December 3 until the morning of December 4. (T.03-97,549-53;T.03-98,10) Evidence markers were in place. (T.03-98,66)

According to Arthur, police searched the residence from his arrival into the early morning hours of December 4, and then "we started up again a few hours later on December 4". (T.03-98,10-18) Arthur assisted with the search of the residence and with the questioning of TORRES. (T.03-98,264) Arthur took 433 photos during the pre-warrant searches, execution of the search warrant, and afterwards. (T.03-98,318)

NMSP Agent Art Ortiz, arrived at 11:24 p.m. and was an expert at trial in blood stain pattern analysis and accident reconstruction. (T.03-98,375-482)

Ortiz was briefed on what agents had seen at the scene. (T.03-98,483) Casaus was videotaping inside the residence. (T.03-98,485) Ortiz put on shoe covers and Applegate and Harris took him into the residence. (T.03-98,490)

No blood was found on the pottery, which contradicted TORRES' statements Pace cut herself with a ceramic pot. (T.03-

12

99,204,224) Evidence markers were used "to identify pieces of evidence from the crime scene." (T.03-99,270 & 370)

Ortiz saw blood stains on the couch, living room kitchen, and hallway. (T.03-99,250-300)  The blood stains in the living room and hallway were "somewhat consistent with length and width of the wound" on Pace's left upper thigh. (T.03-99,309)  No transfer patterns were found at a walking distance. (T.03-99,426)

An L-shaped blood swipe was found  (T.03-99,445)  No evidence existed that Pace walked to the back. (T.03-99,452)

In the hallway, 10 blood stains were between the kitchen and the master bedroom. (T.03-99,493)  25 blood stains were in the kitchen. (T.03-99,492)

6 or 7 drops of blood existed on the shotgun. (T.03-100,24) Something was at the top of the shotgun to keep in the gases and caused the explosion. (T.03-100,44)  Blankets were "somewhat piled up" under Pace. (T.03-100,54)  The blood stains and flow patterns evidenced that Pace had been moved. (T.03-100,64)

Pace's right upper arm, bra and abdomen had dark staining consistent with gun shot powder residue. (T.03-100,76)  No gun shot residue was found in the wound track like Ortiz normally sees as close distance. (T.03-100,160-64)

The shotgun was fired and exploded, shrapnel lacerated the back of Pace's hands and abdomen, and gun powder residue was blocked from the wound track. (T.03-100,173)  A piece of

13

suspected potato was on the barrel of the shotgun. (T.03-100,210)

No transfer stains existed from the stains on the bottom of Pace's feet. (T.03-100,274,288)  A person with bloody feet did not walk on the floor. (T.03-100,313)  A substance appearing to be potato was found in TORRES' home. (T.03-100,360)

The prosecutor asked Ortiz, "Do you know approximately what time these items were found?" (T.03-100,370)  Ortiz responded, "I would say in the early morning hours of December the 4th." (T.03-100,371)

On Pace's neck was found suspected potato. (T.03-100,418) On the ceiling above the bed was shredded duct tape, potato, gun shot residue and a piece of shrapnel. (T.03-100,459)

Due to blood stains on TORRES' clothing, Ortiz believed that TORRES had contact with Pace. (T.03-100,528)

Ortiz rendered the opinion that Pace did not commit suicide. Pace laid back on the bed when she was shot. (T.03-101,117-20)

Pace was not accidentally shot. (T.03-101,140)

Ortiz testified that it was obvious that the towel was used to shield the shooter.  The potato was used at the end of the barrel with layers of duct tape, done "ahead of time".  Pace, due to her state of dress, possibly was in the bedroom when TORRES went into the room with the shotgun, "maybe with the intent to kill her at that point in time." (T.03-101,183-92)  Pace possibly ran from the room and TORRES pursued her, forced open the other

14

bedroom door.   A struggle ensued, in which Pace began to bleed,
property was broken, and   Pace was strangled.   TORRES then
carried Pace to the master bedroom. (T.03-101,193-220)

Ortiz continued that TORRES then shot Pace.   The "physical
evidence does not lie," and "all the physical evidence points to
this was a deliberate killing." (T.03-101,248-53)

Ortiz agreed "physical evidence doesn't lie, but there are
different interpretations of physical evidence". (T.03-101,258)

During the evening of December 3, Ortiz testified, "we took
a look at the evidence [inside TORRES' residence] and it was very
suspicious and it was obvious it was staged." (T.03-101,284-86)

Regarding the fact that State agents searched TORRES'
residence without a warrant prior to the December 4 search
warrant later issued, TORRES' trial counsel asked, "Gilbert had
given consent to search his house, correct?" (T.03-102,392)
Ortiz responded, "That's correct." (T.03-102,393)   TORRES' trial
counsel responded, "I didn't think there's anything really of
interest there." (T.03-102,399)

After photographing the scene, Harris went to LLPD. (T.03-
82,55)   At approximately 12:35 a.m. on December 4 at LLPD, Harris
began the questioning of TORRES who had no objection to being
videotaped. (T.03-82,237-377)

In his first statement on December 4, TORRES told police
Pace was mad at him, and threw some pottery and a beer bottle.

15

TORRES denied there was a big fight.  Pace cut her leg on the broken pottery or beer bottle, TORRES offered to assist Pace, and Pace profanely rejected TORRES.  Pace went to the master bedroom.  Minutes later TORRES heard the shotgun blast.  TORRES went to the bedroom and shook Pace to attempt to revive her. (T.03-85,250)

TORRES kept the shotgun in the closet. (T.03-83,122)  After TORRES heard the shot and went into the bedroom, he called his son and then called LLPD. (T.03-83,170-84)

An officer present at the time of the videotaping can be heard to have said that he has already processed the scene. (T.03-82,259)  An officer also asserted that Ms. Pace did not cut her leg on the pot as determined by the investigation at the scene. (T.03-82,336)

TORRES denied throwing the blue rag and duct tape and potato over the fence. (T.03-83,395,425,441)  TORRES asserted that Pace shot herself. (T.03-83,413,495,557; T.03-84,250)

An officer can be heard telling TORRES the investigation showed TORRES was involved in Pace's death. (T.03-83,403,415)

Harris told TORRES police investigation showed TORRES put the blue rag on the shotgun butt and threw the rag over the fence. (T.03-83,424)  This was one of many references in the videotape by officers of the continuing investigation in TORRES' home and the officers' consequent belief TORRES was involved in Pace's death. (T.03-83,436,452,501,568; T.03-84,147,252,447)

16

TORRES denied shooting Pace. (T.03-83,449; T.03-84,238,424,486,522)

TORRES proffered the possibility that, when he shook Pace after discovering her body, he said, "Pam, Pam, Pam!", his hands may have caused bruises to Pace's neck. (T.03-83,497)

Harris wanted to give TORRES a break while Harris called the other agents to ask them what they have learned at the scene. (T.03-83,498)  "Our investigation is showing you are involved in this." (T.03-83,501; T.03-84,147)

Harris spoke with NMSP Agent Ortiz at the scene, and told TORRES, "its not adding up to the way your story is saying, Gilbert." (T.03-83,518)  Harris said, "They're examining her wounds." (T.03-83,528)

Harris told TORRES, "It's clearing up that that rag was taped on that shotgun." (T.03-83,568)  TORRES denied knowing anything about the blue rag and duct tape. (T.03-84,1-30)

Harris told TORRES that their investigation was showing that Ms. Pace was not cut from the pottery. (T.03-84,115)

Harris told TORRES that his statements were inconsistent with the officers' investigation at the scene. (T.03-84,324)

TORRES denied moving Pace and instead asserted that Pace walked into the bedroom. (T.03-84,406-45,545)

A police officer asserted that Pace's wounds were not consistent with TORRES' statement. (T.03-84,447)

Agent Ortiz then arrived after investigating in TORRES's home and told TORRES that, based on the "evidence at the scene", Pace did not commit suicide. (T.03-84,483) Ortiz asserted that TORRES tried to make it look like Pace committed suicide. (T.03-84,487; T.03-102,256) The police theory of Pace's murder was based on their investigation at the scene. (T.03-84,491)

Ortiz questioned TORRES about hair found in a broken chair which appeared consistent with Pace's hair. (T.03-84,516) Ortiz questioned TORRES about marks on Pace's neck and alleged TORRES strangled Pace. (T.03-84,530) Ortiz questioned TORRES about blood stains on the bottom of Pace's feet. (T.03-84,546)

Ortiz claimed TORRES propped up Pace and there was no blood on the rifle where her blood-soaked left hand would have been. (T.03-85,55) An police officer asked TORRES about the blood on the bed sheets. (T.03-85,160) Ortiz said too much of the evidence pointed to TORRES. (T.03-85,180) "This scene over there does not add up to what you are saying." (T.03-85,221) TORRES was asked how the blood got on Pace's hands and feet. (T.03-85,237)

TORRES was informed that he was being arrested and booked on the charge of tampering with evidence and suspicion of murder. (T.03-85,242,250) 30-45 minutes later, TORRES apparently approached Harris and asked if he could talk to Harris again because he wanted to tell the truth. (T.03-85,279)

NMSP agents took the video camera back to the scene. (T.03-

18

85,287-95)  Later, NMSP agents returned to LLPD with the video camera. (T.03-85,290)

Harris stated the NMSP agents "out at the scene" advised of "additional evidence that they had located and that they wanted to come back and interview him further." (T.03-85,291-94)

TORRES began the second statement by changing his version of events. (T.03-85,279)  Pace and he had a big fight, Pace had cut herself, Pace had run into the master bedroom, TORRES entered the bedroom, Pace pointed the shotgun at him, they struggled over the shotgun, the shotgun got turned around, the shotgun somehow went off, and Pace was shot. (T.03-85,344- T.03-88,100)

TORRES denied any knowledge of the blue rag. (T.03-85,350)

Pace was " accident[ally]" shot. (T.03-85,362,369,466,558)

The police officer asserted Pace did not walk into the bedroom. (T.03-85,411)

TORRES then started posing the question, "Either way, I'm going to prison, right?" (T.03-85,439)

An officer asserted that they have physical evidence of strangulation, including bruises and marks. (T.03-85,451)  An officer asserted that the blue rag and tape found beyond the fence match the rag and tape on the gun. (T.03-85,528) An officer asserted that the blood drops are not foot prints but they indicate Pace was dragged. (T.03-86,94)  An officer asserted that Pace was bruised under her arms and on her neck. (T.03-86,103)

19

An officer asserted that Pace's blood vessels were blown in her eyes, consistent with strangulation. (T.03-86,108)

At one point an officer asserted, "There's some more stuff we found over there, its getting deeper...." (T.03-86,173)

Then, questions about the potato started after the investigation inside TORRES' residence by the NMSP crime scene team showed that a potato was likely put at the end of the shotgun. (T.03-86,227,307,540)  Police learned of potato in Pace's hair, on the ceiling and on duct tape. (T.03-86,320,463)

TORRES eventually agreed that he did put the blue towel on the shotgun to try to prevent Pace from using the gun. (T.03-86,397)

TORRES denied any knowledge of the potato. (T.03-86,432)

An officer told TORRES that it looked like premeditated murder. (T.03-87,524)

After TORRES was booked on the tampering with evidence charge, Harris collected TORRES' blood stained clothes and boots. (T.03-82,93-127,136-40;T.03-88,336)

Forensic pathologist Jeffrey Nine performed the autopsy on Pace on December 5. (T.03-91,362)  The cause of death was the gun shot wound to the chest. (T.03-91,411)  The manner of death was homicide. (T.03-91,415)

Some duct tape was found in the shotgun wound indicating that duct tape had to be in front, not necessarily at the tip, of

the barrel. (T.03-91,491; T.03-92,215,383,408)

White material consistent with potato was found on some duct tape and on Pace's hair, bra, chest or skin. (T.03-92,246)  Pace was alive when shot. (T.03-92,266)

Nine rejected suicide due to injuries to the backs of hands and the rest of her body. (T.03-92,308)  "I don't believe there is any way that she could have done this herself." (T.03-92,323)

The twisting metal from barrel of the gun possibly cut her thumb off. (T.03-92,432)  There was something at the end of or in the barrel, fragmented the barrel and the projectile. (T.03-92,444)

The shotgun barrel was close to her body because of burnt gun powder material around the wound. (T.03-91,501)

The back of both of her hands had wounds which indicated her hands were in front of the gun barrel when fired.  (T.03-91,520-47)

On Pace's left thigh was a wound from a knife or sharp instrument or possibly from a shard of glass. (T.03-92,7,33)

The prosecutor's opening words during closing argument were: "Pamela Pace's prophesy came true: 'The next time you see me you are going to find me dead.'  She told Officer Josh Perea of the Los Lunas Police Department.  And sure enough, the next time Josh Perea saw Pamela Pace, he saw her dead." (T.03-103,446)  More references were made by the prosecutor during closing argument to

that statement by Pace. (T.03-103,506; T.03-106,225)

## Affidavit for Search Warrant

Affiant James Harris' affidavit for search warrant was filed in the Valencia County Magistrate Court at 8:48 a.m. on December 4, 2001. The affidavit specifically requested permission to search the following:

1. ANY AREAS OF BLOOD STAINED CARPET AND OR FLOOR TILING LOCATED THROUGHOUT THE RESIDENCE.
2. THE BEDDING LOCATED IN THE FAR EAST BEDROOM OF THE RESIDENCE.
3. THE 12-GAUGE SHOTGUN, AMMUNITION, AND ANY OTHER WEAPONS POSSIBLY USED IN THE HOMICIDE.
4. A COMPLETE COMPUTER SYSTEM WITH MONITOR TO INCLUDE ANY SOFTWARE.
5. ANY BROKEN GLASS.
6. ANY BROKEN POTTERY.
7. ANY FURNITURE ITEMS THAT HAS BLOODSTAIN PRESENT.
8. A SECTION OF CEILING IN THE FAR EAST BEDROOM OF THE RESIDENCE APPROXIMATELY 8 FT. BY 8 FT.
9. ANY ITEMS DISCARDED IN TRASH RECEPTACLES.
10. ANY CUTTING INSTRUMENTS.
11. ANY POTATOES, EITHER HOLE OR PORTIONED.
12. ANY LOCKED CONTAINERS.
13. ANY OTHER ITEMS THAT CAN BE DIRECTLY OR INDIRECTLY LINKED TO THE OFFENSE LISTED.

(Affidavit at 1)

The Affidavit did not contain any assertion that MR. TORRES provided any consent for the police officers to search his residence after he left the property.

The Affidavit alleged the officers did search and evaluate evidence inside TORRES' home before acquiring the search warrant. The Affidavit at 2 alleged, "Upon further investigation of the crime scene, by officers, they learned that a domestic dispute

22

occurred between the victim and TORRES."  The Affidavit at 2 alleged the blue cloth and tape found beyond the neighbor's fence "appeared to be the same as a piece of cloth and tape that was found on the butt" of the shotgun.  The Affidavit at 2 alleged that "found near the cloth was another amount of duct tape that had been wrapped around a potato."  The Affidavit at 2 alleged, "An apparent explosion of some kind had blown the potato apart."  The Affidavit at 2 alleged inside the room where Ms. Pace laid dead "officers discovered the remains of potato on the floor and what papered (sic) to be potato in the hair of the victim."

8.  **Grounds for Petition:**  The grounds and law, or other legal authorities on which Petitioner is confined and which support the bases for his claims are as follows:

A.

Trial counsel, Mr. Joseph Campbell, failed to provide adequate and effective assistance of counsel to MR. TORRES as required by the Sixth Amendment to the United States Constitution by failing to file and litigate a motion to suppress evidence under the Fourth Amendment to the United States Constitution and consequently denied MR. TORRES his rights to prepare a defense, including denial of a fair trial under the Sixth Amendment, and to due process of law under the Fifth and Fourteenth Amendments.

This issue was not raised by trial counsel below.

TORRES called the LLPD to his residence regarding an

23

apparent suicide by Pace, showed the police the body of Pace
inside his residence, agreed to remain outside his residence, and
then was transported to the LLPD.  After TORRES departed the
scene and Pace was dead inside, no exigent circumstances existed,
no consent was provided by MR. TORRES for the night-long search
of his residence, and a warrant was not acquired until
approximately 8:30 a.m. the next day on December 4 based largely
on information learned by police during the unreasonable,
warrantless night-long search of MR. TORRES' residence.

Without any evidence of any specific, voluntary consent by
TORRES for police to enter his residence after he left the scene,
the scene was processed, photographs taken, videotape taken,
evidence markers placed, blood patterns analyzed, evidence
seized, and the murder theory established by LLPD and NMSP.

Based on these actions, and relying on information learned
during the unreasonable nighttime search of his residence, TORRES
was questioned at LLPD with the newest investigatory
determinations.  Based on the investigation, TORRES was arrested
for tampering with evidence.

B.

Trial counsel, Mr. Joseph Campbell, failed to provide
adequate and effective assistance of counsel to MR. TORRES as
required by the Sixth Amendment to the United States Constitution
by not objecting to a prior statement by the decedent based on

24

the confrontation clause of the Sixth Amendment to the United States Constitution.

This issue was not raised by trial counsel below.

Over defense counsel's objection based on hearsay, the trial court allowed Perea to testify that as Pace left TORRES' residence on October 14, 2001 she said to Perea, "The next time you guys see me you're going to find me dead." (T.03-77,472)

The trial court overruled under Rule 11-803(C), N.M.R.A. 2003.

There was no evidence presented that MR. TORRES had a prior opportunity to cross-examine Ms. Pace concerning her October 14, 2001 statement. Ms. Pace's statement became evidence at MR. TORRES' trial by means of Sgt. Perea's testimony. Ms. Pace's statement was testimonial. Due to Ms. Pace's death, Ms. Pace was unavailable to testify at trial.

C.

For any combination of the foregoing allegations, trial counsel Mr. Campbell provided inadequate and ineffective assistance of counsel under the Sixth Amendment, and denied MR. TORRES a fair trial and due process of law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and improperly contributed to MR. TORRES' convictions.

9.  **State of Law,** pursuant to Rule 5-802(B)(7):

A.

25

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." Flippo v. West Virginia, 528 U.S. 11, 13, 120 S.Ct. 7 (1999); Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412 (1978).

There is not a "murder scene exception" to warrant clause of the Fourth Amendment. Flippo v. West Virginia, 528 U.S. at 12-14.

"It seems implausible that the court found that there was a risk of intentional or accidental destruction of evidence at a 'secured' crime scene or that the authorities were performing a mere inventory search when the premises had been secured for 'investigative purposes' ...."" Flippo v. West Virginia, 528 U.S. at 14, n.2.

The Flippo Court reaffirmed Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408 (1978), where the U.S. Supreme Court rejected any "murder scene exception" or "crime scene exception to the Warrant Clause of the Fourth Amendment." Flippo v. West Virginia, 528 U.S. at 14. Both people who had been present in TORRES' residence, Pace and TORRES, had been located. Mincey v. Arizona, 437 U.S. at 393, 98 S.Ct. at 2414. "Except for the fact that the offense under investigation was a homicide, there were no exigent circumstances in this case". Mincey v. Arizona, 437 U.S. at 394, 98 S.Ct. at 2414. "Mincey controls here." Flippo v. West Virginia, 528 U.S. at 14.

26

Finally, the call by TORRES for the police due to the apparent suicide by his ex-wife in his residence did not "evidence a diminished expectation of privacy" on his part or constitute consent for police to search TORRES' residence after TORRES was removed from the premises. Thompson v. Louisiana, 469 U.S. 17, 22-23, 105 S.Ct. 409, 411-12, *reh'g denied*, (1984); Mincey v. Arizona, 437 U.S. at 391-92, 98 S.Ct. at 2412-13.

While the State claimed perfunctorily at trial that TORRES consented to the warrantless search of his residence from December 3 to December 4 before acquisition of the search warrant, there was no specific factual basis for any conclusion that TORRES specifically, clearly and unequivocally consented.

To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial courts' results unreliable. State v. Cooper, 1998-NMCA-180, ¶11, 126 N.M. 500, 972 P.2d 1.

Defendant must establish a case of ineffective assistance of counsel where a plausible, rational strategy or tactic cannot explain the conduct of defense counsel, and that, as a result, the defense was prejudiced. Patterson v. LeMaster, 2001-NMSC-013, ¶17, 130 N.M. 179, 21 P.3d 1032; State v. Cooper, 1998-NMCA-180, ¶11. These are the "the reasonableness prong and the prejudice

27

prong." <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶17.

In determining whether the failure to pursue a motion to suppress constitutes ineffective assistance of counsel, this Court must consider whether the record supports the motion on the ground asserted and whether a reasonably competent attorney could have decided the motion was unwarranted. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶19; <u>State v. Cooper</u>, 1998-NMCA-180, ¶12.

The facts of this case show that a motion to suppress should have been filed. TORRES' residence was searched for hours before the acquisition of the search warrant on December 4 and evidence developed as a result of that warrantless search. There are no apparent applicable exceptions to the warrant requirement, particularly no exigent circumstances. Law from the U.S. Supreme Court existent for the last 25 years from <u>Mincey</u> to <u>Flippo</u> clearly shows that there is no "crime scene exception" to the warrant requirement. The record supports the motion to suppress. *Contra* <u>State v. Cooper</u>, 1998-NMCA-180, ¶¶21-22.

A reasonably competent attorney could not have decided that the motion was unwarranted. "There was no strategic reason for a reasonably competent attorney who was aware of the facts of this case and the governing case law not to try to suppress" the evidence gained as a result of the warrantless search of TORRES' residence. <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶27.

TORRES was prejudiced because there was no apparent

indication that TORRES was disposed to plea the case out, the strength of the proper and admissible evidence was not great, and the motion to suppress "was crucial because it could have excluded key evidence". <u>Patterson v. LeMaster</u>, 2001-NMSC-013, ¶¶28-33. The confidence in the jury's verdict is consequently undermined. <u>Id</u>.

Because no evidentiary hearing has ever been held on the merits of TORRES' Fourth Amendment claim, and the State likely will not concede the illegality of the search and seizure issues, TORRES is entitled to a hearing at which to establish the night-long warrantless search of his home violated the Fourth Amendment and the use of the illegally gained evidence as fruit of the poisoned tree for arresting TORRES for tampering with evidence and in the State's subsequent questioning of him at the LLPD tainted TORRES' consequent statements. <u>Kimmelman v. Morrison</u>, 477 U.S. at 390-91, 106 S.Ct. at 2591; <u>Wong Sun v. United States</u>, 371 U.S. 471, 83 S.Ct. 407 (1963); <u>State v. Cassola</u>, 2001-NMCA-072, ¶13, 130 N.M. 791, 32 P.3d 800; <u>State v. Wagoner</u>, 2001-NMCA-014, ¶¶19-40, 130 N.M. 274, 24 P.3d 306.

For any and all of the foregoing reasons, MR. TORRES' trial counsel, by failing to file a motion to suppress evidence, rendered inadequate and ineffective assistance to TORRES in violation of the Fourth and Sixth Amendments and Article II, §§ 10 and 14 of the New Mexico Constitution.

B.

Under the United States Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004), the out-of-court statement by a witness that is testimonial is barred under the confrontation clause of the Sixth Amendment to the U.S. Constitution unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

The U.S. Supreme Court in Crawford reversed the defendant's murder conviction by holding a woman's hearsay trial testimony, admitted as a statement against penal interest, was inadmissible as a denial of the defendant's Sixth Amendment rights to confront and cross examine the witness. Pace's statement to Perea, admitted as a statement of her state of mind, is very analogous to the inadmissible statement to police in Crawford.

For any and all of the foregoing reasons, MR. TORRES' trial counsel, by failing to object to the admission of Ms. Pace's statement as a violation of TORRES' right to confront the witnesses under the Sixth Amendment, rendered inadequate and ineffective assistance to TORRES in violation of the Sixth Amendment and Article II, § 14 of the New Mexico Constitution.

10.  MR. TORRES does not seek appointment of counsel to represent him as undersigned counsel is retained to represent him.

11.  **Relief Requested:**

30

WHEREFORE, the Petitioner, GILBERT TORRES, JR., requests, pursuant to Rule 5-802(B)(8), that this Court grant his petition for writ of habeas corpus, reverse his convictions, vacate his sentence, and order him released from the custody of the New Mexico Department of Corrections.   MR. TORRES also requests such other and further relief as this Court deems just and proper.

Respectfully submitted,

TODD HOTCHKISS
FRECHETTE & ASSOCIATES, P.C.
Attorney for GILBERT TORRES, JR.
P.O. Box 26807
Albuquerque, New Mexico  87125
Tele. (505) 247-8558

## CERTIFICATE OF SERVICE

I, Todd Hotchkiss, hereby certify that on April 17, 2006 I placed a true and accurate copy of the foregoing petition in the U.S. Mail, first-class postage affixed thereto, for mailing to Mr. Joe Romero, Warden, Central New Mexico Correctional Facility, P.O. Drawer 1328, Los Lunas, New Mexico  87031 and to the Thirteenth Judicial District Attorney, P.O. Box 1919, Los Lunas, New Mexico  87031, the last known addresses.

TODD HOTCHKISS

31

THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO


GILBERT TORRES, JR.,

      Petitioner,

v.                                    No. D-1314-CR-2001-43

JOE ROMERO, Warden,
Central New Mexico Correctional Facility,

      Respondent.


<u>**VERIFICATION OF PETITION FOR WRIT OF HABEAS CORPUS**</u>

STATE OF NEW MEXICO     )
                         ) ss.
COUNTY OF VALENCIA     )

    I, Gilbert Torres, Jr., being duly sworn and under penalty
of perjury according to the laws of the State of New Mexico,
state that I am the Petitioner in this case, I have read the
foregoing Petition, I know and understand the statements and
contents therein, and the statements and contents of the Petition
are true and correct to the best of my information, knowledge,
and belief.

                            Signed

                            GILBERT TORRES, JR.


    SUBSCRIBED AND SWORN TO before me by  on this _3_ day of
___April_____, 2006, by Gilbert Torres, Jr..

My Commission Expires

NOTARY PUBLIC
OFFICIAL SEAL
Vince Wiggins
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: F____ 11 2010

IN THE MAGISTRATE COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO

STATE OF NEW MEXICO,

VS.

Gilbert Torres

NO. M-59-SW 02001 00017
#43844      JSD



## AFFIDAVIT FOR SEARCH WARRANT

Affiant, being duly sworn, upon his oath, states that he has reason to believe that on the following described premises: A gray in color mobile home, with white trim, which is situated at 932 Las Rosas South East, in the Village of Los Lunas, County of Valencia, State of New Mexico. Said dwelling is situated on the east side of the roadway, east of Carson Drive, and is gray in color with a pitched roof. The front door faces north and there is a six foot dog eared wooden privacy fence that surrounds the home. The above described residence and property is accessed by turning south off Main Street on to Carson Drive. Travel south on Carson Drive about one mile, and turn right on Las Claveles heading east to 932 Las Rosas. The search is to include the above described residence, surrounding curtilage, and vehicles, for the following items of evidence. *815 MDA*

1. ANY AREAS OF BLOOD STAINED CARPET AND OR FLOOR TILING LOCATED THROUGHOUT THE RESIDENCE.
2. THE BEDDING LOCATED IN THE FAR EAST BEDROOM OF THE RESIDENCE.
3. THE 12-GAUGE SHOTGUN, AMMUNITION, AND ANY OTHER WEAPONS POSSIBLY USED IN THE HOMICIDE, .
4. A COMPLETE COMPUTER SYSTEM WITH MONITOR TO INCLUDE ANY SOFTWARE.
5. ANY BROKEN GLASS
6. ANY BROKEN POTTERY
7. ANY FURNITURE ITEMS THAT HAS BLOODSTAIN PRESENT.
8. A SECTION OF CEILING IN THE FAR EAST BEDROOM OF THE RESIDENCE APPROXIMATELY 8 FT. BY 8 FT.
9. ANY ITEMS DISCARDED IN TRASH RECEPTACLES
10. ANY CUTTING INSTRUMENTS
11. ANY POTATOES, EITHER HOLE OR PORTIONED
12. ANY LOCKED CONTAINERS.
13. ANY OTHER ITEMS THAT CAN BE DIRECTLY OR INDIRECTLY LINKED TO THE OFFENSE LISTED.

The facts tending to establish the foregoing grounds for issuance of a search warrant are as follows: Affiant is a full time, salaried and certified law enforcement officer, employed by the Los Lunas Police Department, Valencia County, New Mexico. Affiant has six years of law enforcement experience and is presently assigned to criminal investigation division. Affiant has obtained and executed search warrants that have resulted in the seizure of controlled substances, stolen property and other evidence that is admissible in court, and in the arrest and criminal prosecution of the offenders. Affiant has received training, both on the job and in the classroom regarding criminal investigations including but not limited to violent crimes.

On November 3, 2001, Los Lunas police officers were dispatched to 932 Las Rosas in reference to shooting that had just occurred. Upon their arrival officers discovered the victim, Pamela Pace, had been fatally shot in the abdomen. Gilbert Torres, the victim's ex-husband, advised that Pamela shot herself with a 12-gauge shotgun that he kept inside of the home. Upon further investigation of the crime scene, by officers, they learned that a domestic dispute occurred between the victim and Torres. Witness heard what they reported as being the sounds of a scuffle and then a loud noise. Shortly after the noise, they reported seeing Torres exit the home and throw something over the fence of the home directly north of 932 Los Rosas. Officers located the item, which was a blue in color cloth that had Duct Tape wrapped around it. This cloth and Duct Tape appeared to be the same as a piece of cloth and tape that was found on the butt portion of the 12 gauge shot gun. Also found near the cloth was another amount of Duct tape that had been wrapped around a potato. An apparent explosion of some kind had blown the potato apart. Inside the room where the deceased was located, officers discovered the remains of potato on the floor and what papered to be potato in the hair of the victim. It was also noted that the barrel of the shotgun had been mushroomed out, as if there was an obstacle blocking the barrel. BASED ON THE ABOVE INFORMATION AND FACTS THE AFFIANT PRAYS THAT THE COURT ISSUES A SEARCH WARRANT AUTHORIZING THE SEARCH OF THE LOCATION AND PROPERTY DESCRIBED HEREINABOVE AND THE SEIZURE OF THE PROPERTY AND ITEMS DESCRIBED HEREINABOVE.

_James Harris_
SIGNATURE OF AFFIANT

SUBSCRIBED AND SWORN TO BEFORE
ME IN VALENCIA COUNTY OF THE STATE
OF NEW MEXICO THIS 4TH DAY December,
2001.

**DETECTIVE**
OFFICIAL TITLE ( IF ANY)

_John W. Pope_
JUDGE, NOTARY OR OTHER OFFICER AUTHORIZED
TO ADMINISTER OATHS.
CHRISTINE TORRES
MY COMMISSION EXPIRES: 1-23-98

Approved as to form:
Barbara A. Sanchez, ADA

STATE OF NEW MEXICO

IN THE MAGISTRATE COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO

VALENCIA CO. MAG CT

01 DEC 1    AM 9:49

NUMBER M-59-SW-0200100017

V.
GILBERT TORRES        (Defendant)



# SEARCH WARRANT

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS SEARCH WARRANT:

Proof by Affidavit for Search Warrant, having been submitted to me, I am satisfied there is probable cause that the person named or property described in the Affidavit is located where alleged in the Affidavit and I find grounds exist for the issuance of the Search Warrant. A copy of the Affidavit is attached and made a part of this Search Warrant.

**YOU ARE HEREBY COMMANDED** to search forthwith the person or place described in the Affidavit between the hours of 6:00 a.m. and 10:00 p.m., unless I have specifically authorized a nighttime search for the person or property described in the Affidavit, serving the warrant together with a copy of the Affidavit, making the search and if the person or property be found there, to seize the person or the property and hold for safekeeping until further order of the Court.

You are further directed to prepare a written inventory of any person or property seized and to file the return and written inventory with the Court promptly after its execution.

Dated this_____/_____day of ~~January~~, 2001

_____
MAGISTRATE COURT JUDGE

## AUTHORIZATION FOR NIGHTTIME SEARCH

I further find reasonable cause has been shown for nighttime execution of this Warrant, I authorize execution of this Search Warrant at any time of the day or night for the following reasons_____

_____
_____
_____

_____
MAGISTRATE COURT JUDGE

# RETURN AND INVENTORY

I received the attached Search Warrant on _12-04-01_, _0800_ and executed it on _12-04-01_, _____ at _1031_ o'clock (a.m.) (p.m.). I searched the person or premises described in the Warrant and I left a copy of the Warrant with _GILBERT TORRES_

(name the person searched or the owner at the place of search) together with a copy of the inventory for the items seized.

The following is an inventory of property taken pursuant to the Warrant: *(Attach separate inventory if necessary.)*

_SEE ATTACHED FORMS_

This inventory was made in the presence of _____

*(name of Applicant for the Search Warrant) and other credible person witnessing the inventory.)*

This inventory is a true and detailed account of all the property taken pursuant to the Warrant.

_____  DETECTIVE CLPD
Signature of Officer

_____
Signature of owner of property
or other witness

Return made this _7TH_ day of _DEC_____, _01_, at _1130_ (a.m.)(p.m.).

_____
(Judge)(Clerk)

After careful search I could not find at the place, or on the person described, the property described in this Warrant.

_____          _____
Date                                           Officer

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

| [X] OWNER | GILBERT TORRES | PAGE 1 OF 2 |
|---|---|---|
| [ ] OTHER | 932  LAS ROSAS | |
| | LOS LUNAS,  NEW MEXICO  87031  01-23-3-0149 | |

**LOCATION WHERE PROPERTY WAS OBTAINED**

AT SUSPECTS RESIDENCE          LIVINGROOM  AREA

**PURPOSE FOR WHICH OBTAINED**

EVIDENCE

**LOCATION WHERE PROPERTY WILL BE STORED**

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| LR 1 | 1 | CARPET WITH STAIN |
| LR 2 | 1 | CARPET WITH STAIN |
| LR 3 | 1 | CARPET WITH STAIN |
| LR 4,5, 14 | 1 | BLANKET FROM SOFA  WITH STAINS (ITEMS 4,5, 14) |
| LR 6 | 1 | SWAB OF RED STAIN FROM TV TRAY |
| LR 7A | 1 | CARPET WITH STAIN |
| LR 7B | 1 | BLUE FIBER FROM AREA NEAR 7A |
| LR 8 | 1 | PIECE OF CERAMIC VASE |
| LR 9 | 1 | CARPET WITH STAIN |
| LR 10 | 1 | CARPET WITH STAIN |
| LR 11 | 1 | CARPET WITH STAIN |
| LR 12 | 1 | FOLDING KNIFE - POSSIBLE STAIN |

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01   1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED

[X] OWNER       GILBERT TORRES
[ ] OTHER       932 LAS ROSAS
                LOS LUNAS, NEW MEXICO  87031  01-23-3-0149

ADDRESS (Include Zip Code)

*PAGE 2 OF 2*

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECTS RESIDENCE        LIVINGROOM AREA

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (include model, serial #, identifying marks, condition, and value) |
|--------|----------|-------------------------------------------------------------------------------------------|
| LR 13  | 1        | EYEGLASS FRAME                                                                             |
| LR 15  | 1        | CARPET WITH STAIN                                                                          |
| LR 16  | 1        | SWAB OF STAIN ON ARM OF SOFA                                                               |
| LR 17  | 1        | SWAB OF STAIN ON SOFA                                                                      |

*MTA*

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|-------------------|------------|-----------|
| 12-3-01    1800   | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED

[X] OWNER     GILBERT TORRES
[ ] OTHER     932  LAS ROSAS
           LOS LUNAS,  NEW MEXICO  87031  01-23-3-0149

ADDRESS (Include Zip Code)

PAGE 1 OF 2

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECTS RESIDENCE    MASTER BEDROOM

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES<br>(Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| MB 1 | 1 | PIECE OF POTATO |
| MB 2 | 1 | KNIVES FROM NIGHTSTAND<br>MB2 A KNIFE<br>MB2 B KNIFE<br>MB2 C KNIFE<br>MB2 D KNIFE<br>MB2 E KNIFE<br>MB2 F SHEATH |
| MB 3 | 1 | PIECE OF SHRAPNEL / MUZZLE |
| MB 6 | 1 | WOODEN BACK SCRATCHER |
| MB 7 | 1 | BEDDING<br>MB7A  COMFORTER<br>MB7B  COMFORTER<br>MB7C  BLANKET<br>MB7D  BLANKET<br>MB7D  BLANKET<br>MB7E  TOP SHEET<br>MB7F   BOTTOM SHEET<br>MB7G  PILLOW CASE<br>MB7H  PILLOW CASE<br>MB7 I  PILLOW CASE<br>MB7 J  PILLOW CASE<br>MB7 K  PILLOW CASE<br>MB7 L  PILLOW CASE |
| MB 9 | 1 | PIECE (S) OF DUCT TAPE - INTERWOVEN |
| MB 10 | 1 | BLUE JEANS |

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01      1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

| | | |
|---|---|---|
| [X] | OWNER | GILBERT TORRES |
| [ ] | OTHER | 932 LAS ROSAS |
| | | LOS LUNAS, NEW MEXICO  87031  01-23-3-0149 |

ADDRESS (Include Zip Code)

PAGE 2 OF 2

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECTS RESIDENCE   MASTER BEDROOM

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| MB 11 | 1 | SHIRT |
| MB 13 | 1 | THROW RUG  5' X 8' |
| MB 14 | 1 | COLLECTED SPATTER (POTATO) FROM CEILING |
| MB 15 | 1 | SHRAPNEL / MUZZLE  FROM  WEST WALL |
| MB 17 | 1 | SPATTER FROM CLOSET DOOR (POTATO) |
| MB 19 | 1 | BUTTER KNIFE |
| MB 20 | 1 | WADDING |

*MTA*

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01      1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE
## CRIMINAL INVESTIGATIONS SECTION
## RECEIPT FOR PROPERTY OR EVIDENCE

*CASE / EVIDENCE NUMBER: 01-23-3-0149*

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:
Owner:[] Other: [X]                                    ADDRESS (Include ZIP code):

LOCATION WHERE PROPERTY WAS OBTAINED: Los Lunas Police Department, Los Lunas, NM

LOCATION WHERE PROPERTY WILL BE STORED:
Los Lunas Police Department

| ITEM # | QUAN-TITY | DETAILED DESCRIPTION OF ARTICLES (INCLUDE MODEL, SERIAL #, IDENTIFYING MARKS, CONDITION, VALUE) |
|---|---|---|
| CD101 | 1 | Sony, 8cm compact disc with photographs of a crime scene at 932 Los Rosas Dr., Los Lunas, NM taken on December 3, 2001 by NMSP Agent Thomas Shayne Arthur. |
| CD102 | 1 | Sony, 8cm compact disc with photographs of a crime scene at 932 Los Rosas Dr., Los Lunas, NM taken on December 4, 2001 by NMSP Agent Thomas Shayne Arthur. |
| CD103 | 1 | Sony, 8cm compact disc with photographs of a crime scene at 932 Los Rosas Dr., Los Lunas, NM taken on December 4, 2001 by NMSP Agent Thomas Shayne Arthur. |
| CD104 | 1 | Memorex, 8cm compact disc with photographs of a crime scene at 932 Los Rosas Dr., Los Lunas, NM taken on December 4, 2001 by NMSP Agent Thomas Shayne Arthur. |
| VT101 | 1 | Maxell videotape of an interview with Gilbert Torres recorded on December 4, 2001 at the Los Lunas Police Department. |
| VT102 | 1 | Maxell videotape of an interview with Gilbert Torres recorded on December 4, 2001 at the Los Lunas Police Department. ***END*** |

| DATE AND TIME RECEIVED: | TYPED NAME: | SIGNATURE: |
|---|---|---|
| December 4, 2001 @ 7:00 p.m. | Thomas Shayne Arthur | |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

☒ OWNER     GILBERT TORRES
☐ OTHER     932 LAS ROSAS
              LOS LUNAS, NEW MEXICO 87031   01-23-3-0149

PAGE 1 OF 1

**LOCATION WHERE PROPERTY WAS OBTAINED**

AT SUSPECT'S RERSIDENCE          REAR PORCH AREA

**PURPOSE FOR WHICH OBTAINED**

EVIDENCEA

**LOCATION WHERE PROPERTY WILL BE STORED**

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| EX | 1 | SWABS FROM REAR PORCH LABLED AS "EXT - " <br><br> EXT 1 <br> EXT 2 <br> EXT 3 <br> EXT 4 <br> EXT 5 |
| TK | 1 | BLOOD TEST KIT USED ON STAIN "LR 8"   TEST POSITIVE |

*MTA*

| I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED |||
|---|---|---|
| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
| 12-3-01    1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

[X] OWNER     GILBERT TORRES
[ ] OTHER     932 LAS ROSAS
          LOS LUNAS, NEW MEXICO  87031   01-23-3-0149

PAGE 1 OF 1

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECT'S RERSIDENCE        KITCHEN AREA

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| K | 1 | BLOOD SWABS FROM KITCHEN AREA |
| | | K 1 |
| | | K 2 |
| | | K 3 |
| | | K 4 |
| | | K 5 |
| | | K 6 |
| | | K 7 |
| | | K 8 |
| | | K 9 |
| | | K 10  (LINOLEUM w/ BLOOD PRINT) *MTA* |
| | | K 11 |
| | | K 12 |
| | | K 13 |
| | | K 14 |
| | | K 15 |
| | | K 16 |
| | | K 17 |
| | | K 18 |
| | | K 19 |
| | | K 20 |
| | | K 21 |
| | | K 22 |
| | | K 23  (Broken Arm of Chair with  Hair) |
| | | K 25 |

*MTA*

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01   1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

[X] OWNER  GILBERT TORRES
[ ] OTHER  932  LAS ROSAS
LOS LUNAS. NEW MEXICO  87031   01-23-3-0149

PAGE 1 OF 1

LOCATION WHERE PROPERTY WAS OBTAINED

\922  LAS ROSAS  (NIEGHBOR'S BACK YARD)

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| A | 1 | BLUE TOWEL / RAG WITH DUCT TAPE |
| B | 1 | PIECES OF DUCT TAPE WOVEN TOGETHER |

*MTA*

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01   1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|

[X] OWNER   GILBERT TORRES
[ ] OTHER   932 LAS ROSAS
            LOS LUNAS, NEW MEXICO  87031  01-23-3-0149

ADDRESS (Include Zip Code)

PAGE 1 of 1

**LOCATION WHERE PROPERTY WAS OBTAINED**

AT SUSPECTS RESIDENCE   MASTER BEDROOM   "BLOODSTAIN SWABS"

**PURPOSE FOR WHICH OBTAINED**

EVIDENCE

**LOCATION WHERE PROPERTY WILL BE STORED**

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| MB BS 1-22 | 1 | BLOODSTAIN SWABS:  AS FOLLOWS |
| | | MBBS 1 |
| | | MBBS 2 |
| | | MBBS 3        ITEMS NOT COLLECTED AS "SWABS" |
| | | MBBS 4        THEY ARE THE STAIN ON ITEM |
| | | MBBS 5        "MB7A → MB7L" |
| | | MBBS 6                    MTA |
| | | MBBS 7                    12/5/04 |
| | | MBBS 8 |
| | | MBBS 9 |
| | | MBBS 10 |
| | | MBBS 11 |
| | | MBBS 12 |
| | | MBBS 13   CIELING |
| | | MBBS 14   CEILING |
| | | MBBS 15   CEILING |
| | | MBBS 16   WEST WALL |
| | | MBBS 17   WEST WALL |
| | | MBBS 18   WEST WALL |
| | | MBBS 19 |
| | | MBBS 20 |
| | | MBBS 21 |
| | | MBBS 22 |

MTA

**I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED**

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01   1800 | MICHAEL T. APPLEGATE | Michael T. Applegate |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

| NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED | ADDRESS (Include Zip Code) |
|---|---|
| [X] OWNER     GILBERT TORRES<br>[ ] OTHER     932 LAS ROSAS<br>         LOS LUNAS, NEW MEXICO 87031 01-23-3-0149 | PAGE 1 OF 1 |

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECTS RESIDENCE ·     FRONT BEDROOM

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES<br>(Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| FB 2 | 1 | BROWN LEATHER DOG LEASH |
| FB 3 | 1 | ROLL OF GREY DUCT TAPE WITH BLUE FIBER |
| | | *MTA* |

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01   1800 | MICHAEL T. APPLEGATE | *Michael T. Applegate* |

# NEW MEXICO STATE POLICE RECEIPT FOR PROPERTY OR EVIDENCE

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED

[X] OWNER GILBERT TORRES

[ ] OTHER 932 LAS ROSAS
LOS LUNAS, NEW MEXICO 87031 01-23-3-0149

ADDRESS (Include Zip Code)

PAGE 1 OF 1

LOCATION WHERE PROPERTY WAS OBTAINED

AT SUSPECTS RESIDENCE        FRONT HALLWAY

PURPOSE FOR WHICH OBTAINED

EVIDENCE

LOCATION WHERE PROPERTY WILL BE STORED

LOS LUNAS POLICE DEPARTMENT

| ITEM # | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial #, identifying marks, condition, and value) |
|---|---|---|
| FH 1 | 1 | BROKEN VASE (CERAMIC) |
| FH 2 | 1 | CARPET WITH STAIN |

I CERTIFY THAT I HAVE RECEIVED AND HOLD MYSELF RESPONSIBLE FOR THE ARTICLES LISTED

| DATE & TIME REC'D | TYPED NAME | SIGNATURE |
|---|---|---|
| 12-3-01    1800 | MICHAEL T. APPLEGATE | Michael T. Applegate |

ENDORSED

THIRTEENTH JUDICIAL DISTRICT COURT
COUNTY OF VALENCIA
STATE OF NEW MEXICO

FILED IN MY OFFICE
DISTRICT COURT CLERK

03 JUN 20 PM 2:47

STATE OF NEW MEXICO,
     Plaintiff,

vs.

Gilbert Torres

     Defendant.

No.  D1314 CR 01 583————DEPUTY
DA#  VL 01 1631

JAMIE GOLDBERG

## JUDGMENT, SENTENCE AND COMMITMENT

On the 19th day of May, 2003, this case came before the Honorable John W. Pope, District Court Judge, for sentencing, the State appearing by John J. Bogren, Senior Trial Prosecutor, the Defendant appearing personally and by his attorney, Joseph Campbell, and the Defendant having been found guilty convicted on the 14th day of February, 2003 by a jury, accepted and recorded by the Court, of the offense(s) of: **Murder in the Second Degree and Tampering with Evidence**, contrary to NMSA 1978, Sections 30-2-1(B) and 30-22-5, a second and fourth degree felony offenses occurring on or about the 3rd day of December, 2001.

The Defendant is hereby found and adjudged guilty and convicted of said crime(s).

IT IS THE JUDGMENT AND SENTENCE of the Court that the Defendant, Gilbert Torres, be committed to the custody of the Department of Corrections as follows:

1.    For the charge of **Murder in the Second Degree** the defendant shall serve fifteen (15) years;

2.    For the charge of **Tampering with Evidence** the defendant shall serve eighteen (18) months;

3.     That the above sentences shall run consecutive to each other for a period of incarceration of 16 1/2 years;

4.     The defendant is to receive <u>97</u> days of pre-sentence confinement to date of sentencing;

5.     Upon release, the defendant is to be placed on parole for a period of two (2) years.

6.     That the Defendant shall provide a sample of biological material sufficient for DNA testing and shall pay a fee of $100.00 for the combined DNA Index System (CODIS) to the Field Services Division of the New Mexico Corrections Department, pursuant to the DNA Identification Act, Section 29-16-1, et.seq., NMSA 1978.

THEREFORE, You Cornell Corrections are hereby commanded to take the above-named Defendant into custody and confine him for the above term.

JOHN W. POPE, DIV 1
ENDORSED
John W. Pope
DISTRICT JUDGE

APPROVED AS TO FORM:

John J. Bogren
SENIOR TRIAL PROSECUTOR

*telephonic approval*

Joseph Campbell
COUNSEL FOR THE DEFENDANT